**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
                              )
3M COMPANY,                   )
                              )
              Plaintiff,      ) Case No: 4:20cv225
                              )
         v.                   ) Tallahassee, Florida
                              ) May 7th, 2020
1 IGNITE CAPITAL, LLC,  ET AL,)
                              ) 4:00 PM
                              )
              Defendants.     )
_____)
```

**TRANSCRIPT OF TELEPHONIC MOTION HEARING**
**BEFORE THE HONORABLE ALLEN WINSOR**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 33)**

<u>APPEARANCES</u>:

```
For the Plaintiff:      McDermott Will & Emery, LLP
                        By:  JOSEPH MATTHEW WASSERKRUG
                             MICHAEL GARRETT AUSTIN
                             Attorneys at Law
                             jwasserkrug@mwe.com
                             maustin@mwe.com
                        Wells Fargo Center, 45th Floor
                        333 Avenue of the Americas
                        Miami, Florida 33131


For the Defendant:      Auta Lopes, Pro se Defendant
```

***LISA C. SNYDER, RPR***
**Official United States Court Reporter**
**111 North Adams Street, Tallahassee, Florida 32301**
**850.597-4715 * lisasnydercr@gmail.com**

EXHIBIT A

# P R O C E E D I N G S

(Call to Order of the Court at 4:05 PM on Thursday, May 07, 2020.)

THE COURT:  Good afternoon.  This is Judge Allen Winsor.

We are here on 3M Company versus 1 Ignite Capital, LLC and others, case number 4:20cv225.

Tell me -- whoever is going to be speaking for the plaintiffs, if you will introduce yourself and let me know who else is on the line for of plaintiff.

MR. WASSERKRUG:  Good afternoon, Your Honor.  This is Joseph Wasserkrug with McDermott Will & Emery.

Also from McDermott Will & Emery on the line today are Michael Austin and Michael Weaver.

And William Childs from 3M Company is also on the line.

THE COURT:  Good afternoon to all of you.

As my order indicated, there are two things I want to do.  I want to separate the TRO from the motion for preliminary injunctive relief.

As to the latter, we will talk about procedures for how to get that resolved.

On the TRO piece, I wanted to address that because it was filed as a TRO.

The first question, Mr. Wasserkrug, what has happened

1   regarding notice with the defendant, if anything?

2         MR. WASSERKRUG:  Yes, Your Honor.

3         We have -- so today in response to Your Honor's order

4   we immediately sent an email to the defendant at the email

5   address that we have for her, and that attached all of the

6   documents that have been filed today or that have been filed;

7   the Complaint, the motion for the temporary restraining order,

8   the declarations in support of the motion for temporary

9   restraining order, the order setting today's hearing, and the

10   notice of the telephonic hearing with the call in information.

11         I do want to advise Your Honor that I believe Ms.

12   Lopez, or Ms. Lopes is attempting to call in.  I'm not sure if

13   she has succeeded on that.

14         She sent a follow-up email after we were underway here

15   on the call asking for the information again, and we did go

16   ahead and send it.  But we do have confirmation, based on a read

17   receipt, that she opened up our initial email at 12:30 this

18   afternoon, which had all of that dial in information.

19         THE COURT:  Okay.

20         So before you sent that email today, had there been

21   any notice provided at all?  I know the summons was issued.  I

22   don't know what the status of the service is.

23         MR. WASSERKRUG:  We have engaged a process server, but

24   service has not been perfected as of right now.  We expect it

25   should be perfected within the next 24, 48 hours.

1          THE COURT:  Okay.  That's formal, official service of

2     process.  Have there been any -- in other words, has Ms. Lopes,

3     or the other entities, as far as you know did they have any

4     notice of this before this afternoon?

5          MR. WASSERKRUG:  No, Your Honor.

6          THE COURT:  Okay.  And why is that?  This isn't one of

7     these situations where they shouldn't know about it, because of

8     some action you might take in the interim, or is it?  Your

9     motion didn't indicate anything like that.

10          MR. WASSERKRUG:  Well, Your Honor, we only had --

11          THE COURT:  I'm sorry.  The speakerphone some times

12     makes it hard.

13          You know, an ex parte TRO is disfavored and for good

14     reason, and I'm just asking whether there was any reason why

15     notice -- I mean, this isn't a brand new case.  It was filed a

16     week ago.  We got the TRO last night.  Why would you not want

17     them to have as prompt a notice as possible?

18          MR. WASSERKRUG:  Well, Your Honor, we have -- again,

19     we have been -- immediately after filing the complaint, we went

20     through the process of engaging a process server, and we have

21     been attempting -- the process server is engaged, and is

22     attempting service of the complaint.  And then we were -- you

23     know, our plan was, which is exactly what happened, is when we

24     filed the TRO was to provide notice of that immediately.

25          Of course, we did not expect to be called into court

1    less than 24 hours after our filing, but we did intend to

2    provide notice so that the defendants did have an opportunity to

3    be heard.

