**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| 3M Company,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Matthew Starsiak, et al.,<br><br>　　　　　Defendants. | Case No. 20-cv-1314 (SRN/TNL)<br><br>**ORDER ON PLAINTIFF'S MOTION FOR A TRO** |

John Ursu, David Gomez, Isaac B. Hall, Kerry L. Bundy, Michael M. Sawers, and Peter Routhier, Faegre Drinker Biddle & Reath, LLP, 2200 Wells Fargo Center, 90 S. 7th St., Minneapolis, MN 55402, and Peter W. Baldwin, Faegre Drinker Biddle & Reath, LLP, 1177 Avenue of the Americas, Ste. 41st Floor, New York, NY 10036, for Plaintiff

Timothy Schupp and Robert William Vaccaro, Meagher & Geer, PLLP, 33 S. 6th St., Ste. 4400, Minneapolis, MN 55402, for Defendants

SUSAN RICHARD NELSON, United States District Judge

　　This matter is before the Court on the Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction [Doc. No. 8] filed by Plaintiff 3M Company ("3M"). The parties appeared for a hearing by teleconference on June 25, 2020 before the undersigned judge. For the reasons set forth below, the Court grants Plaintiff's request for a TRO, and defers ruling on its request for a preliminary injunction.

## I.  BACKGROUND

### A.  Procedural Background

On June 5, 2020 Plaintiff filed this trademark infringement lawsuit against Defendants Matthew Starsiak, AMK Energy Services LLC, and John Does 1 through 10. Plaintiff alleges that Defendants have falsely claimed to represent 3M, and have used 3M's name and trademarks without authorization in a false and deceptive scheme to sell 3M N95 respirators to unwitting customers and consumers during the global COVID-19 pandemic. (Compl. [Doc. No. 1] ¶ 1.)  As a result, Plaintiff asserts that Defendants have violated multiple provisions of the Lanham Act, as well as Minnesota state law regarding unlawful trade practices, trademark infringement, trademark dilution, and false advertising. (*Id.* ¶¶ 70–139.)

On June 22, 2020, Plaintiff filed the instant motion for a TRO, seeking to enjoin Defendants from using 3M marks, and any other confusingly similar word, name or symbol, in connection with the sale of goods or services, including 3M-brand N-95 respirators. (*See* Pl.'s Mem. [Doc. No. 10].)  They further seek to enjoin Defendants from engaging in any false, misleading, or deceptive conduct in connection with 3M and its products, including representing themselves as an authorized distributor, vendor, agent, representative, retailer, and/or licensee of 3M or any of 3M's products; falsely representing to be associated or affiliated with or sponsored by 3M or any of 3M's products; and falsely representing that 3M has increased the prices of its 3M-brand N95 respirators. (*Id.*)  Along with their motion, memorandum, and reply memorandum [Doc. No. 35], 3M filed the Declaration of David A. Crist [Doc. No. 11], the Declaration of Charles Stobbie [Doc. No.

2

12], the Declaration of Haley Schaffer [Doc. No. 13], the Declaration of Ivan Fong [Doc. No. 14], the Declaration of John Ursu [Doc. No. 15], the Declaration of Matthew Hise [Doc. No. 16], the Supplemental Declaration of Haley Schaffer [Doc. No. 36], and supporting exhibits.

Separately, on June 24, 2020, Defendants filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) [Doc. No. 27], for lack of specific personal jurisdiction. The hearing on Defendants' motion is scheduled for August 5, 2020. (Notice of Hr'g [Doc. No. 28].)

In opposition to Plaintiff's TRO motion, Defendants also argue that the Court lacks specific personal jurisdiction over them, and accordingly a TRO cannot issue. (*See* Defs.' Opp'n [Doc. No. 33] at 2.)  In addition, Defendants argue that 3M does not satisfy the elements necessary for injunctive relief. (*Id.* at 2–6.)  Plaintiff responds that the Court has specific personal jurisdiction[1] over Defendants pursuant to the *Calder* "effects test," set forth in *Calder v. Jones*, 465 U.S. 783, 790 (1984). (Pl.'s Reply at 2–4.)

