1    UNITED STATES DISTRICT COURT
         DISTRICT OF MINNESOTA

2

3    ------------------------------------------------------------
                                    )
     3M Company,                    )    File No. 20-cv-1314
4                                   )            (SRN/BRT)
              Plaintiff,            )
5                                   )
     vs.                            )    Saint Paul, Minnesota
6                                   )    June 25, 2020
     Matthew Starsiak and AMK       )    3:30 p.m.
7    Energy Services, LLC, et al,   )
                                    )    AT&T Conference Bridge
8                                   )
              Defendants.           )
9    ------------------------------------------------------------

10        BEFORE THE HONORABLE SUSAN RICHARD NELSON
            UNITED STATES DISTRICT COURT JUDGE
11                 **(MOTIONS HEARING)**

12   APPEARANCES
     For the Plaintiff via      FAEGRE DRINKER BIDDLE & REATH
13   telephone:                 LLP
                                JOHN W. URSU, ESQ.
14                              MICHAEL M. SAWERS, ESQ.
                                ISAAC B. HALL, ESQ.
15                              90 South Seventh Street
                                Suite 2200
16                              Minneapolis, Minnesota
                                55402-3901
17
     For the Defendants via     MEAGHER & GEER, PLLP
18   telephone:                 TIMOTHY R. SCHUPP, ESQ.
                                ROBERT WILLIAM VACCARO, ESQ.
19                              33 South Sixth Street
                                Suite 4400
20                              Minneapolis, Minnesota 55402

21   Court Reporter:            CARLA R. BEBAULT, RMR, CRR, FCRR
                                316 North Robert Street
22                              Suite 146 U.S. Courthouse
                                Saint Paul, Minnesota 55101
23
          Proceedings recorded by mechanical stenography;
24   transcript produced by computer.

25

**P R O C E E D I N G S**

**ALL PARTIES APPEARING REMOTELY VIA TELECONFERENCE**

THE COURT:  Good afternoon, counsel.  Can you hear me?

MR. URSU:  We can.  Thank you, Your Honor.

THE COURT:  Very good.  Well, we will begin.  We do have a court reporter.  This is the matter of 3M Company versus Matthew Starsiak, AMK Energy Services, LLC.  This is court file number 20-1314.  Could counsel please note your appearances for the record.

MR. URSU:  Certainly.  For 3M Company this is John Ursu from Faegre Drinker Biddle & Reath, and with me are Isaac Hall and Michael Sawers, also from Faegre.

THE COURT:  Good afternoon.

And who do we have from the defense?

MR. SCHUPP:  Good afternoon, Your Honor.  This is Tim Schupp and Rob Vaccaro on behalf of Mr. Starsiak and on behalf of AMK.

THE COURT:  Very good.  We are here today to consider 3M's motion for temporary restraining order.  Mr. Ursu, do you wish to be heard?

MR. URSU:  Yes.  Thank you, Your Honor.

THE COURT:  You may proceed.

MR. URSU:  3M has filed, as the Court may be

aware, a number of these cases around the country and it is hard to imagine a stronger case for preliminary relief. As the Court is well aware, we're in the middle of a national health crisis and 3M is one of a very few number of N95 manufacturers. These are vital, life-saving respirators that can be used by healthcare workers and other frontline professionals in order for them to keep doing their jobs and help keep the rest of us safe. There are a very limited number of these available and there is enormous desperation in the marketplace for exactly what the 3M stands for, which is for trust, reliability and quality.

And these attributes make a difference of life and death for healthcare workers and others who are relying on them, and unfortunately gray marketeers like Mr. Starsiak and AMK have leapt into the gap to line their own pockets, and that's -- stopping that conduct is what this case is about.

3M is working with federal law enforcement and where there's a claim of false affiliation with 3M, we are filing suit. There have been cases that have been filed by 3M in New York, in Florida, in Indiana, in California, in Canada. There are at least 14 that are pending around North America.

And this is the very first case that 3M filed in Minnesota and it was filed in Minnesota for a particular

1    reason, which is that defendants lied their way into the 3M

2    legal department and then used the names of the 3M lawyers

3    they found there as part of perpetrating their fraud.  They

4    infringed our trademarks.  When they were doing that, they

5    claimed a false affiliation.  And as part of demonstrating

6    their fraudulent intent, we have transcripts of --

7    transcripts of one phone call, at least, where defendants

8    are saying that they were -- got into the PPE business

9    because 3M needed government contractors like them to vet

10   buyers and that they were in regular contact with Ivan Fong

11   here in Minnesota, and none of that is true.