4           THE COURT:  Okay.  Well, I mean, the reason you're

5    here on such quick notice is because contained in the motion was

6    an indication that this couldn't wait for even a preliminary

7    injunction.

8           When a TRO hits my desk I'm going to tend to it as

9    quickly as possible.

10          If you are telling me this can wait a week, or so, we

11   can stop the hearing right now and let Ms. Lopes get served and

12   come back in a week.  I have no problem doing that at all.  And

13   I certainly didn't mean to put any one on your team in a bind by

14   having a prompt hearing.

15          MR. WASSERKRUG:  No.  Not at all, Your Honor.  And we

16   appreciate your prompt attention to this matter.

17          The urgency here is -- and this gets into a little bit

18   of the merits of our motion, but the urgency here is these

19   defendants are attempting to sell masks that may not exist

20   during a global pandemic, and they are trying to basically

21   defraud the State of Florida out of $56 and a half million.

22          It's of paramount importance to 3M that this conduct

23   be enjoined immediately so that this conduct does not continue

24   and that there is a temporary restraining order in place, at

25   least until a preliminary injunction hearing can be held, so

that these efforts do not continue, and that the State of
Florida does have to continue dealing with -- either the State
of Florida or any other consumer of personal protective
equipment does that have to vet and deal with these fraudulent
and deceptive trade practices in realtime as we are fighting
this pandemic.

THE COURT: Okay. Just one moment, Mr. Wasserkrug. I
heard -- did someone from the defense just join -- did someone
from the defendants just join.

This is Judge Allen Winsor speaking.

MS. LOPES: This is Auta Lopes, 1 Ignite Capital, IFS.

THE COURT: I'm sorry. Would you say your name again,
please?

MS. LOPES: Auta, A-u-t-a, Lopes, L-o-p-e-s.

THE COURT: Do you have a lawyer, Ms. Lopes?

MS. LOPES: No, I do not.

THE COURT: Okay. This is a hearing on a motion for
temporary restraining order that's been filed against you and
two others. The voice you heard when you joined was Mr.
Wasserkrug. He represents 3M.

So I am hearing from him right now. I will hear from
you in a moment.

Do you expect anyone else on your behalf to be
joining? I guess not. You said you don't have lawyer, and the
other two defendants are entities.

1　　　　　MS. LOPES:  Yeah.  No; I don't have anybody else

2　joining me.

3　　　　　THE COURT:  Okay.  But you have received the

4　documents?

5　　　　　MS. LOPES:  I received an email today around 12 --

6　12:20, 12:21.  And I have the email.  I had to ask for a call in

7　number, so I just got the number.

8　　　　　THE COURT:  Okay.  Back to you, Mr. Wasserkrug,

9　getting back to what I said earlier, is it urgent?  Do you want

10　to proceed today, or do you want to come back in a few days?

11　You tell me.  I am prepared to go forward with the TRO hearing

12　right now.

13　　　　　MR. WASSERKRUG:  Yes, Your Honor.

14　　　　　We would like to go forward on the motion for the TRO.

15　We do think it is urgent to enjoin the conduct here.

16　　　　　This is just one instance that we are aware of at this

17　time.  And we need to be sure -- 3M needs to be sure that its

18　goodwill and its reputation are protected, because of these

19　fraudulent activities that are happening where parties, like the

20　defendants, are trying to sell purported 3M products at

21　exorbitant prices to officials in government, and to other

22　consumers, who again are fighting this global pandemic.  And

23　this equipment is of paramount importance to fighting that

24　pandemic, and the resources are scarce that it can be used for.

25　　　　　So these resources are being diverted to entities who

are not authorized to distribute products on behalf of 3M, or who you are either selling counterfeit or nonexistent merchandise, which significantly decreases the effectiveness of the fight against this pandemic.

THE COURT: I understand that. And I understand the importance of the equipment getting in the right hands in the pandemic. I understand the global concerns of fraud and counterfeit things. But, what I want to do is focus on the claims that you brought in this case, which are claims based on your trademark and Florida's Deceptive and Unfair Trade Practices Act.

You said something a minute ago that I wanted to -- it was a good segue to what was going to be one of my first questions. You said you don't know what else is going on in this particular instance. And I know, as your papers indicate, 3M has filed a number of cases against different defendants that are similar to this case.

In this case, in terms of evidence, you have this one email and nothing else, is that correct, as to what this defendant did? I have seen everything you filed. I have seen the affidavits and the registration information and website and things like that. But as to the conduct of this, or these defendants, it's the one email; correct?

MR. WASSERKRUG: Correct, Your Honor.

THE COURT: So, when you are talking about counterfeit

1  masks, and things like that. There is just no evidence having

2  anything to do with that in this case; correct?

3           MR. WASSERKRUG: Correct, your Honor.

4           And if I can explain a little bit, the reason that I

5  say -- mention potential counterfeit or nonexistent products is

6  because 3M, as the manufacturer of these products, cannot verify

7  the authenticity and effectiveness for products for which it

8  can't account for.