### B.  Factual Background

3M is a Delaware corporation, with its principal place of business in St. Paul, Minnesota. (Compl. ¶ 19.)  It is a provider of personal protective equipment ("PPE") for healthcare professionals, industry workers, and the public. (Stobbie Decl. ¶ 4.)  In particular, it is a leading manufacturer of N95 respirators, which have been sold under the

---

[1]  Plaintiff does not assert that the Court has general personal jurisdiction over Defendants.

3

3M brand name for many years. (*Id.*; Crist Decl. ¶ 10.) During the global COVID-19 pandemic, the general public has become familiar with 3M as a manufacturer of N95 respirators. (Crist Decl. ¶ 16; Stobbie Decl. ¶ 14.)

3M contends that it has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to consumers, using the standard-character mark "3M" and the 3M design mark 3M (together, the "3M Marks"). (Crist Decl. ¶ 10.) 3M has obtained numerous federal trademark registrations for the 3M Marks. (*Id.*, Exs. 5, 7.)

Since the outbreak of COVID-19, 3M has increased its production of 3M-brand respirators to ensure that an adequate supply is available to governments and healthcare personnel, as well as to workers in the food, energy, and pharmaceutical industries. (Stobbie Decl. ¶¶ 8, 9, Exs. 1–3.) In the United States alone, 3M plans to produce 50 million respirators per month in June 2020. (*Id.* ¶ 11, Exs. 1, 3.) More than 90 percent of 3M's respirators are slated for healthcare and public health users. (*Id.*) The Federal Emergency Management Agency is coordinating the distribution of these respirators in the United States, basing its allocation decisions on the most urgent needs. (*Id.* ¶ 13.) Despite the heightened demand and need for PPE at this time, 3M has pledged to not increase prices of its N95 respirators in authorized sales, and will work to eliminate fraud and price-gouging by third parties in the midst of this public health crisis. (Stobbie Decl. ¶ 12, Ex. 3, *see also id.* ¶¶ 14–16, Exs. 4, 5.) It believes that these efforts will protect the public from defective or inferior products and grossly inflated pricing. (*Id.*)

Defendant Matthew Starsiak is a resident of Bountiful, Utah. (Compl. ¶ 20.) He is the president of Defendant AMK Energy Services, LLC ("AMK Energy"). (*Id.*) AMK

4

Energy is a Utah limited liability company, with a Bountiful, Utah address listed with the Utah Secretary of State. (*Id.* ¶ 21.) Plaintiff also alleges that John Does 1 through 10 worked in concert with Defendants in connection with their fraudulent scheme. (*Id.* ¶ 22.)

On May 1, 2020, a prospective buyer of a billion 3M N95 respirators contacted the Paris office of the international law firm Dentons. (Schaffer Decl. ¶ 13, Ex. 2.) The buyer stated that AMK Energy's operations chief Mark Wright had advised him to correspond with Dentons about the possible purchase of 3M respirators. (*Id.*) In addition, the buyer attached a letter of intent for 3M, "via AmkGOV . . . which is providing access to 3M . . . ." (*Id.*) Plaintiff alleges that the purchase of one billion respirators would account for roughly a year's worth of 3M's current total production of all models of N95 respirators. (Compl. ¶ 68.) It further alleges that Defendants had no ability to "provide access to 3M." (*Id.*) Moreover, 3M was unaware of any circumstances by which Defendants could legitimately offer to provide "access to 3M." (Schaffer Decl. ¶ 14.)

On May 10, 2020, Ivan Fong, 3M's Senior Vice President, General Counsel & Secretary, and a Minnesota resident, received an email from Eric S. Schuster, an attorney at Funk & Bolton, PA. (Fong Decl. ¶¶ 1–3.) Schuster requested "10 minutes" of Mr. Fong's time, and asked that he read an attached email "from my close contact who is trying to close a deal for a well known charity to send hundreds of billions of 3M masks to Africa." (*Id.*, Ex. 1.) The "close contact" to whom Schuster referred was Defendant Starsiak, President of AMK Energy. (*Id.*) In the attached email from Starsiak to Schuster, Starsiak claimed to be "getting the run around by 3M escrow attorneys." (*Id.*) Starsiak referred to a "very influential client" who sought to donate 100 billion 3M masks to Africa,