12          That fraud is part and parcel, of course, with the

13   contacts here and that's why this case is in Minnesota.  I

14   want to be clear that we did investigate filing in other

15   locations.  We first looked at filing in New York City,

16   which is where defendants claim to have their headquarters,

17   but it turned out that that headquarters was fictitious.  It

18   doesn't exist.

19          We then looked on the AMK website and with their

20   filings with the government where they claim to have 80

21   locations around the country, 150 locations around the

22   globe, and we could not find those locations anywhere.  All

23   we could find was a one-and-a-half-story house in Bountiful,

24   Utah.  So we filed suit in Minnesota because that's one

25   thing we know about.  That's where we were when they lied to

us.  And this case is, I think, a perfectly appropriate case

for the exercise of personal jurisdiction.  Their contacts

with Minnesota are part and parcel of the fraud.

There's no question here, I think, that the

prerequisites for preliminary relief are met.  It satisfies

the Eighth Circuit's test for personal jurisdiction and it's

not a close case.  These are intentional acts.  It's plain

that Mr. Starsiak and his agents reached out to Minnesota,

reached out to a Minnesota company and reached out to

Minnesota residents, to try and convince them to provide him

with respirators out of sequence.

He had -- was in possession, as of May 1st, of a

Letter of Intent to purchase 1 billion 3M N95 respirators.

That's almost 3M's entire supply of respirators that it can

produce in one year, and he had promised access to 3M.  They

spent --

THE COURT:  Mr. Ursu, can I just interrupt you for

a moment?

MR. URSU:  Yes.

THE COURT:  I'm sorry.  It's awkward on the phone

to interrupt and I hate to do that, but there certainly is a

basis under the law for specific personal jurisdiction where

there is purposeful fraud on the state.  I suspect that when

we hear from the defense they will argue that the question

is not one of contact with the plaintiff or the plaintiff's

1    employees or counsel but rather with the state.

2          Could you cite to me -- and I know that their

3    motion just came in I believe yesterday and this is all very

4    last minute -- but are you aware of Eighth Circuit authority

5    that would support the exercise of specific personal

6    jurisdiction in a case like this where there's been an

7    allegation of an intentional fraud?

8          MR. URSU:  Yes.  So I would cite you to the

9    *St. Jude Medical versus Lifecare International* case.  This

10   was in the reply brief that we just filed.  That's at 250

11   F.3d 587, and the pincite is 592.  And this relates to

12   conduct that is not random, fortuitous or attenuated.  These

13   are not blast e-mails.  This is not access to a website, but

14   rather the purposeful connection that should have put

15   defendants on notice that they would be hailed into court in

16   Minnesota.

17         I think that *Calder*, the Supreme Court authority

18   on this point, too, which is from 1984, is actually also

19   very close to being on point.  That was a defamation case.

20   In that case the misconduct was directed towards California

21   and the defamatory remarks themselves were -- involved

22   California and conduct within California.  It's almost

23   identical to what we have here.  Not only did they come in,

24   harvest the identities of Ivan Fong and Haley Schaffer, but

25   were then going and lying about their access to 3M to others

1     based on those communications.

2           And so Minnesota is really the central focus of

3     the fraud and their ability to conduct it.  Without those

4     contacts, the fraud would have looked very different than it

5     ultimately was.

6           THE COURT:  Thank you.

7           MR. URSU:  Certainly.  In this district, courts

8     have looked at whether defendants' acts were intentional,

9     whether they were uniquely or expressly aimed at the forum

10    state, and whether the harm suffered was suffered here.

11    These are all things that would be met in this case.

12          Again, these are not accidental or incidental

13    contacts with Minnesota or Minnesota residents or a

14    Minnesota company, and they were also directed here in a way

15    that is specific.  They were directed to specific

16    individuals who have submitted declarations stating they are

17    Minnesota residents and at a company with its principal

18    place of business in Minnesota.  And under generally

19    applicable trademark law, that harm is suffered at the

20    principal place of the business of the trademark holder, and

21    of course that would be in Minnesota in Maplewood.

22          So I think the Eighth Circuit test for personal

23    jurisdiction is met here on the face of the affidavits that

24    have been provided and there's no contrary evidence that's

25    been submitted.