9           3M at this point, because these are not authorized

10  dealers -- they don't have any affiliation or connection or

11  association whatsoever with 3M -- 3M cannot back up the

12  genuineness or authenticity of these products that are

13  purportedly for sale to the Florida Department of Emergency

14  Management.

15           THE COURT: Right. But that would be equally true if

16  it was somebody who wasn't indicating they were at all

17  affiliated with 3M and just selling 3M masks.

18           I mean, there is nothing -- correct me if I am wrong.

19  There is a lot I don't know in this area -- but if someone has a

20  stash of 3M masks, there is nothing to preclude them from

21  selling those; right? Your claim is they are misrepresenting

22  their relationship with 3M to help the sale. But if I had a big

23  pile of masks I could call up the State and offer to sell them,

24  subject to price gouging laws; is that correct?

25           MR. WASSERKRUG: I believe you are correct. And I

1  believe what you are referring to would be in the First Sale

2  Doctrine, which would be permissible.  But, here defendants'

3  conduct goes well past that.

4          THE COURT:  I understand that.  But, that's not --

5  that's not -- okay.

6          So walk me through what happened in this case, because

7  another concern I have is obviously for injunctive, or any

8  injunctive relief, you would have to show future harm.  And here

9  we have the one email that, I guess to the extent it was

10  fraudulent, was recognized that way.  And according to your

11  papers, Ms. or Mr. Davis, at DEM, let your client know about

12  this, and so nothing came of this; correct?

13          MR. WASSERKRUG:  To our knowledge, that's correct.

14          THE COURT:  How did that -- what came back to 3M?

15          In other words, was it saying, This looks like fraud.

16  You might want to look into it?  Or was it, Is this legitimate?

17  Or what was the response?

18          MR. WASSERKRUG:  Correct, Your Honor.

19          The Florida Department of Emergency Management reached

20  out -- attempted to verify whether this sale was legitimate and

21  contacted 3M, and 3M flagged it for the department.

22          THE COURT:  Okay.  Do you know who R. McClendon is on

23  the cc line of the email?  It's a gmail.com address.

24          MR. WASSERKRUG:  No, Your Honor.

25          MS. LOPES:  Can I answer that, Your Honor?

1          THE COURT:  I will come to you in a moment, Ms. Lopes.

2   I will give you an opportunity in a moment.

3          MS. LOPES:  Oh, okay.  Sorry.

4          THE COURT:  Okay.

5          There is no evidence of who even sent this; right?  I

6   mean, we are presuming it was sent by the person that it

7   purports to be sent from, but -- anyway, literally all of the

8   evidence that you have related to this is this one email that

9   was forwarded to you from the DEM?

10          MR. WASSERKRUG:  Yes, Your Honor.

11          Just as far as the email address that you referenced,

12  this is the Auta@InstitutionalFinancialService.com is the same

13  email that we used to contact the defendants today.

14          THE COURT:  Okay.

15          MR. WASSERKRUG:  So we do know that now, especially as

16  Ms. Lopes has joined the call, that she has received this email

17  and that is her email address.

18          THE COURT:  Okay.

19          Walk me through the individual claims, the FDUTPA

20  claim.  Let me tell you my concerns with that one.

21          I am not sure how, at least as to the price gouging

22  component of that, how 3M would be able to present a price

23  gouging claim on behalf of someone else.

24          I know your FDUTPA claim was broader than that, but

25  maybe you can walk me through how your FDUTPA claim would come

1  out.

2          MR. WASSERKRUG:  Sure.

3          To start with the price gouging aspect of it, we did

4  not bring a claim for price gouging, specifically; however, it

5  does go to the first element of a claim for FDUTPA which is, as

6  you know, a deceptive act or unfair practice.

7          So this unfair practice of charging 460 percent of the

8  suggested list price, which in this case 3M's suggested list

9  price for these particular model number of N95 respirator masks

10  is anywhere from $1.02 to $1.31.

11          Here the defendants' offer to the Department of

12  Emergency Management was for $5.65, which in 3M's view

13  constitutes price gouging under the applicable Florida Statute,

14  especially during a state of emergency, which, as I am sure you

15  are aware, was declared by Governor DeSantis in March.

16          So the deceptive practices in addition to price

17  gouging, we also have defendants' conduct, which even though it

18  is only one email, it lays out a false association with 3M as a

19  distributor, acting as an escrow agent, and it falsely lays out

20  a procurement process that is not 3M's process.

21          So all of these taken as a whole, each of the false

22  representations in the email is itself a deceptive or unfair

23  trade practice fulfilling the first element, that's again in

24  addition to price gouging.

25          So every instance where the defendants' email

1    indicates, or implies this association with 3M, or a legitimate

2    association with 3M, is a false representation.  And that

3    representation was being used to lure the Department into

4    spending $56.5 million on these 10 -- purported 10,000 N95

5    masks, or 10 million.  I apologize.

6            So that is the first element of the FDUTPA claim.

7            As to the second element that 3M was aggrieved by this

8    because, again, this diminishes 3M's goodwill that it has been

9    establishing over more than 100 years, since its inception, and

10   any association that -- any purported association with 3M

11   participating in this type of price gouging activity severely

12   diminishes 3M's reputation in the general public, and especially

13   to consumers who are desperately trying to procure these masks

14   to fight against the pandemic.