5

but whose efforts were being hampered by the inability to reach a 3M attorney in order to transfer funds. (*Id.*) Starsiak asked for Schuster's assistance to schedule a phone call with "a legitimate 3M attorney" to move the transaction along, and stated that "the buyers I'm bringing to 3M are some of the richest, most powerful people in the world that want to remain anonymous except to the 3M attorneys of course." (*Id.*)

Mr. Fong replied via email, stating that he was unable to speak with Starsiak at that time, but asked Schuster to send the name of the 3M attorney with whom Starsiak had been dealing. (*Id.*, Ex. 2.) Alternatively, Fong offered to ask one of his direct reports to speak with Starsiak. (*Id.*, Ex. 2.)

The following day, May 11, 2020, Haley Schaffer, Senior Counsel at 3M, and a Minnesota resident, spoke with Starsiak on the phone. (Schaffer Decl. ¶¶ 1, 3.) Schaffer attests that she was located in Minnesota at the time she received all communications with Defendants that are described in her two declarations. (Supp'l Schaffer Decl. ¶ 3.) At the outset of the May 11 call, Starsiak stated that he had served in the Marine Corps for 24 years, running a counter-drug initiative in Latin America, and having played a large role in Iraq. (Schaffer Decl. ¶ 3.) He also stated that he was presently working for Sir Richard Branson, founder of the Virgin Group, and the Gates Foundation. (*Id.*) In addition, Starsiak claimed that Branson and the Gates Foundation wished to purchase 900 billion respirators for underserved populations in the world. (*Id.* ¶ 4.)

In response to Starsiak's request for a subsequent call that day with additional members of his team, including Mark Wright, AMK Energy's operations chief, Schaffer invited two other 3M employees to join the call, Michael Gannon, Senior Trademark

Counsel, and Joel Van Heyst, a former FBI agent who works for 3M Corporate Security. (*Id.* ¶¶ 5–6.)  After the second call on May 11, Schaffer called Mr. Schuster, the attorney who had first reached out to 3M's Senior Vice President and General Counsel, to verify Starsiak's "bona fides."  (*Id.* ¶ 7.)  Schuster assured Schaffer that he had known Starsiak for five years and would not connect someone with Mr. Fong who "wasn't kosher."  (*Id.*)

The next day, Schaffer declined Starsiak's request on behalf of 3M.  (*Id.*, Ex. 1.)  She stated that due to the unprecedented health crisis, the vast majority of 3M's respirator capacity was spoken for, based on existing commitments for government emergency response and healthcare orders.  (*Id.*)

Subsequently, 3M's Director of Global Security contacted the Gates Foundation to ask if Starsiak or his company had any connection with the Gates Foundation.  (*Id.* ¶ 10.)  He was informed that the Gates Foundation had never heard of either of them.  (*Id.*)

While Defendants were trying to purchase billions of 3M-branded N95 respirators from 3M, they were simultaneously trying to find buyers willing to purchase them at a higher price.  (Pl.'s Mem. at 18.)  In May 2020, Starsiak had a series of calls with Star Brands Group, a New York-based PPE supplier dedicated to the ethical sourcing and supply of PPE for medical professionals.  (Hise Decl. ¶¶ 2, 6.)  Star Brands Group's Matthew Hise, a New York resident, attests that Defendants identified themselves as 3M's "number one sales team" and as a "3M authorized distributor," claiming to have "hundreds of millions of [N95 respirator] stock available."  (*Id.* ¶¶ 1, 7, Ex. 1.)  Hise was initially confused by these representations and believed that AMK Energy was an authorized 3M dealer.  (*Id.* ¶ 7.)  Hise states that Defendants pushed Star Brands Group to quickly close

7

the deal, and Defendants always conveyed a sense of urgency. (*Id.* ¶ 6.) Further, Hise contends that "AMK people told me that I needed to provide letters of intent from my clients that included terms such as bank account information that, in my experience, are not typical terms for procurement letters of intent. The proposed transactions also include[d] consummating the transaction by depositing monies into escrow accounts." (*Id.* ¶ 8.)