1          I think moving on from personal jurisdiction, if

2    the Court does not have further questions on that, I do not

3    hear, at least with respect to this temporary restraining

4    order, a serious contest on the other prerequisites for

5    preliminary relief.  Plainly, 3M is likely to succeed on the

6    merits and there's no contest with respect to the various

7    *SquirtCo* factors that the Eighth Circuit has relied on.

8    These are -- this is the 3M wordmark.  This is the 3M

9    trademark.  And when they use 3M in that context to claim

10   that they are 3M distributors and they are not, when they

11   claim that they are 3M sales team and they are not, that

12   under those circumstances plainly that creates a likelihood

13   of confusion and a false affiliation with 3M and that

14   violates the Lanham Act.

15         These were -- includes -- it doesn't -- I think

16   the focus for defendants' contest on this point has been

17   that the fraud actually didn't succeed.  That despite the

18   many efforts that we've put forward in the declaration here,

19   that they actually did not close transactions.  It's

20   interesting to hear that given that the conversation that

21   one of the targets of their fraud recorded, an AMK's

22   operation chief is badgering the other party, the declarant

23   said he was being bullied on the phone call itself by

24   saying, you know, asking him again and again, Have you

25   closed transactions?  Have you closed transactions?

1          Well, now they claim that they haven't, but that's

2    not the test.  The test under the Eighth Circuit factors of

3    course includes offering for sale and that's part of what

4    trademark is; and there's no doubt in this case that it did

5    confuse the public and that its intent was to confuse the

6    public.

7          Bad faith has been a driver of a great many of the

8    trademark cases.  I think there was a survey that said where

9    bad faith is found, and the other factors, there's

10   reasonable showing on the other factors that it -- in almost

11   every case there's found to be infringement.  There's no

12   question here, I think, that this is fraud.  It's -- the

13   intent here was to confuse.

14         Many courts have found a presumption of

15   irreparable harm.  We don't need to even rely on that

16   presumption here because, of course, the Southern District

17   of New York and the Southern District of Indiana have all

18   issued preliminary injunctions in this context finding that

19   there's irreparable harm and finding that the particulars of

20   this health crisis in particular make it vital that people

21   be able to trust the information that they receive.  Buyers

22   are not ordinary buyers in the regular stream of commerce.

23   They are, you know, in many cases either state officials or

24   hospitals that are desperately trying to find much needed

25   life-saving equipment so that they can keep doing their jobs

1    and so that they can tend to the people who are in fact ill.

2    It's not an ordinary lying environment and in those types of

3    circumstances irreparable harm is a real thing.

4         I just took a deposition in another case of

5    someone who was confused by this kind of gray market conduct

6    and he said based on what he saw, the marketplace resembled

7    something like cocaine dealers might do.  Obviously, those

8    kind of mis-affiliations with 3M are highly damaging and

9    highly damaging in this context in particular.

10        The public interest is likewise satisfied and, as

11   courts have found, procurement officials being able to trust

12   the information that they receive, making sure that it's

13   genuine and making sure that there are legitimate offers at

14   the end of these -- these buying chains is in fact part of

15   the public interest, and protecting that not only protects

16   3M but protects lives out there in the world where people

17   need these N95 respirators.

18        And so I think the preliminary relief factors are

19   all met here.  This is not a close case.  There have been

20   many of these filed around the country.  There was one where

21   the court did deny it and it has nothing to do with the kind

22   of conduct here.  I was surprised to see in defendants'

23   papers their discussion of this as somehow being a singular

24   incident, a singular e-mail or otherwise.  It's just not.

25   And if defendants have told their counsel that, they are not

1    being truthful. All you need to do is look at the

2    declarations in this case, the e-mails, the many, many, many

3    parties that Mr. Starsiak himself is name checking out

4    there; the way that the AMK operations chief, according to

5    Matthew Hise's declaration, is jumping in and out of phone

6    calls because of all these balls they have in the air.

7           You know, in the end, 3M was prompted to file suit

8    immediately given a contact that Mr. Starsiak had on June

9    4th, and we submitted a supplemental declaration to that

10    effect that shows where he once again was saying things that

11    were not true, where he was being corrected by other people

12    on the lines and where they were thanking him for passing

13    along information, further information about 3M counsel.

14    That's identity theft. It's not okay and that's why 3M

15    filed suit when it did.