15           THE COURT:  Okay.  Everything you're saying there

16   would depend on an assumption that things like this are

17   happening other than this one email; right?

18           In this particular instance, there was no harm to the

19   value of the goodwill because someone at DEM recognized it as

20   fraud and said, Hey, we're not doing anything with this, and

21   nothing came of it; right?

22           As a matter of Florida law -- I know you're seeking

23   injunctive relief here, but you would have to show damages to

24   succeed on a FDUTPA claim; don't you?

25           MR. WASSERKRUG:  If we were seeking damages under

1 FDUTPA, yes.  But we are only seeking an injunctive relief under

2 FDUTPA in this case.

3         THE COURT:  Okay.

4         On the trademark claims, your first one, the unfair

5 competition false endorsement, there is a requirement, as I

6 understand it, that there is -- that the use leads to consumer

7 confusion; is that right?

8         MR. WASSERKRUG:  Yes, Your Honor.

9         THE COURT:  And --

10         MR. WASSERKRUG:  I'm sorry.

11         The element four; the unfair competition, false

12 endorsement, false association, false designation claim, the

13 elements are that we have an enforceable trademark right, and

14 that there was an unauthorized use.  So those are the two

15 elements there.  The dilution falls under the trademark dilution

16 claim, which is listed -- I don't want to mix up --

17         THE COURT:  That's under a different subdivision;

18 correct?  I thought I saw something, maybe I'm wrong, that the

19 Eleventh Circuit would say for any 1125(a)(1)(A) claim you had

20 to have consumer confusion.

21         Is that not correct?  Maybe it's not.

22         MR. WASSERKRUG:  Your Honor, I believe that the

23 consumer confusion element is under Section 1125(c).

24         THE COURT:  Okay.

25         MR. WASSERKRUG:  Sorry, Your Honor.

1          If I could have just one second.

2          THE COURT:  Certainly.

3          I am looking at a case, and again it's short research,

4   but an Eleventh Circuit case says that a viable cause of action

5   for false endorsement under 43(a), which is what you are

6   proceeding under, "only if consumers were likely to believe from

7   Dean's marketing that he sponsored or approved the" -- whatever

8   was happening in this case.

9          MR. WASSERKRUG:  Right, Your Honor.  So we address

10  that --

11         THE COURT:  It's **Webster** versus -- go ahead.

12         MR. WASSERKRUG:  I was going to say, Your Honor, we

13  address that prong under the false advertising claim under

14  1125(a)(1)(B).

15         And on page 18 of our motion for temporary restraining

16  order we have -- is where the argument for the capacity for

17  deception can be found.

18         THE COURT:  But it's not capacity for deception.  It's

19  actual deception for the (a)(1)(A); isn't it?

20         Just for the record the case I was referencing a

21  moment ago, it's a recent case called **Webster versus Dean**

22  **Guitars, 955 Fed3d 1270,** which is an Eleventh Circuit decision

23  from this year.

24         I am looking at you said page 17 of your paper?

25         MR. WASSERKRUG:  Page 18, Your Honor.

1    THE COURT:  That's under your false advertising claim.

2    MR. WASSERKRUG:  Correct.

3    THE COURT:  Right.  So, as to unfair competition

4 claim, the (a)(1)(A) claim -- the question is for the (a)(1)(A)

5 claim, do you have to show actual consumer confusion?  I think

6 the answer is yes.  And then the question is have you, and how

7 could you if it's an email to a state agency that recognized it

8 as improper and didn't act on it.

9    MR. WASSERKRUG:  Your Honor, I would argue that that

10 actually demonstrates the actual confusion there.  The actual

11 confusion was here is a representation from this -- from these

12 individuals and entities that are their legitimately affiliated

13 with 3M, which caused the reaction of, let me reach out to 3M.

14 There was confusion here, as far as the need for the

15 verification.

16    THE COURT:  Maybe I misunderstood what the evidence

17 was with respect to what came back to you all.  That email is

18 not in this record.  But I thought you said they recognized it

19 as not plausible, and that's why they told you about it.  You

20 are saying they were asking because they were confused?

21    MR. WASSERKRUG:  Correct.  They inquired about the

22 legitimacy with 3M.

23    THE COURT:  Okay.

24    MR. WASSERKRUG:  Perhaps we can supplement the record

25 with those emails as well.

1          THE COURT:  Okay.  I understand the argument.

2          Then the next one is trademark dilution, and I guess I

3     have some similar concerns there.

4          I mean, the dilution claim is when someone is using a

5     different mark that's cutting into yours, or doing something

6     that would make your mark less valuable by using it, or misusing

7     it.

8          Is that more or less what a trademark dilution claim

9     is?