In addition, during their conversations, Defendants claimed to have access to 3M attorneys, identifying Fong and Schaffer, by name. (*Id.* ¶ 9.) Defendants provided Star Brands Group with "AMK Procedures for 3M SPOT/Production Contract with Client," detailing how Star Brands Group was to send money to AMK's Swiss escrow account. (*Id.* ¶ 8, Ex. 1.) In that document, Defendants stated that they would provide letters of intent to the "3M Team, who then provides 3M Attorney information for the region." (*Id.*, Ex. 1.) AMK's Swiss escrow agent would then "confirm with 3M Attorney that [proof of funds] . . . had been provided and verified." (*Id.*)

During the course of Hise's conversations with Defendants, he grew concerned that AMK Energy did not have the affiliation with 3M that they claimed, (*id.* ¶ 10), prompting him to record some of the conversations with Defendants. (*Id.* ¶ 12, Ex. 2.) During the May 20, 2020 call, Starsiak explained Defendants' involvement with 3M, stating, "So how we go into this with the PPE is . . . 3M needed some government contractors to do bidding because there was many buyers [sic] who were trying to purchase." (*Id.*, Ex. 2.) He stated, "3M doesn't have any patience. We'll call them once, a 3M attorney, it all goes to their attorney." (*Id.*) When Hise asked Starsiak for documentation of the link between

Defendants and 3M, Starsiak stated that was "not a problem," and emphasized his connections with 3M attorneys Fong and Schaffer, again, by name. (*Id.*) Referring to his alleged deal on behalf of the Gates Foundation, Richard Branson, and others, Starsiak stated, "the top attorneys for 3M did come on the line with them." (*Id.*) When Hise insisted that Defendants produce documents confirming Defendants' affiliation with 3M, Starsiak eventually hung up the phone. (*Id.*) Hise then reported Starsiak's suspicious conduct, along with the phone recording, on 3M's fraud prevention website. (*Id.*, Ex. 1.)

## II.   DISCUSSION

### A.  Specific Personal Jurisdiction

Defendants first argue that the Court lacks specific personal jurisdiction over them, and therefore, a temporary restraining order cannot issue. (See Defs.' Opp'n at 2.) Plaintiff responds that the Court has specific personal jurisdiction over Defendants pursuant to the "effects test" set forth in *Calder v. Jones*, 465 U.S. 783, 790 (1984).

At the pleading stage, a " 'plaintiff must make a prima facie showing that personal jurisdiction exists.' " *Paisley Park Enters., Inc. v. Boxill*, 361 F. Supp. 3d 869, 875 (D. Minn. 2019) (quoting *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011)). This showing requires that the Plaintiff "plead 'sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state.' " *Id.* (citation omitted). The evidence "must be tested by affidavits and exhibits supporting or opposing the motion, and not by the pleadings alone[,]" but in any event, the showing required is "minimal[.]" *Id.* at 875–876 (citation omitted). When deciding whether Plaintiff has made the necessary prima facie showing, the Court views "the evidence in the

light most favorable to the plaintiff and resolves all factual conflicts in the plaintiff's favor." *Id.* at 876 (citing *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996)).[2]

Under the *Calder* effects test, "[a] defendant's tortious conduct can be a basis for personal jurisdiction." *Id.* at 878 (citing *Calder*, 465 U.S. at 790). To establish specific personal jurisdiction under the intentional tort theory set forth in *Calder*, "a plaintiff must make a prima facie showing that 'the defendant's acts (1) were intentional, (2) were 'uniquely' or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—there.' " *Id.* (quoting *Zumbro, Inc. v. Cal. Nat. Prods.*, 861 F. Supp. 773, 782–83 (D. Minn. 1994)).