16           If the Court has any further questions, I will be

17    happy to entertain them, but until then I'll just note that

18    our hope is that the Court will enter this temporary

19    restraining order and that we can then put something on the

20    docket for 14 days hence so that we can have a preliminary

21    injunction hearing.

22           THE COURT: Very good. Thank you, Mr. Ursu.

23           Mr. Schupp or Mr. Vaccaro.

24           MR. SCHUPP: Thank you, Your Honor. It's Tim

25    Schupp.

1    I'd like to start first, obviously you're aware

2    that we filed a motion to dismiss based on personal

3    jurisdiction yesterday because you mentioned it, and if I

4    could just address that briefly first.

5    I think as a preliminary issue, the Court needs to

6    address the jurisdictional issue before proceeding with

7    anything relating to a temporary restraining order or an

8    injunctive relief that 3M has requested.  We submitted our

9    brief yesterday and I'd just like to comment briefly on the

10   *Calder* case which 3M cited and said that the Court would

11   have jurisdiction under the doctrine in the *Calder* case, and

12   I actually think that the Eighth Circuit authority is to the

13   contrary.

14   You were quite right when you commented earlier to

15   Mr. Ursu that the issue is contacts with the forum itself,

16   not with representatives or individuals who are within the

17   forum, but it must be contacts with the forum state itself.

18   And I guess I'd like to start with the *Paisley*

19   *Park Enterprises* case that 3M cited.  That was a decision by

20   Judge Wright from February of 2019, *Paisley Park Enterprises*

21   *versus Boxill*, and Judge Wright noted that the Eighth

22   Circuit, on page 878 of that case, that the Eighth Circuit

23   has acknowledged the limited reach of *Calder*.

24   So the beginning point I think in the analysis is

25   to understand that *Calder* is very narrow and has limited

1   reach and does not have the broad application that 3M urges.

2   And Judge Wright cited a couple of Eighth Circuit cases.

3   The first one on page 879, Judge Wright said: Instead,

4   personal jurisdiction under *Calder* is appropriate when a

5   defendant purposefully targets the forum state such as by

6   directly selling an infringing product to retailers or

7   customers in that state. Of course we don't have that here.

8   All we have is a couple of telephone calls and some e-mails

9   sent to 3M.

10        And she cited *Dakota Industries, Incorporated*

11   *versus Dakota Sportswear, Inc.*, 946 F.2d 1384, and then

12   there's a parenthetical in that case, saying that:

13   Affirming exercise of personal jurisdiction over

14   out-of-state company because company was aware of competing

15   trademark yet still used its infringing trademark when

16   selling to retailers and customers in the forum state.

17        So I think that's pretty clear that the Eighth

18   Circuit requires some form of tortious conduct directed in

19   the forum state and not with individuals in the forum state,

20   and that's what 3M has here.

21        I think Mr. Ursu mistook our arguments and perhaps

22   we weren't clear enough. We're not saying that there was

23   just a single e-mail. What we're saying is there was just a

24   single customer that they alleged that we tried to sell to,

25   which was Star Brands, Inc. Now, there apparently were

multiple contacts with Star Brands, Inc., but it was only

one company -- and they are in New York, by the way --  they

only cite to one company where they were trying to sell to

them, and not as a 3M distributor as Mr. Ursu says.

And in fact if you look at the transcript they

attached, it doesn't say what they claim it says.  He says

that they -- Mr. Starsiak claimed he was a 3M distributor,

but that's not what it says.  It says that Starsiak and AMK

worked with various distributors who were 3M distributors.

They didn't claim that they were those.

Now, I can see that Mr. Hise in his affidavit says

he was told that, but what Mr. Hise says in his affidavit

conflicts with the transcript of their phone call, so I

don't know what to make of that conflict and the evidence

that they've submitted.  And I don't know that saying that

you work with 3M distributors in any way is a misuse of a

trademark.  It simply isn't.

So in any event, we're not saying it's a single

e-mail.  We're saying that they have only identified one

attempt to sell respirators that they claim that's at issue.

And we went down -- and they had referenced that Florida

case in their footnote -- and we went down and got a

transcript of the hearing and attached it to our opposition

to the motion for temporary restraining order, and that case

down there was actually quite similar in that there was only

1   one attempt to sell to one customer.