10         MR. WASSERKRUG:  In a sense, yes, Your Honor, but here

11    the dilution is by use of the wrongful and false claim of

12    affiliation.  It dilutes the value of the 3M brand, and thereby

13    the marks, by even having any mere association with such bad

14    actors who would charge upwards of 450 percent of reasonable

15    price for these products.  And creating that association between

16    price gouging and 3M, as the email does, causes the dilution of

17    3M's marks, and of its goodwill and business reputation.

18         THE COURT:  Okay.  And then the last claim is false

19    advertising.  And I guess the question there is kind of the same

20    theme that I have asked about on the others, but tell me what

21    you want to tell me about the false advertising.

22         MR. WASSERKRUG:  Sure, Your Honor.

23         As we have already established, the email is false.

24    3M does not have affiliation or association with any of the

25    defendants.  The defendants are not escrow agents.  The Khalid

character, who is referenced in the email, is not a direct

distributor for 3M.  So there are numerous false statements,

meeting the first element, in the email.

The advertisements certainly deceived, as we discussed

before.  The Department had to reach out to 3M for verification.

So, certainly, if there was not actual deception, there was at

least the capacity for detention, and definitely the intent for

deception through the email to deceive the Department into

purchasing, or spending $56 and a half million for these

purported masks.

The intent, again, of using the 3M brand name, and the

3M marks in the email was to boost the reputation of the

defendants, to try to create that perception of affiliation with

3M's reputable brand for the purpose of procuring this contract

with the Department certainly affects interstate commerce.

Whereas here they used the instrumentalities to send an email

across state lines.  So we have the means and instrumentalities

test here.

And then also the plaintiffs, again, the injury to the

plaintiffs here is the goodwill and reputation of the 3M brand,

the 3M marks that has been built up over a hundred years now.

THE COURT:  Okay.  What is the – does there have to be

a material effect on purchasing decisions for that claim to

succeed?

MR. WASSERKRUG:  Yes, Your Honor.  That is one of the

1    elements.

2           THE COURT:  How would you go about satisfying that in

3    this case?

4           MR. WASSERKRUG:  Well, as I mentioned, Your Honor,

5    this is the -- the 3M masks here, the 3M N95 respirator masks,

6    are incredibly in demand right now because they are of paramount

7    importance to protecting our healthcare workers on the front

8    lines of the COVID-19 pandemic.  So the use of 3M's mark is

9    intended to influence, in this instance, the Department of

10   Emergency Management into purchasing 10 million of these masks

11   for the benefit not of the public, but for the benefit of the

12   defendants so they can line their pockets with these price

13   gouging profits.

14          THE COURT:  Does it have to be a material effect on

15   purchasing decisions, or the possibility for an effect on

16   purchasing decisions?  In other words, forget we are in a TRO

17   phase here.  If you are suing somebody for false advertising,

18   don't you have to prove that there actually was a purchasing

19   decision that was swayed, or changed by the advertising?

20          MR. WASSERKRUG:  Your Honor, I don't believe the

21   element of the claim is that there was an actual purchase.  It's

22   just that it had an affect on the purchasing decision.  So here

23   certainly with the Department at least -- the Department of

24   Emergency Management didn't just write this off wholesale.  They

25   were interested to the extent of inquiring whether they should

1  go forward with this, and did so by contacting 3M.

2  So there was -- the effect was achieved in that they

3  said there was an affiliation association with 3M, and the

4  Department decided to look into it further.  So, it had a

5  material affect in the subsequent actions that the Department

6  took.

7  THE COURT:  Okay.  I mean, there is no evidence of any

8  of that, but I understand the argument.

9  Okay.  Do you have anything further before I hear from

10  Ms. Lopes?

11  MR. WASSERKRUG:  May I just have one minute, Your

12  Honor?

13  THE COURT:  Certainly.

14  MR. WASSERKRUG:  Unless Your Honor has any further

15  questions on the remaining elements for granting the temporary

16  restraining order, then I believe I will conclude by saying that

17  again this is reprehensible behavior that is seeking to take

18  advantage of a global pandemic for the sole purpose of obtaining

19  profits, and would have a devastating effect of the ability of

20  the State of Florida to have resources available to legitimately

21  combat the COVID-19 pandemic.

22  For those reasons as we have discussed we believe that

23  a temporary restraining order is necessary to preserve the

24  status quo in this case.

25  Thank you.

1          THE COURT:  Thank you.

2          And I will come back to you and give you a final word.

3          Ms. Lopes, now is your opportunity to respond to

4   anything you just heard, or say anything else you'd like.  Go

5   ahead.

6          MS. LOPES:  Thank you, sir.  I appreciate it.

7          I'm sorry.  I am very nervous.  I don't know what any

8   of these terminologies mean, but what I did, when I called the

9   state emergency, FEMA, it was an email that was sent to me by a

10  gentleman named Terrance Pullen, and he told me that the State

11  of Florida had an interest in purchasing masks and he sent me

12  the email.