However, the *Calder* effects test is not sufficient on its own for the exercise of specific personal jurisdiction. The Eighth Circuit considers it in conjunction with its normal five-factor analysis used to evaluate specific personal jurisdiction. *See Johnson v. Arden*, 614 F.3d 785, 797 (8th Cir. 2010) (noting that "the *Calder* test [is] merely as an *additional factor to consider* when evaluating a defendant's relevant contacts with a forum state" and reaffirming prior case "declin[ing] to grant personal jurisdiction solely on the basis of forum state effects from an intentional tort" (citation omitted)); *see also Regenexx, LLC v. Regenex Health LLC*, ___ F. Supp. 3d ___, 2020 WL 1269790, at *5 (S.D. Iowa

---

[2]   The Court notes that federal courts follow state law when determining the bounds of the federal court's personal jurisdiction, and that because Minnesota's long-arm statute extends jurisdiction to the maximum limit permitted by due process, Minnesota federal courts need only determine whether its exercise of personal jurisdiction comports with due process. *Paisley Park Enters.*, 361 F. Supp. 3d at 876 (citations omitted).

Mar. 17, 2020) ("Ultimately, a court 'must look at all of the factors in the aggregate and examine the totality of the circumstances in making a personal-jurisdiction determination.' ") (quoting *Johnson*, 614 F.3d at 794).

The Eighth Circuit considers five factors in evaluating the sufficiency of a defendant's contacts with the forum state: "(1) the nature and quality of contacts, (2) the quantity of contacts, (3) the relation of the cause of action to the contacts, (4) the interest of the forum state in providing a forum for its residents, and (5) the convenience of the parties." *Paisley Park Enters.*, 361 F. Supp. 3d at 876 (citing *Land-O-Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983)). It has also observed that the first three factors of the test are "primary" in terms of importance, while the last two are of "secondary" importance. *Johnson*, 614 F.3d at 794.

At this early stage of the proceedings, and assuming the facts alleged in the Complaint and supporting declarations as true, Plaintiff has made a prima facie case of specific personal jurisdiction, under both the *Calder* effects test and the regular five-factor test. Plaintiff appears to initially meet the *Calder* effects test, as it has shown that Defendants directed allegedly fraudulent statements aimed at the forum state, and caused harm to 3M's reputation and goodwill in Minnesota, which Defendants knew was likely to be felt there. *Paisley Park Enters.*, 361 F. Supp. 3d at 878 (citing *Calder*, 465 U.S. at 790). Defendants intentionally represented to third parties, such as Star Brands Group, that they had unique contacts with Minnesota, claiming to be 3M's "number one sales team," with "hundreds of millions of [N95 respirator] stock available." (Hise Decl. ¶ 7, Ex. 1.) In his recorded conversation with Hise, Starsiak referred to the "process" of submitting

11

paperwork to 3M to create a reference number. (*Id.*, Ex. 2.) To reassure Hise, Starsiak further stated, "I have Ivan Fong that I go to regularly." (*Id.*)

Under the regular five-factor test for minimum contacts, *Paisley Park Enters.*, 361 F. Supp. 3d at 878, the nature and quality of contacts with Minnesota consist of Defendants' specific, back-and-forth communications with Ms. Schaffer and her colleagues, as well as Defendants' frequent representations to third parties of doing systematic and continuous business with 3M, as its "number one sales team," with "hundreds of millions of [N95 respirator] stock available," (Hise Decl. ¶ 7, Exs. 1, 2). *See St. Jude Med. Inc. v. Lifecare Int'l*, 250 F.3d 587, 591–92 (8th Cir. 2001) (finding personal jurisdiction established, in part, by the parties' communications leading up to a contract negotiation that involved the distribution of goods manufactured in Minnesota, as well as their continued communications after the contract was established).

The contacts here, as documented by Plaintiff, were neither random nor fortuitous, but were directly related to the causes of action in this suit. Through these contacts, defendants gained information from 3M regarding the identity of its Minnesota legal counsel, and traded upon those contacts in subsequent efforts to attempt to sell allegedly 3M-authorized goods. Certainly, Minnesota has an interest in providing a forum for its resident businesses, and while Minnesota is convenient for 3M, the Court acknowledges that it is inconvenient for Defendants. At this time, the Court finds that these elements are sufficiently met.