2          And the district court judge down in Tallahassee,

3   I believe, said that there was no evidence of any ongoing

4   harm or irreparable harm sufficient to justify a TRO.  He

5   said based on a single transaction, that it just didn't

6   warrant a temporary restraining order.  And we've submitted

7   Mr. Starsiak's affidavit that says they are not engaging in

8   any attempts to broker any sales and he doesn't intend to do

9   so in the future.  So, you know, other than the single Star

10  Brands customer, there isn't any evidence of any other

11  activity.

12          And I will note that Star Brands said they thought

13  something was fishy and contacted 3M about it, so I don't

14  know what the confusion was.  Although Mr. Hise says in his

15  declaration he was confused, he certainly didn't bear out in

16  his conduct when he filed some documentation with 3M and

17  also signed the affidavit with them.

18          With respect to our opposition to the motion, as

19  we -- motion for TRO, as we said in our papers, that given

20  the fact that we only had two days' notice, we weren't able

21  to fully and appropriately respond to the voluminous

22  filings.  They had five or six affidavits, a bunch of

23  exhibits, a 26-page brief, and I thought we were pretty

24  clear that we just didn't have the time to respond to

25  everything; and now 3M is claiming that due to the time

1      constraint, anything we didn't respond to is now some kind

2      of admission, which we would respectfully dispute and assure

3      the Court that we're not conceding anything by not

4      addressing it.  It was simply a question of time and

5      function.

6              They didn't serve it with their summons and

7      complaint a couple of weeks ago, but they certainly could

8      have done that and we could have had additional time to

9      prepare for this, and instead we have a two-day notice and

10     some emergency hearing.  And I don't know why there's any

11     crisis now that didn't exist at the time they served the

12     summons and complaint, and here we are approaching July.  So

13     I don't think there's any exigent circumstances that

14     requires a temporary restraining order.

15             Mr. Ursu also made the comment that Mr. Starsiak

16     is lining his pockets.  That's a little bold because they

17     don't have any evidence, and Mr. Starsiak asserts that he

18     hasn't sold a single 3M mask to anybody.  So I don't know

19     how he's, quote, unquote, lining his pockets, and I think

20     that's really kind of a gross exaggeration of the record

21     they have here to suggest that that's really what's going on

22     because they don't have any evidence that that in fact is

23     going on in this particular instance.

24             What else am I overlooking, Rob?

25             Okay.  Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Schupp.

2          Mr. Ursu.

3          (Pause in proceedings.)

4          THE COURT:  Mr. Ursu, you might be on mute.

5          MR. URSU:  I am -- I was on mute and you can

6     just -- I think we can all stipulate that the things I said

7     when I was on mute was magical and very persuasive.  I'll

8     start again.

9          MR. SCHUPP:  There is no need to repeat them,

10    John.

11         MR. URSU:  Right.  There you go, Mr. Schupp.

12         So the Eighth Circuit -- I think Mr. Schupp had

13    mentioned the Eighth Circuit's interpretation of *Calder* and

14    it's set forth in another case that I'll call to your

15    attention, which would be *Hicklin Engineering versus Aidco*,

16    and that's at 959 F.2d 738, and that that may have an effect

17    on a competitor and that effect alone is not going to be

18    sufficient to bestow personal jurisdiction.

19         3M is a trademark holder.  It is in this forum

20    state and there is no question that the effect of this

21    conduct harms 3M here in the forum state, but that is not

22    what 3M is relying on alone to establish personal

23    jurisdiction here.  It's effects plus, and the plus conduct

24    here is not just purposeful availment; not just, you know,

25    selling to customers here in this state, but actually going

1   in trying to do business activities with 3M here in the

2   state and then using the results of that to go out and try

3   to defraud others.  So I think that the effects plus

4   standard that we have here in the Eighth Circuit is plainly

5   satisfied.

6          You know, if I were to go through a long list of

7   the different entities that Mr. Starsiak was engaged with in

8   trying to sell N95 respirators or broker N95 respirators

9   over the course of this month, the ones that we know about

10  involve -- what he said were someone named Billy K, the John

11  Paul Mitchell Foundation.  He claimed to be involved with

12  the Gates Foundation.  He claimed to be involved with Elon

13  Musk.  He claimed to be involved with Richard Branson.

14  There was a V.A. Hospital in Texas he claimed to be involved

15  with.  We have this GreenNet Group that had the letter of

16  intent that was circulated to Dentons.  We have Star Brands

17  Group and we have an affidavit here from Mr. Hise that says

18  that they were jumping on and off calls all the time talking

19  about how urgent and busy they were, or at least

20  demonstrating how urgent and busy they were.