13         With that said, first and foremost let me explain to

14  you I am a small business woman-owned company out of Atlanta,

15  Georgia.  I don't do business in Florida.  I don't live in

16  Florida.  I have one person that I know that lives in Florida.

17         With that said, I had the COVID virus, and I was

18  working through that.  And I felt bad for people that was going

19  through what I was going through.  So I talked to my business

20  partner, and that's the gentleman -- the R. McClendon -- and I

21  said -- there was another group that came to us and they were

22  basically representing that they were working with Florida, and

23  they just seemed very shady, if I can use that terminology.

24         And I ended up saying to my business partner, Hey, I'm

25  going to call this guy over in Florida, this Ashley Davis, to

1  let him know that I have these shady characters coming to me

2  representing that they are representing FEMA.

3          So we literally called Ashley Davis, from that email

4  that I received, and explained to him that there were these

5  fraudulent people asking us to help them sell masks.

6          Now, mind you I'm still going through the COVID virus.

7  Finally, on the 26th of March I got tested and it was positive.

8  I had been sick since March 5th.

9          I didn't think that I was trying to do any harm.  I

10  was trying to help the State of Florida.

11          And then I had another group of brokers, or another

12  group of distributors and suppliers, asking me if I can help

13  them.

14          Being a small business owner, I know a lot of

15  government entities.  I have different business people that I

16  work with, so they asked me to reach out and see if I can help

17  them maybe in introducing them.  I didn't have a fee agreement

18  with anybody.  It was more of an introduction.  And that's the

19  information they gave me.

20          You talked about escrow agent, and the guy, Khalid,

21  that's the information they gave me.  And I passed it on to

22  Ashley Davis, and that's basically all I have.

23          I didn't have possession of the masks.  I didn't buy

24  any masks.  I haven't made any money from the masks.  It was

25  more just passing on information to say, Hey, this is what this

1 group has.

2       Along with that email that I sent Mr. Ashley Davis,

3 there was an attachment.  It was based on my firm.  It was a

4 pitch deck, and in the pitch deck it said, Please understand

5 that these are not firm prices, and you have to call and

6 basically -- because it's a dynamic market.  It's literally in

7 bold red on the first page and the last page, I said, Please

8 call so you can get information from different suppliers.

9       And so I wasn't trying to sell the masks for $5, and

10 whatever cents he just said.  All I did was I tried to make two

11 introductions from one end to the other.  And I literally called

12 Ashley to tell him that he had some bad characters trying to

13 represent him.  That's literally all I did.

14       I don't have an attorney.  I don't know what I'm

15 saying.  I mean, I know what I'm saying but I don't have an

16 attorney.  I don't know what the personal injunction means, or

17 anything.  This is so crazy.

18       THE COURT:  Thank you, Ms. Lopes.

19       Mr. Wasserkrug, anything further?

20       MR. WASSERKRUG:  I don't believe so.

21       Well, just to respond, the bottom line from 3M's

22 perspective is the evidence that we have at this time, there was

23 an offer to sell these masks at 460 percent of the list price

24 for a total of $56 and a half million, and that is reprehensible

25 conduct in 3M's view.  That is severely damaging to the public

1    interest, and threatens overall effectiveness of the COVID-19

2    battle.

3              I am very sorry to hear that Ms. Lopes has had to go

4    through that, but the bottom line is that the conduct here is

5    not excused just by passing along information, if that is indeed

6    what happened.

7              What we know is there was an offer to sell these masks

8    at exorbitant prices in an attempt to trade-off 3M's name and

9    reputation.

10             THE COURT:  Okay.  So here is what we are going to do.

11             I am going to deny the motion to the extent it seeks

12   temporary restraining order.  We will set up a schedule for the

13   preliminary injunction.  I will explain the ruling a little bit.

14             I have considered generally the fact that TROs are

15   disfavored, and I have considered the fact that the plaintiff

16   filed this case a week ago, roughly, and didn't provide notice

17   until today, so defendants are in a little bit of a worse

18   position by virtue of that.

19             I think the argument that something would have to

20   happen immediately are undermined by a couple of things: One,

21   principally the fact that the case has been filed for a week.

22   The totality of the evidence is this one email, which was the

23   basis of the lawsuit, and has been in the possession of 3M at

24   least for that week that the case has been pending.  So I don't

25   think this is the type of case where I want to issue injunctive

1 relief.

2      Everything I said counts as against injunctive relief,

3 without giving the defendants a meaningful opportunity to

4 respond.  So, that's point number one.

5      Point number two, considering the factors that would

6 go into any determination about preliminary injunctive relief, I

7 will start with the requirement that there be a showing of

8 substantial likelihood of success on the merits.

9      Regardless of what anyone thinks was or wasn't

10 happening with respect to this email, 3M has the burden of

11 showing something like this will happen in the future.  If

12 nothing is going to happen in the future, injunctive relief

13 doesn't do any good.

14      This isn't a situation where there are 10 or 12 of

15 these types of solicitations, and there is any evidence that

16 there are more coming from these defendants, and so I don't

17 think at this point 3M has met its burden on that.