While the Court finds that Plaintiff has adequately met the elements of specific personal jurisdiction for purposes of this TRO, it recognizes that Defendants present valid

arguments to the contrary, and the record on the issue of specific personal jurisdiction is quite undeveloped at this time. Furthermore, as noted, the reach of *Calder* is limited, and the act of promoting and soliciting customers at the expense of competitors will not alone be sufficient to confer specific personal jurisdiction. *Paisley Park Enters.*, 361 F. Supp. at 878 (citing *Hicklin Eng'g, Inc. v. Aidco, Inc.,* 959 F.2d 738, 739 (8th Cir. 1992)). Accordingly, as discussed at the hearing on the instant motion, the Court will explore the question of specific personal jurisdiction in greater detail in connection with Defendants' Motion to Dismiss and Plaintiff's Motion for a Preliminary Injunction, both of which will be heard on August 5, 2020. Limited jurisdictional discovery will provide necessary information to inform the Court as to whether the exercise of specific personal jurisdiction is proper, going forward.

Accordingly, the parties are ordered to meet and confer to address whether, and to what extent, limited jurisdictional discovery, on a mutual basis, will occur. They shall also meet and confer regarding the briefing schedule applicable to their respective motions, and advise the Court by letter, within one week, about both the extent of discovery and the agreed-upon briefing schedule.

### B. TRO

This Court must consider four factors to determine whether injunctive relief, in the form of a TRO, is warranted: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en

banc); *accord Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (quoting *Dataphase*). To analyze these factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). The burden of establishing the four *Dataphase* factors lies with the party seeking injunctive relief. *Watkins*, 346 F.3d at 844.

### 1. Likelihood of Success on the Merits

As to Plaintiff's likelihood of success on the merits, to succeed on its trademark and unfair competition claims, 3M must establish the following: (1) that its 3M Marks are valid and entitled to protection; and (2) that Defendants are using the 3M Marks in a manner that is likely to create consumer confusion. *Roederer v. J. Garcia Carrión, S.A.*, 732 F. Supp. 2d 836, 863 (D. Minn. 2010) (citing *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009)); *see also Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 756 (D. Minn. 2009) (finding claims under the Lanham Act and state common law and state deceptive trade practices statutory claims were "coextensive," involving the same standards), *adhered to*, 711 F. Supp. 2d 991 (D. Minn. 2010); *aff'd*, 650 F.3d 1139 (8th Cir. 2011).

As to the likelihood of confusion in trademark cases, courts consider the factors set forth in *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980): (1) the strength of the plaintiff's marks; (2) the similarity of the marks; (3) the degree to which the allegedly infringing goods or services compete with the plaintiff's goods or services; (4) the alleged infringer's intent to confuse or deceive the public; (5) evidence of actual confusion, if any;

14

and (6) the conditions of purchase. No one factor controls. *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011).

Plaintiff appears likely to succeed on its Lanham Act and related state law claims, given the evidence of the validity and strength of 3M's trademarked name and marks. Moreover, 3M has presented evidence showing that Defendants used the characters "3M," holding themselves out as 3M authorized distributors for the sale of identical goods, and falsely represented an affiliation and association with 3M, including representations about the role of 3M's attorneys in their dealings, such that Defendants' actions in representing the ability to sell 3M-branded respirators caused buyer confusion on the part of Mr. Hise of Star Brands Group. Accordingly, the likelihood of success on the merits weighs in 3M's favor.

### 2. Irreparable Harm

Traditionally, a showing of trademark infringement gives rise to a presumption of irreparable harm. *See Cmty. of Christ*, 634 F.3d at 1012 ("in trademark law, injury is presumed once a likelihood of confusion has been established."). 3M has presented evidence of confusion in the marketplace from Mr. Hise of Star Brands Group, who initially believed that Defendants were authorized 3M dealers. 3M has also shown that it has heavily invested in advertising and marketing its products under the 3M Marks, and adheres to rigorous quality-control standards for its products. (Crist Decl. ¶¶ 9–10.)