21         And in the supplemental declaration of Haley

22  Schaffer that we just filed, you will see the last

23  communication that we received from him that prompted this

24  suit immediately on June 4th in which he's talking about

25  other transactions involving other people.

1          The fact is that this has not been -- he has not

2     demonstrated himself to be an honest person through the

3     course of these transactions.  There's an enormous amount of

4     activity here and absent a court order, we have no reason to

5     believe that it's going to stop.

6          I believe that in the end, that the courts that

7     have entered preliminary injunctions and entered temporary

8     restraining orders in these contexts have been right and

9     they have done so on much less intense facts.  Mr. Starsiak

10    says this happened over a short period of time.  That's the

11    world that the buyers were living in, too.  That's the world

12    that 3M was living in, too, where all of a sudden people

13    like Mr. Starsiak, who had no business being in the PPE

14    distribution chains, started to claim an enormous amount of

15    connection with 3M that he didn't have.

16          All you have to do is read the transcript, which

17    is one of five calls that he had with Matthew Hise, the one

18    that Mr. Hise was scared enough to record at the very end

19    where he talks about being in regular contact with Ivan

20    Fong, where he talks about getting into the PPE business

21    because 3M needed someone like him to vet buyers like Star

22    Brands Group.  And you see it's a little rich for them to be

23    claiming now to have no affiliation with the State of

24    Minnesota given that their conduct was so directed there.

25          So those are my comments.  Thank you.

1          THE COURT:  Mr. Ursu, in the other 3M cases that

2     you have filed elsewhere in the country, has there been a

3     challenge to specific personal jurisdiction and a ruling

4     that implicates the *Calder* effects test?

5          MR. URSU:  Yeah, there have been no other personal

6     jurisdiction tests.  In most other cases they have

7     involved -- the Indiana case is the one that I'm most

8     intimately involved with.  That involves a defendant in Las

9     Vegas.  There have been other places, so the defendants are

10    not always resident in the forum, but there have not been

11    other personal jurisdiction challenges.

12         THE COURT:  And what is your view of the burden

13    that 3M has in this case at this stage of the game, that is

14    a motion for a TRO, with respect to alleging personal

15    jurisdiction?

16         MR. URSU:  So we have alleged jurisdiction,

17    including personal jurisdiction, in the complaint and we

18    have filed declarations that would support the exercise of

19    personal jurisdiction over defendants here, including that

20    declarants themselves, Haley Schaffer and Ivan Fong, are

21    themselves 3M residents [sic] and that 3M itself is a 3M

22    Company here.  So I think that we have satisfied whatever

23    prima facie burden we have to show that there's -- the

24    exercise of personal jurisdiction is appropriate.

25         The Court, of course, can all always assess its

1  own jurisdiction over these matters and if it turns out

2  later that it concludes that it didn't have it when it

3  thought that it did, it can always revise those findings.

4  That is, I think, my understanding of personal jurisdiction.

5  But whatever the burden is that 3M has here, I believe we

6  have satisfied.

7  THE COURT:  Mr. Schupp, I would ask the same

8  question of you but perhaps I'll word it this way.  Isn't it

9  true that 3M's burden at this point is a prima facie burden?

10  We could later on, for instance, conduct some discovery on

11  the issue if that was appropriate.  But for purposes of a

12  TRO, isn't it true that they simply need to plead sufficient

13  facts to implicate the *Calder* effects test, even though that

14  I would agree with you that the Eighth Circuit has stated

15  that *Calder* has limited applications, although it is -- it

16  typically arises in a case that involves allegations of

17  fraud.  How would you respond?

18  MR. SCHUPP:  I don't think they have pled it

19  adequately to invoke the *Calder* factors.  I think a lot of

20  this is not to be found in their complaint.  But just for

21  purposes of argument, let's assume that they did plead it,

22  and I don't think it's sufficient.  What they are saying, if

23  I understand it, is that they committed a fraud in New York

24  by referencing that they knew 3M lawyers.  And just as an

25  aside, I don't know how telling people that you know

1    somebody is identity theft.  But in any event, that they

2    knew 3M lawyers, that is not a fraud committed in the State

3    of Minnesota.  That is not conduct committed in the State of

4    Minnesota that would invoke the *Calder* factors.  That's

5    something that's going on in New York with Star Brands,

6    Inc., not in Minnesota.

7            And Mr. Ursu had said, well, the conduct with Star

8    Brands and talking about that they are affiliated with 3M

9    has an effect on 3M or an effect on 3M's trademarks and 3M

10   is in Minnesota.  Well, if that's true, then every single

11   trademark case where somebody misuses a 3M trademark in any

12   state in the union would then have an effect on 3M in

13   Maplewood, Minnesota; and I dare say that that would not be

14   sufficient to confer either general or specific jurisdiction

15   over that cause of action.