18      I will incorporate a little bit the concerns based on

19 my questioning about the specific claims on the trademark

20 claims, whether there was any confusion to the State.  There is

21 not any evidence of that.

22      I think the dilution claim, same thing.  If we are

23 talking about one email that was sent, whether that would dilute

24 the value of the trademark when the State immediately recognizes

25 it as illegitimate, or potentially.  We just don't have any

1  evidence on what the State did, but we certainly don't have any

2  evidence that the State views 3M any worse today than it did

3  before this email was sent, or that it should.

4        I don't see the harm, and I don't find 3M has

5  established that there would be harm to it.  I certainly agree

6  with 3M that there is no interest in the defendants, or anyone

7  else, price gouging or in any way taking advantage of this COVID

8  crisis, that's caused so much harm already.  No one has an

9  interest in unlawfully using, or misusing the marks of another

10 company.  But, at any rate considering all of those factors I am

11 not going to grant TRO.

12        That's obviously without prejudice to the preliminary

13 injunction, which we will get to next.

14        Ms. Lopes, so you'll know, you have the right to have

15 an attorney represent you, obviously as anyone does.  The

16 entities that are sued, I guess, those are your entities; is

17 that right?

18        MS. LOPES:  Yes.

19        THE COURT:  They cannot appear without a lawyer.  So

20 you can hire a lawyer for yourself, or you can continue in the

21 case without a lawyer and represent yourself.  The entities have

22 to have a lawyer.

23        MS. LOPES:  Okay.

24        THE COURT:  So now we are going to put a schedule in

25 place to get the preliminary injunction resolved.

1    Mr. Wasserkrug, based on that ruling, and based on

2  your suggestion that you might want to supplement the record, I

3  want to give you an opportunity to file an amended preliminary

4  injunction motion, or supplement the one.  So I'm going to ask

5  how much time would you need to do that.

6    MS. LOPES:  Your Honor, can I say one more thing

7  please?

8    THE COURT:  Just a moment.  I will come back to you.

9    MS. LOPES:  Okay.  Okay.  I'm sorry.  I'm sorry.

10    THE COURT:  That's fine.  Mr. Wasserkrug?

11    Alternatively, Mr. Wasserkrug, would you want to

12  confer with Ms. Lopes separately and see if you guys can agree

13  to a schedule?  I don't know how promptly she will get

14  counsel -- I'd like to leave here with a plan going forward.

15    Mr. Wasserkrug, this is kind of an unusual

16  circumstance, so I will hear from you if you have some other

17  suggestion as to how we move forward.

18    MR. WASSERKRUG:  I'm just thinking here.  I don't

19  know -- I think we would like the opportunity to supplement or

20  file an amended motion.

21    Looking at the calendar here, I think -- I think a

22  week is sufficient.

23    THE COURT:  Okay.  You can have longer than that.

24  Your client is the one with the need for quick relief, so I will

25  go as fast -- at least on your end.  I will make sure the

1   defense has a reasonable amount of time to respond.  But if you

2   want a week, that's fine.  If you want more, that's fine from my

3   perspective.

4           MR. AUSTIN:  Judge, this is Mike Austin.

5           One issue, too, is the ability to take some expedited

6   discovery from Ms. Lopes, given Your Honor's questions about

7   some of the details of the business, and what they were actually

8   doing.  Is there the ability to facilitate some expedited

9   discovery before our supplemental motion is filed?

10          THE COURT:  Yeah.  I mean, we've got to get summons

11  issued, and give them a reasonable chance to get counsel

12  engaged.  But certainly I would be -- and would hear from them.

13  I don't know that that would be problematic.

14          MR. WASSERKRUG:  Your Honor, this is Joseph Wasserkrug

15  again.

16          I guess, as I am thinking here, would it be possible

17  by the end of -- you know, we could propose, and we can work

18  with Ms. Lopes on this, to propose a scheduling order for the

19  preliminary injunction hearing, and any discovery that would be

20  needed beforehand, and propose that to Your Honor?

21          THE COURT:  Yes.

22          Why don't we do this.  Why don't we set a telephonic

23  hearing for a week from Monday.  In the mean time you can work

24  with Ms. Lopes, and whatever counsel appears, on a schedule, and

25  you can file it any time next week.  Then if it's something

1   that's agreeable to everyone, we will cancel the telephonic

2   hearing. If it's not, then we will have a telephonic hearing

3   Monday and work out the schedule from there.

4             Does that work for you, Mr. Wasserkrug?

5             MR. WASSERKRUG: I believe so. Just to be clear, do

6   you mean Monday the 11th for the telephonic conference?

7             THE COURT: No. I meant a week from then. That would

8   give you all next week to work on this schedule and, you know,

9   to the extent you are going to be amending you could work on

10   that during that time period as well.

11             I'm happy -- we could do something Monday. I don't

12   know how much, reasonably speaking, without service, how much

13   progress could be made. That would basically just leave

14   tomorrow.