While Defendants argue that 3M only alleges a single solicitation to Star Brands Group, which did not result in a sale, (Def.'s Opp'n at 3), 3M has presented evidence,

15

sufficient for the issuance of a TRO, that Defendants attempted to gain information from 3M, and then profit from a false association with 3M's quality products and an association with 3M's counsel, creating a threat of irreparable harm to 3M's reputation and goodwill. *See Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Ptrs., LLC*, 829 F. Supp. 2d 836, 846 (D. Minn. 2011) (finding that to allow defendants to continue operating restaurants with plaintiffs' marks while holding themselves out as franchises posed a significant threat of irreparable harm to plaintiff's reputation and goodwill); *Gold's Gym Licensing, LLC v. K-Pro Mktg. Grp., Inc.*, No. 09-cv-1211 (PJS/RLE), 2009 WL 2253247, at *2 (D. Minn. July 28, 2009) (finding it reasonable to presume that defendant's use of identical marks created risk of irreparable harm to plaintiff's goodwill and favorable reputation). Absent a TRO, there is no assurance that Defendants will stop representing a false association with 3M. Accordingly, the Court finds that Plaintiff has sufficiently established the existence of irreparable harm.

### 3. Remaining *Dataphase* Factors

Regarding the balance of harms, the issuance of a TRO appears unlikely to harm Defendants, who have no affiliation with 3M, and therefore are not authorized to sell 3M products. *See Buffalo Wild Wings*, 829 F. Supp. 2d at 846 (finding that defendants brought any harm upon themselves through non-payment and infringement). On the other hand, 3M will suffer harm to its reputation and goodwill, absent a TRO, as discussed above. Accordingly, consideration of the balance of harms weighs in 3M's favor.

Finally, as to the public interest, the Court finds that it also weighs in 3M's favor. There is a strong public interest in protecting trademarks, *see id.* at 847, whereas Defendants identify no public interest that would be advanced if a TRO were denied.

Accordingly, Plaintiff's Motion for a TRO is granted. However, as the Court stated at the hearing on this motion, it will revisit the question of specific personal jurisdiction, and whether a preliminary injunction should issue, after the parties have had the opportunity to conduct limited jurisdictional discovery, in preparation for the August 5, 2020 hearing on Defendants' Motion to Dismiss and Plaintiff's Motion for a Preliminary Injunction.

In light of the Court's ruling on the TRO, Defendants agreed to extend the duration of the TRO through the August 5, 2020 hearing. The Court therefore issues the following TRO:

1. Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them, are temporarily restrained from using the standard character "3M" mark and 3M design mark **3M** (the "3M Marks"), and any other word, name, symbol, device, or combination thereof that is confusingly similar to the 3M Marks, for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, Plaintiff's 3M-brand N95 respirators, and

2. Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them, are temporarily restrained

17

    from engaging in any false, misleading, and/or deceptive conduct in connection with 3M and its products, including, without limitation, representing themselves as being authorized distributors, vendors, agents, representatives, retailers, and/or licensees of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirators); falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products; and falsely representing that 3M has increased the price(s) of its 3M-brand N95 respirators.

3. Sufficient reason having been shown therefor, for a period beginning on the date of this order and ending at the conclusion of the August 5, 2020 hearing on Plaintiff's Motion for a Preliminary Injunction and Defendant's Motion to Dismiss Pursuant to Rule 12(b)(2), Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with it, are hereby temporarily restrained, pursuant Fed. R. Civ. P. 65(b), from engaging in any of the acts and/or conduct described in Paragraphs 1 and 2, above.

4. Pursuant to this Court's equitable powers and discretion, 3M need not post a bond.

## IV.    ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff 3M Company's Motion for a Temporary Restraining Order and Preliminary Injunction [Doc. No. 8] is **GRANTED** as to its request for a TRO, subject to the terms set forth above, and the Court defers ruling on its request for a preliminary injunction.

2. The parties shall meet and confer to address whether, and to what extent, limited jurisdictional discovery, on a mutual basis, will occur. They shall also meet and confer regarding the briefing schedule applicable to their respective motions, and advise the Court by letter, within one week, about both the extent of discovery and the agreed-upon briefing schedule.

.

Dated:  June 26, 2020                                                    s/Susan Richard Nelson
                                                                                         SUSAN RICHARD NELSON
                                                                                         United States District Judge