16           And Mr. Ursu also said that they had a light sale

17   to Minnesota and that's just simply not true.  There is no

18   allegation that Mr. Starsiak or AMK made any sales in the

19   State of Minnesota.  That's nowhere to be found in the

20   complaint or the voluminous documents that they produced.

21   So I would dispute that that's an allegation in the

22   complaint, Your Honor.

23           And with respect to burden, there's also a

24   substantial burden on Mr. Starsiak and AMK having to defend

25   a lawsuit in Minnesota when they are located in Utah in

1    order to hire attorneys here and have to come here and

2    defend themselves a long distance away from their home state

3    and where they do business, particularly since Mr. Starsiak

4    is a hundred percent disabled veteran from the U.S. Armed

5    Forces.  I think the Court should consider the burden on him

6    in having to litigate a case that has -- really the only

7    connection with Minnesota is that 3M is here and that we had

8    some phone calls here.

9           You know, the fact of the matter is, you know,

10   Ivan Fong could have been anywhere when he talked to him.  I

11   don't know if he was in Minnesota or not.  Haley Schaffer

12   says she was here in Minnesota when she talked to him, but

13   that's fortuitous at best and doesn't create sufficient

14   minimum contact to show purposeful availment, as Mr. Ursu

15   argues, of the laws of the State of Minnesota.

16          So I would say that proceeding without the

17   resolution of that issue at this point in time would be

18   extremely burdensome on Mr. Starsiak and AMK.

19          THE COURT:  Mr. Ursu, any final remarks before I

20   make some comments?

21          MR. URSU:  Certainly.  Just to be clear, I did not

22   intend to say, and I hope I didn't say, that there were

23   sales by AMK of 3M respirators in Minnesota.  That's not

24   true and I don't believe that's been alleged and that would

25   not be correct.  They certainly tried to procure from 3M an

1    enormous number of respirators through the fraudulent

2    conduct that happened here where they claimed to be

3    associated with the Gates Foundation and otherwise.  And

4    what they were saying out in the world involved access to

5    3M.  They had regular contacts and that they were acting as

6    3M's agent.  They cannot be surprised if that's what they

7    are claiming and they are making those claims based on

8    contacts with Minnesota within the forum state to be hailed

9    into court here.

10          I'll just lastly say, of course, we are not

11    relying on the effects test by itself.  That's entirely true

12    that the effects alone are not sufficient.  We're relying on

13    that additional conduct in bringing suit here.

14          THE COURT:  All right.  The Court is of the view

15    that the -- the burden on 3M to adequately allege specific

16    personal jurisdiction at this very early stage of the

17    proceedings on this very limited record has been met, but

18    the Court would like to explore further this question of

19    specific personal jurisdiction when the Court entertains the

20    motion for preliminary injunction.

21          My understanding is that 3M suggests that we

22    conduct a hearing in 14 days.  Mr. Ursu, am I correct about

23    that?

24          MR. URSU:  That's correct, or at least with --

25    unless there's consent, the Court order a longer period of

1      time for the temporary restraining order.

2              THE COURT:  All right.  Mr. Schupp, do you have

3      any views on that?  Should we proceed with the hearing -- I

4      think that would have to be on July 9th then -- or would

5      your client consent to extending the entry of a temporary

6      restraining order further to allow more of a record on both

7      questions, that is personal jurisdiction and the merits of

8      the preliminary injunction issue?

9              MR. SCHUPP:  We have our motion to dismiss on for

10     August 5th, Your Honor, for lack of personal jurisdiction.

11     I don't know if that makes a difference.

12             THE COURT:  Well --

13             MR. SCHUPP:  So I think that by -- I'm sorry.

14             THE COURT:  Yes, you do.  We could extend the

15     temporary retraining order until August 5th at which time we

16     could add to the calendar a motion for a preliminary

17     injunction.  That would give the parties more time to

18     develop a record on personal jurisdiction.  But I think

19     that's up to you.  You need to consent to that.