15             MR. WASSERKRUG: Right. Understood.

16             I believe --

17             MR. AUSTIN: The 18th should be fine.

18             THE COURT: I'm sorry?

19             MR. WASSERKRUG: The 18th for a status conference

20   works for us.

21             THE COURT: Anyone have a conflict with 10 AM?

22             Okay. Let me look at my own calendar before I commit

23   to that. Just a moment.

24             Ms. Stark, is there any problem with that?

25             MS. LOPES: No; it's not.

1          COURTROOM DEPUTY CLERK:  No, sir.  If you are going to

2     move the other hearings, as we discussed, there won't be any

3     problem.

4          THE COURT:  Okay.  We will set a telephonic status

5     conference for Monday the 18th at 10 AM.  There will be call in

6     information that will be sent around.

7          Ms. Lopes, as I indicated, the entities will need a

8     lawyer before then.  It will be up to you whether you can

9     represent yourself, or get a lawyer.

10          You said something a minute ago, Ms. Lopes.  You

11     wanted to say something?

12          MS. LOPES:  I did want to say something.  The other

13     thing that I did, while going through this process and being

14     ill -- you don't understand.  The ambulance had to be called

15     several times -- I called 3M several times to basically

16     verify -- I have the emails coming from Andrew from 3M, telling

17     me that there is an 800 fraud-line to call into, to verify that

18     these brokers, or these people saying that they were

19     distributors, or whatever, if they were real or not.  So I

20     called the 800 number.  I got an email back from them.  I tried

21     to become a distributor myself with 3M.  So I think I did

22     everything I could to be -- to do the decent thing to help

23     people in the community, or the government, or whatever they are

24     saying that I tried to do.

25          THE COURT:  Ma'am?

1    MS. LOPES:  I'm sorry.

2    THE COURT:  I do want to interrupt you, because -- I

3    am going to give you a little background of what's happening

4    here.

5    The motion that you got was for two things; one, it

6    was for what's called a temporary restraining order, which in

7    some circumstances can be granted where a federal court can

8    order certain relief without even hearing from the other side.

9    That was one of the things that was requested.  That request has

10   been denied, and so right now we are not talking about anything

11   about the merits of the case -- about who should win and who

12   should lose.

13   The next thing that the plaintiff has asked for is

14   what's called a preliminary injunction, which is similar but it

15   doesn't operate quite as quickly.  So that's why we're going to

16   have time during which you, and your attorney, or the attorney

17   for the entities, can meet with the attorneys for 3M and work

18   out a schedule.  And then that will be the schedule that will

19   control when we hear the merits of the case, and that gets into

20   who is right and who is wrong and whether the Court should grant

21   any relief or not.

22   I interrupted you because you were getting into that

23   phase of things, which isn't what we are talking about right

24   now.  And that's okay, and I understand that you are not an

25   attorney so that's why I wanted to tell you that.

1           For right now there will be a hearing as I indicated a
2   week from Monday, at 10 AM.
3           In the mean time, those attorneys have your email
4   address.  And I would direct the parties to confer on the
5   schedule, and so that's you right now, Ms. Lopes, and so I am
6   directing you to work with them.
7           If you get a lawyer, he or she would then work with
8   them and you would go through that lawyer.
9           MS. LOPES:  What if I don't have money to pay these
10  lawyers, because my company hasn't made any money for the last
11  three and a half years?  I have been living on my savings.
12          THE COURT:  As I indicated, you can represent
13  yourself.  An entity cannot appear in Court without a lawyer.
14  So, if no one shows up to represent them sometimes they can be
15  defaulted, or lose by default.  So it's important that a lawyer
16  appear on behalf of those entities.
17          MS. LOPES:  Thank you.
18          THE COURT:  Mr. Wasserkrug, anything further from your
19  perspective?
20          MR. WASSERKRUG:  No, Your Honor.  We will confer with
21  Ms. Lopes for a schedule, and if we are not able to agree on a
22  schedule I guess we will advise Your Honor on the 18th.
23          Just to be clear, if we do agree on a schedule we will
24  submit it to Your Honor ahead of the 18th, and upload a proposed
25  schedule for the preliminary injunction phase.

1          THE COURT:  Right.  Just to clarify, and I think I

2    said this before, if there is an agreement that is acceptable I

3    will cancel the hearing, unless -- if you file a notice and

4    there is some other reason you want a status conference, you can

5    let me know.  But if the notice that's filed says, We have

6    agreed on this, this, and this, and we don't need a status

7    conference, you can let me know that too and I will cancel it.

8          MR. WASSERKRUG:  Understood.  Thank you, Your Honor.

9          THE COURT:  Thank you all.

10          Everyone have a good afternoon.

11     (Proceedings concluded at 4:54 on Thursday, May 07, 2020.)

12                    *  *  *  *  *  *  *  *

13          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
14   Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
15   transcript.

16

17   /s/ Lisa C. Snyder_____                    5/19/2020

18   Lisa C. Snyder, RPR
     Official U.S Court Reporter
19

20

21

22

23

24

25