20             MR. SCHUPP:  Yeah.  So as I understand what you're

21     telling me, you're going to enter the TRO?

22             THE COURT:  Yes.  Every other aspect of the TRO I

23     think 3M has clearly pled adequately and has a sufficient

24     record to support.  Specific personal jurisdiction, while I

25     understand that the Eighth Circuit narrowly applies the

1    *Calder* effects test, I think *Calder* effects plus this record

2    is sufficient for this stage of the proceedings.  That is

3    what is the prima facie showing 3M must make on this stage.

4    But that's not to say that the Court wouldn't entertain a

5    fuller record at the time of the preliminary injunction

6    hearing.

7            MR. SCHUPP:  Okay.  Since he's not doing anything

8    anyway, I have no problem extending the time period and

9    doing it all August 5th.

10           THE COURT:  All right.  Very good.  Given that

11   it's August 5th then, the usual deadlines for briefing would

12   apply then under the rules.

13           MR. URSU:  And, Your Honor, I would respectfully

14   request, if we're going to brief this for a TRO -- sorry, if

15   we're going to brief this for the preliminary injunction,

16   that we would have the opportunity to depose Mr. Starsiak on

17   the jurisdictional question and that he do a limited

18   production of documents associated with his communications

19   with others the things that are related to this period of

20   time that he was involved in this market.

21           THE COURT:  Mr. Schupp, do you have any opposition

22   to that?

23           MR. SCHUPP:  I don't think it's necessary.  I

24   think jurisdiction -- in specific jurisdiction is -- is

25   contacts with 3M, which hopefully they know what they are.

1          THE COURT:  Well, no, I think that we can develop

2     a better record, especially a record that involves both

3     parties, like a deposition or documents, to make this

4     judgment.

5          Now you, in turn, would be entitled, if you

6     believe that there was a deposition or some documents that

7     would be useful to your side, to ask for that.

8          MR. SCHUPP:  You anticipated my question, Your

9     Honor.  Thank you.

10         THE COURT:  And do you know -- perhaps I should

11    have the parties meet and confer about that and only come

12    back if there is a concern, but I think some limited

13    discovery might be appropriate on that issue.

14         MR. URSU:  And with respect, Your Honor, could we

15    also meet and confer then on a briefing schedule that would

16    permit that evidence that was collected as part of that

17    process to be part of the record?

18         THE COURT:  Absolutely.

19         MR. URSU:  Thank you.

20         THE COURT:  So why don't I -- I will enter the TRO

21    proposed by 3M unless, Mr. Schupp, you have any argument

22    about any specific language in that proposed order.

23         MR. SCHUPP:  May I take a look at it briefly?

24         THE COURT:  Of course.

25         MR. SCHUPP:  Paragraph 1 we need to change to

1     August 5th.  Well, I don't know about paragraph 1.  It says

2     that defendant is supposed to appear in front of you to show

3     cause on a preliminary injunction, so I guess that has to be

4     changed.

5               THE COURT:  I will make it appropriate to what it

6     will be.  Any other specific arguments?

7               MR. SCHUPP:  No, Your Honor.

8               THE COURT:  All right.  I will enter some form of

9     that order.  The parties will meet and confer.  I'd like the

10    parties to get back to the Court with just a letter

11    submission in the next week about your meet and confer so

12    the Court understands the extent of any discovery that will

13    occur and the briefing schedule that you have agreed to.

14    But, Mr. Schupp, you should advise your client that the TRO

15    will likely be entered tomorrow.

16              MR. SCHUPP:  Okay.  Like I said, he's not doing

17    anything anyway, Your Honor, so it's -- but I'll let him

18    know.

19              THE COURT:  Okay.  All right.  Very good.

20              Anything further today from 3M?

21              MR. URSU:  No.  Thank you, Your Honor.

22              THE COURT:  Very good.  Anything else, Mr. Schupp?

23              MR. SCHUPP:  No thank you, Your Honor.

24              THE COURT:  All right.  Very good.  The hearing is

25    adjourned.

1           MR. URSU:  Thank you.

2           (Court adjourned at 4:14 p.m.)

3                   *    *    *

4

5

6          I, Carla R. Bebault, certify that the foregoing is

7  a correct transcript from the record of proceedings in the

8  above-entitled matter.

9

10

11         Certified by:  s/Carla R. Bebault
                           Carla Bebault, RMR, CRR, FCRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25