# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| 3M Company, | ) | Case No: |
| | ) | |
| Plaintiff, | ) | 0:20-cv-01314 (SRN/DTS) |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| MATTHEW STARSIAK, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

VIDEOCONFERENCED DEPOSITION OF

MATTHEW STARSIAK

July 27, 2020

9:00 a.m. to 4:01 p.m. (MDT)

Location:

Gordon Rees Scully Mansukhani, LLP
460 West 50 North
Fifth Floor
Salt Lake City, Utah 84101

Reported by:

Rose-Marie Robinson,
RPR, Utah CCR, California CSR, Idaho CSR.

U.S. Legal Support, Inc.
(312) 236-8352

**EXHIBIT A**

Page 26

1  discretion as needed.
2        So, for example, when we were in Puerto
3  Rico between 2017 and 2018, we set up an office
4  there, and we set up a warehouse there, and we
5  brought in the equipment needed to repair the hut
6  homes quickly, and we had the office there during
7  that time. But once that contract ended, then we
8  shut the office down because we couldn't sustain it,
9  you know, past the time that we had the contract.
10   Q.   At the present time, 2020, do you have
11  offices beyond Utah?
12   A.   Just the joint venture offices that are --
13  my joint venture partners have agreed to let me use
14  if we have a project in that area. For instance,
15  let's say we have a meeting in India, and I have a
16  joint venture partner in India. I have gone to
17  India, I've met in that office, I've met with
18  different people in that location; so we -- AMK is
19  able to use those offices as needed to keep the
20  overhead down.
21   Q.   Have you had any joint venture
22  partnerships with anyone in Minnesota?
23   A.   No.
24   Q.   Have you ever had an operating location or
25  an office in Minnesota?

Page 27

1   A.   No.
2   Q.   Other than any other activities that
3  you've had with 3M Company, have you ever had any
4  business activities with any entities in Minnesota?
5   A.   No.
6   Q.   I saw you shake your head, but did you say
7  no?
8   A.   I said no. I'm sorry.
9        MR. SCHUPP: It just didn't come through
10 with the volume, Joe, but I could see his lips
11 moving. For some reason, the sound didn't come
12 through.
13       MR. PRICE: I assume, Madam Court
14 Reporter, Ms. Robinson, you're getting those in if
15 we can't hear them; correct?
16       THE COURT REPORTER: Yes, I am. If I
17 didn't hear it, I would definitely say so.
18       MR. PRICE: Fair enough. Thank you.
19   Q.  (BY MR. PRICE) Is AMK a disabled
20 veteran-owned business?
21   A.   Yes.
22   Q.   Are you the owner?
23   A.   I am.
24   Q.   Are you a disabled veteran?
25   A.   Yes, sir.

Page 28

1   Q.   Is it a woman-owned small business?
2   A.   Say that again?
3   Q.   Is it a woman-owned small business?
4   A.   No.
5   Q.   Is it a minority-owned small business?
6   A.   No.
7   Q.   I just want to -- I won't belabor this
8  point, but during the time you were in the service,
9  you were also then operating projects for AMK? Is
10 that correct?
11   A.   I don't believe that while I was in the
12 service -- well, let me clarify that statement.
13       So when you make that question, are you
14 saying for money, or are you saying just to help
15 countries as needed how I can?
16   Q.   Number one, were you in it for money?
17   A.   Not while I was in the Marine Corps.
18   Q.   Were you providing assistance and aid to
19 countries through AMK, separate and distinct from
20 your being in the Marine Corps?
21       MR. SCHUPP: Objection, Joe.
22       When you say "AMK," you know, he said he
23 didn't form it until 2017. Are we asking him is he
24 doing it as a dba?
25       MR. PRICE: Well the only reason I ask,

Page 29

1  Mr. Schupp, is if you look at -- -
2        MR. SCHUPP: Yeah. I know what you're
3  referring to, but, you know, the fact remains that
4  the legal entity didn't exist until 2017.
5        And so then I assume you're asking him as
6  a dba, but I just want to be clear when we're
7  talking about AMK that we're not confusing the
8  entity with a dba situation.
9   Q.   (BY MR. PRICE) Well, was it a dba until
10 2017, Mr. Starsiak?
11       MR. SCHUPP: Assuming he knows what that
12 means.
13   Q.   (BY MR. PRICE) Were you doing business as
14 AMK?
15   A.   That is correct.
16   Q.   And did you then take some formal legal
17 steps in 2017 to change the nature of AMK?
18   A.   That's correct.
19   Q.   And what steps did you take, and what did
20 you change AMK to, in 2017?
21   A.   I registered 2017 in the state of Utah.
22   Q.   And register as what, sir? I'm sorry?
23   A.   AMK Energy Services.
24   Q.   Is it --
25       MR. SCHUPP: LLC or Inc.?

MATTHEW STARSIAK                                                     July 27, 2020

Page 38

1  Matt.
2      THE WITNESS:  Okay.
3      So you're saying when did I decide to get
4  involved with masks?  I'm sorry.  Maybe I need to
5  understand your question better.
6      Q.   (BY MR. PRICE)  When did AMK decide to get
7  involved with masks?
8      We'll make it the most basic question.
9      A.   So I would say around the end of April,
10 around the middle of April, end of April, I started
11 asking different people that I knew if they knew any
12 3M distributors because I had -- Mark Wright came to
13 me --
14     MR. SCHUPP:  Matt, the question was when.
15     THE WITNESS:  So are you looking for a
16 date?  Are you saying the exact date?
17     Q.   (BY MR. PRICE)  If you've got one, fine.
18 If not, we'll move on.
19     A.   I don't have an exact date.  It was an
20 approximate time period around the end of April,
21 middle of April.
22     Q.   And how -- I'm sorry.
23     A.   I'm sorry.  Go ahead.
24     Q.   And how did you become interested?
25     A.   Did my previous response kind of help you

Page 39

1  understand, or do you want me to repeat that?
2      Q.   Well, you did, but you started to tell us
3  about Mark Wright coming to you, and I was going to
4  ask you:  What did Mark Wright talk to you about
5  with regard to getting involved in PPE respirators?
6      A.   He said --
7      MR. SCHUPP:  Joe, I'm happy to let you
8  keep going here, but we're not getting anywhere
9  close to jurisdiction yet, except for you did ask a
10 couple questions.  I take that back.
11     MR. PRICE:  We've got to figure out how he
12 gets to Minnesota.  I mean, this is part of the
13 foundation.  It may take a while, but I'm moving as
14 fast as I can.
15     MR. SCHUPP:  Yeah, well, we can disagree
16 on that, Joe.  I just want to make sure we're on
17 jurisdiction.
18     MR. PRICE:  I will stipulate that you will
19 probably disagree with me about that.
20     MR. SCHUPP:  I think you're --
21     MR. PRICE:  You're welcome.
22     Q.   (BY MR. PRICE)  What did Mr. Wright come
23 to you about with regard to the masks?
24     A.   That he had buyers looking for 3M masks
25 and could I find a distributor.

Page 40

1      Q.   Is that when Mr. Wright first became
2  involved with AMK?
3      A.   No.  I had known Mark for years before
4  then.  This was just -- I'm sorry.  Go ahead.
5      Q.   What was your understanding of why
6  Mr. Wright thought that you could find distributors
7  of 3M masks?
8      A.   So my company is a humanitarian assistance
9  company, and we focus on helping during disaster
10 relief type of operations; so that's one thought.
11     Q.   When Mr. Wright came to you in April and
12 asked you if you could find distributors, what did
13 you tell him?
14     A.   I said, "I'll see what I can do."
15     Q.   And what did you do?
16     A.   I started reaching out to different people
17 in my network, asking them, "Do you know any 3M
18 distributors or anyone at 3M that can help us find
19 distributors?"
20     Q.   When you said in your network, what are
21 you referring to as your network?
22     A.   People I know -- joint venture partners,
23 just people -- you know, just word of mouth,
24 reaching out to people that I've worked with prior
25 that might have connections with 3M or 3M

Page 41

1  distributors.
2      Q.   You froze a little bit on that
3  Mr. Starsiak.  I apologize.
4      MR. PRICE:  Could the court reporter
5  please read back that answer?
6      (Testimony read back as requested.)
7      Q.   (BY MR. PRICE)  Can you name the people
8  you reached out to?
9      A.   Eric Shuster was one of them -- was
10 somebody that I knew.
11     Q.   Who was Eric Shuster?
12     A.   Eric Shuster was an attorney that I had
13 known for a few years, and I figured he might know.
14     Q.   And was he a personal friend?  Was he your
15 attorney?  What was his relationship with you?
16     A.   He was somebody that was like a friend.
17 We would go back and forth for years.  I think -- it
18 was mostly business related, things like, you know,
19 he would let me know about different business
20 dealings he had, and I would see if I could help.
21     Q.   Is it fair to say that in connection with
22 your dealings with 3M in this case, Mr. Shuster was
23 not representing you as an attorney?
24     A.   That would be fair to say.  Correct.
25     MR. SCHUPP:  We're making no claim of

U.S. Legal Support, Inc.
(312) 236-8352

MATTHEW STARSIAK                                                                     July 27, 2020

Page 46

1  he had a contact at 3M?
2  A.    Probably.  I don't want to speculate
3  because -- I don't want to say "probably."  I'm
4  sorry.
5        I'm not sure.  I wish I could say.
6  Q.    You referred to "my government 3M orders."
7        What does that mean?
8  A.    So when -- it was my understanding at this
9  time that all 3M products had to be purchased by
10 government or first responder agencies; so when Mark
11 Wright was telling me that he had buyers, then these
12 would be from a government agency or first responder
13 type-agency like a hospital or something like that.
14 Q.    Did you have buyers at the time you
15 contacted Mr. Shuster about whether he knew
16 distributors?
17 A.    So there were different -- I would say the
18 only ones that I knew of, let's say, were the ones
19 that Mark Wright had told me about which is what
20 this is referring to.
21 Q.    Do you see -- if we scroll down on that
22 email to the second page of the Exhibit 2 --
23 A.    Correct.
24 Q.    -- there's a paragraph that says:
25       "I currently have two

Page 47

1              separate 200 million mask
2              orders for 3M 1860s, and
3              this is only a small portion
4              of the orders I currently
5              have in hand for
6              US government and eight
7              other countries."
8        Do you see that?
9  A.    I do see that.
10 Q.    And were these your orders, or were these
11 Mark's orders?
12 A.    Well, I'm referring to what Mark Wright
13 told me; so basically I'm repeating what Mark Wright
14 said.
15 Q.    What was your understanding of those 200
16 million mask orders?  Who did they involve?
17 A.    So I didn't know any particulars.  I just
18 know that he had mentioned that he has buyers which
19 is why he asked me to reach out and find a
20 distributor.
21 Q.    And had you looked at the market for 3M
22 respirator masks before April 23rd to say what was
23 available on the market?
24       MR. SCHUPP:  Sorry, Joe.
25       Object to the form.  What do you mean by

Page 48

1  "market"?
2        You can answer, Matt.
3        THE WITNESS:  So I'm not really sure what
4  you mean.  I didn't really know anything about what
5  the market was, and that's why I reached out to see
6  if there was a 3M distributor that could explain to
7  us what the market was.  I didn't have any prior
8  knowledge of the market or how it worked which is
9  why I was looking for a 3M distributor to explain
10 that.
11 Q.    (BY MR. PRICE)  At the time you had this
12 discussion with Mr. Wright, was he already -- did
13 you already have the relationship formed with him
14 for AMK?
15 A.    You mean a consultant relationship?
16 Q.    Yes.
17 A.    So that relationship started when we were
18 introduced to what we were told was a 3M
19 distributor.
20 Q.    Tell me about that.  When you say "what
21 you were told," who were you introduced to and when?
22 A.    So I was introduced to somebody named Tim
23 Dupler, and I submitted that information -- you
24 know, the emails and the information on that, and
25 then -- so you can read what happened when I was

Page 49

1  introduced to Tim Dupler -- but I was introduced to
2  him and was told he was a 3M distributor.
3        And then I asked him, "Okay.  How would we
4  submit these orders for the -- from the buyers, the
5  government buyers, to the 3M distributor?"
6        And then he went on to say, "3M wants you
7  to do this, 3M wants you to do that."
8        So that's how it started.
9  Q.    Was that before you reached out to Eric
10 Shuster?
11 A.    So that's -- I don't know the approximate
12 dates.  I would say -- I don't want to speculate as
13 far as the dates because I'm not looking at the
14 emails right now in front of me; so I don't want to
15 say the wrong date.
16 Q.    Was Tim Dupler ever a consultant of AMK?
17 A.    He worked with a company called Bionica
18 with Greg Gilbert, and he was introduced as the
19 3M distributor, and he said he was looking at the
20 board and he could see the lots that were available,
21 and that's how it started.
22       He was basically our liaison with 3M, and
23 he would say, "3M wants you to do this, and 3M wants
24 you to do that."
25 Q.    And where is Mr. Dupler -- where is he

MATTHEW STARSIAK                                                July 27, 2020

Page 66

1  Security, I was very comfortable with asking him for
2  assistance with -- you know, Eric asking for
3  assistance on my behalf.  Correct.
4       Q.   Had you ever run into him in the capacity
5  as counsel for Homeland Security?
6       A.   I never did, no.  I just knew that that
7  was what his background was which made me very
8  comfortable.
9       Q.   And you asked Mr. Shuster to contact him
10 on your behalf so that you could discuss with him
11 this issue of finding appropriate 3M distributors
12 for mask sales; correct?
13      A.   That's correct.  I let Mr. Shuster know
14 that I had different buyers who were reaching out
15 that wanted 3M products, respirator products.  And
16 the first time I reached out to Eric was for that,
17 to find a 3M distributor.  And the next time was
18 because one of the buyers had requested on behalf of
19 their client an attorney-to-attorney POF
20 attestation.  Correct.
21      Q.   As I understand it, there were two
22 separate sort of discrete contacts for the 3M people
23 in Minnesota.  The first one was because you had
24 some buyers for about -- I think you said 200
25 million mask orders, and you needed a distributor,

Page 67

1  and you wanted a contact in Minnesota who turned out
2  to be initially Mr. Fong; correct?
3       A.   Correct.  And just for the record, I
4  didn't know their location, whether they were in
5  Minnesota or not, but I did know that Mr. Eric
6  Shuster had said that he knew Mr. Ivan Fong and had
7  a prior relationship with him.  So I was very
8  comfortable -- like I said, once I was aware of
9  Mr. Fong's background, I was very comfortable, you
10 know, in him reaching out on my behalf to request
11 assistance.
12      Q.   Were you aware at that time that corporate
13 offices for Minnesota Mining and Manufacturing were
14 in Minnesota?
15      A.   I was not aware of that.
16      Q.   Did you --
17           MR. SCHUPP:  I thought their name was 3M.
18           MR. PRICE:  It's the Minnesota part that's
19 the giveaway, Mr. Schupp.
20           MR. SCHUPP:  I don't think they use that
21 anymore, Joe.
22      Q.   (BY MR. PRICE)  Were you -- subsequently,
23 did you become aware that Mr. Fong and Ms. Schaffer
24 were located in Minnesota?
25      A.   No.  Until the 3M lawsuit came out against

Page 68

1  me -- in the complaint, that was when I realized
2  that it was in Minnesota, because they had filed in
3  Minnesota, and I didn't understand why they filed in
4  Minnesota, but then, you know, I came to realize
5  that this organization, at least the organization
6  that filed, was in Minnesota.
7       Q.   You've read the complaint, did you not --
8       A.   I did.
9       Q.   -- served on AMK and on you personally?
10      A.   I did read it.
11      Q.   And you understood that they were making a
12 variety of claims against you for fraud,
13 misrepresentation, trademark violation, things of
14 this nature; correct?
15      A.   Correct.  Yes, sir.
16      Q.   And you obviously dispute the fact that
17 those things occurred, I assume?
18      A.   Yes, sir.
19      Q.   So would you agree with me that, if those
20 things did occur, that -- just hypothetically, if
21 those things did occur, that those might cause harm
22 to the company where its corporate offices are?
23           MR. SCHUPP:  Object to the form and
24 foundation for this witness.
25      Q.   (BY MR. PRICE)  Could you answer, please?

Page 69

1       A.   So, as you know, I'm claiming that I know
2  that they didn't occur, because I didn't do the
3  things that were stated in there, but I think what
4  you're saying is that, if somebody were to do those
5  things, that it would cause damage to them.
6       Q.   Yes.
7       A.   I agree with that statement.
8       Q.   Right.  And so if this is the company
9  that's located in Minnesota, it would probably do
10 damage to them in Minnesota, isn't that right?
11           MR. SCHUPP:  Form and foundation to this
12 witness.
13           THE WITNESS:  So I couldn't answer that
14 question about Minnesota, whether damage is in
15 Minnesota or not.
16      Q.   (BY MR. PRICE)  Well, I think we talked
17 about earlier, you had that little logo, that little
18 legend on your emails about fraudulent documents.
19 And I think we agreed that, if somebody sent
20 fraudulent material or made fraudulent statements to
21 them that caused them injury, it would cause them
22 injury in Utah; correct?
23           MR. SCHUPP:  Objection.  That misstates
24 his prior testimony.
25      Q.   (BY MR. PRICE)  Am I correct on that, or

MATTHEW STARSIAK                                                July 27, 2020

Page 70

1  can you correct me?
2      A.   Well, what I would probably say is:
3           Depending on the project, where I was
4  working the project -- in which country or which
5  state -- that I would probably -- I don't know if it
6  would hurt Utah, but you know, unless I was working
7  in Utah with that particular project and that was
8  where the government contract was.
9      Q.   The fact that you are located in Utah, and
10 somebody sends you fraudulent documents or makes
11 fraudulent statements to you in Utah, you would
12 consider that to cause you injury in Utah?
13          MR. SCHUPP:  Object to the form and
14 foundation.  What kind of statements?
15          MR. PRICE:  Fraudulent statements.
16 Misrepresentations.
17          MR. SCHUPP:  In connection with what?
18 It's too vague.
19     Q.   (BY MR. PRICE)  Can you answer, please?
20     A.   So, for instance, if I was in Puerto Rico,
21 and somebody -- and we were doing the Puerto Rico
22 contract for FEMA, and somebody sent me a fraudulent
23 document, and I was in the office in Puerto Rico, I
24 would say it would have to originate in Puerto Rico
25 but not Utah -- does that make sense? -- at least on

Page 71

1  my point of view.
2      Q.   What if you were in Utah and they made
3  fraudulent statements or sent those fraudulent
4  documents to you?
5      A.   You mean, if the project was in Utah?
6      Q.   Project was in Utah or somebody just sends
7  you, with respect to the project, fraudulent
8  documents or made fraudulent statements to you in
9  Utah?
10     A.   I would report it to the appropriate
11 authorities.
12     Q.   But if they intended to hurt you, you
13 would seek redress?  You would probably sue them
14 from Utah, wouldn't you, if you could?
15          MR. SCHUPP:  Objection.  Improper
16 hypothetical.  It's vague.  Ambiguous.
17                (Phone ringing.)
18          MR. SCHUPP:  Sorry about that.
19          MR. PRICE:  Is that emphasis on the
20 objection or what?
21          THE WITNESS:  So do you want me to answer
22 that?
23     Q.   (BY MR. PRICE)  I do.  I do.
24     A.   So I would go back to whatever -- wherever
25 the project was that I was working, that's where --

Page 72

1  like, say if it was -- we were working a contract in
2  Puerto Rico and it occurred there, then that's where
3  we would -- I mean, to be honest, I would probably
4  just report it to the authorities and let the
5  authorities handle that, where they felt the
6  jurisdiction was.  I don't know if that's in my
7  ability to determine where it should be filed.
8      Q.   Well, I may come back to that.  I want to
9  move on a little further here.
10          You said, for example, that you don't know
11 -- you didn't know that 3M is located in Minnesota;
12 correct?
13     A.   Correct.
14     Q.   And you didn't know that Ivan Fong and
15 Haley Schaffer were located in Minnesota?
16          MR. SCHUPP:  Are you representing they
17 were in Minnesota when they received the emails?
18          MR. PRICE:  Yeah.
19          MR. SCHUPP:  Okay.  Thank you.
20          THE WITNESS:  I didn't know their
21 location, no.  That is correct.
22     Q.   (BY MR. PRICE)  Did you receive emails
23 from Ms. Schaffer?
24     A.   I did.
25     Q.   Did you ever look at the signature block

Page 73

1  on her email?
2      A.   If I did, I didn't look closely.  You
3  mean, if I noticed there was an address on there?
4      Q.   Yes.
5      A.   I didn't actually look at the address, no.
6      Q.   So you wouldn't know whether it said that
7  she was located in Minnesota or not; correct?
8      A.   That's correct.
9      Q.   But if her email said that, that would be
10 something that you would have within your
11 possession; correct?
12     A.   That's correct.  If her email said she was
13 located in Minnesota, then I would have that in my
14 possession.  That is correct.
15     Q.   I'm just looking here to see one thing, if
16 you can hold on one second.
17          MR. PRICE:  Can we just quickly pull up
18 the documents that are in Tab 30?
19          MR. SCHUPP:  3-0, Joe?
20          MR. PRICE:  3-0.
21          MR. SCHUPP:  Thank you.
22     Q.   (BY MR. PRICE)  So that -- Mr. Starsiak,
23 can you see that document?
24     A.   What I see at the top of this document
25 is "Understood.  Will do."

MATTHEW STARSIAK  July 27, 2020

Page 82

1  Mr. Fong whether you could reference Mr. Fong's name
2  when you contacted Mr. Motalebi?
3      A.   Yes, sir.
4      Q.   And do you recall that Mr. Fong said, "No.
5  It would be awkward; so I prefer that he not use my
6  name."  Correct?
7      A.   Was I cc'd on that one?  Was I cc'd on
8  that email?
9      Q.   No.
10     A.   I don't -- yeah.  If I wasn't cc'd on it,
11 I probably didn't see that.
12     Q.   Are you aware that Mr. Shuster wrote
13 Mr. Fong back and said, "I will do as you instruct"?
14     A.   I'm sorry.  You're coming in a little bit
15 muffled.  It's, like, a little bit hazy.
16          But could you say that one more time,
17 please?
18     Q.   Yes.
19          Are you aware that, when Mr. Fong said, "I
20 don't want him to use my name because it is
21 awkward," Mr. Shuster, on April 27th, wrote back to
22 Mr. Fong and said, "I will do as you instruct"?
23     A.   Did they cc me on that email?
24     Q.   No.  I think we determined he didn't cc
25 you on that.

Page 83

1      A.   So if -- so Eric didn't tell me these
2  things.  So if I wasn't cc'd on it, then I wouldn't
3  be aware of it.
4      Q.   Is it your testimony, sir, that at no time
5  did you ever learn that Mr. Fong did not want you to
6  use his name?
7           MR. SCHUPP:  Objection.  It didn't say
8  that.  It just said the name of one individual, Joe.
9  That's a mischaracterization of what it says.
10          THE WITNESS:  So, sir, could you --
11     Q.   (BY MR. PRICE)  Did you --
12     A.   Go ahead.
13     Q.   I'm sorry.  Go ahead.
14     A.   I was going to ask, sir, if you could
15 repeat that question because I wasn't really sure of
16 what you were asking.
17     Q.   Was it your understanding that you had the
18 authority to use Mr. Fong's name, and you thought
19 this was your negotiation with distributors or
20 sellers?
21     A.   That is correct.  At no time did I think
22 that there was a problem with being very open and
23 honest with people I'm talking to and telling them
24 who I'm communicating with at 3M.  I didn't think
25 that would be an issue.  There was never at any time

Page 84

1  -- it wasn't communicated to me that I shouldn't
2  mention Mr. Ivan Fong's name or Ms. Haley Schaffer's
3  name or anybody's name.  That's correct.
4      Q.   Does that include your communications with
5  Mr. Motalebi?
6      A.   That's the same, I guess.  At no time did
7  I ever think it would have been bad or inappropriate
8  to mention who I was talking to at 3M.  I'm always
9  very open and honest with all my communications, and
10 so I try to be respectful of other people as well,
11 and I'd hope they would be open and honest with me.
12          But at no time did I ever think I wasn't
13 supposed to say their name, that that would be a bad
14 thing.
15     Q.   Is it fair to say that you used Mr. Fong's
16 name quite freely in your negotiations and
17 discussions with other people?
18          MR. SCHUPP:  Objection to the
19 characterization "frequently."
20          MR. PRICE:  I think it was "freely."
21          MR. SCHUPP:  Oh, I see.  I misheard you,
22 Joe.  I apologize.
23          MR. PRICE:  Pick one.  Either one works
24 for me.
25          THE WITNESS:  So I wouldn't say that I

Page 85

1  used it freely.  If somebody asked me a direct
2  question and they asked me who I was speaking to at
3  3M on the legal side, I would be very open and
4  honest of who I was speaking to.  I wouldn't hide
5  that.  I wouldn't lie about it.  I would be very
6  open and honest with them.
7      Q.   (BY MR. PRICE)  And would you use it
8  affirmatively?  Even if somebody didn't ask you
9  about it, would you tell them, "I'm connected with
10 Ivan Fong and Hayley Schaffer at 3M"?
11     A.   If I felt it was appropriate for the
12 audience for whatever reason, then I might have said
13 that if I felt it was appropriate in that particular
14 conversation.
15     Q.   Did you subsequently reach out to
16 Mr. Motalebi?
17     A.   Yes, sir.  Are you talking about the
18 person that Mr. Ivan Fong had on that email, saying
19 to reach out for help finding a distributor?
20     Q.   Yes.
21     A.   Yes, sir.
22     Q.   And what did you do in furtherance of
23 reaching out?  How did you go about it?
24     A.   There's a number on that email, and I just
25 called that number.

MATTHEW STARSIAK											July 27, 2020

Page 86

1  Q.  What happened when you called that number?
2  A.  It went to voice mail.
3  Q.  Did you determine that it was
4  Mr. Motalebi's voice mail?
5  A.  I didn't -- I assumed it was his voice
6  mail, and I just left a voice mail. I just left a
7  message. I figured --
8  Q.  What was the message? I'm sorry.
9  A.  I just identified myself, and I said, "If
10 you could please call me back at your earliest
11 convenience."
12 Q.  Did he do so?
13 A.  No, sir. I never received a call back.
14 Q.  Did you understand what Mr. Motalebi's
15 position was?
16 A.  All I understood was that he was there to
17 facilitate helping me find a 3M distributor at the
18 request of Mr. Ivan Fong. That's all I understood.
19 I didn't know anything personally about him.
20 Q.  Now, after you had your voice mail -- left
21 your voice mail with Mr. Motalebi -- were you told
22 that was his name, by the way? Did Mr. Shuster tell
23 you to call Mr. Motalebi?
24 A.  I don't think we pronounced it correctly.
25     He just said -- if he mentioned the name,

Page 87

1  I don't remember, but I just remember we were
2  supposed to call that number for assistance.
3  Q.  And after you called that number for
4  assistance, you say you had no return; correct? No
5  return?
6  A.  Correct.
7  Q.  Did you have -- strike that.
8     Do you know what 3M Global USA is?
9  A.  Do I know -- I'm just going to repeat your
10 question so I make sure I hear this correctly.
11    Do I know what 3M Local (sic) USA means?
12 Q.  What it is?
13 A.  I don't know what 3M Local (sic) USA is, I
14 don't.
15 Q.  You had mentioned earlier, I think, that
16 you had been dealing with Tim Dupler because you
17 believed him to be an authorized 3M distributor.
18    Did I get that correctly?
19 A.  That's correct. He was referred to me as
20 an authorized 3M distributor.
21 Q.  Is it also true that you considered
22 Mr. Dupler to be an authorized representative of
23 AMK?
24 A.  Tim Dupler's role was to facilitate the
25 buyers that had come to AMK for 3M products and, in

Page 88

1  this case, respirators. So I don't know if you
2  would say he represented AMK. He was supposed to
3  have represented 3M, which, my understanding now is
4  that's not the case, but at the time, he was
5  supposed to have been representing 3M and explaining
6  the process and procedure, because he would say, "3M
7  wants you to do this. 3M wants you to do that.
8  This is the price. This is the procedure. This is
9  how quickly you have to do it."
10    And I would simply introduce the buyer to
11 Tim Dupler, and then Tim Dupler would explain that
12 to the buyer or the government agency that were able
13 to fill out the paperwork that Tim Dupler provided
14 them. So if that makes more sense?
15 Q.  Did you authorize him to sign
16 correspondence as your authorized representative?
17 A.  So what Tim Dupler would do is, he would
18 say, "These are the documents that 3M needs you to
19 sign," or "These are the documents in this format
20 that 3M needs," and he represented himself as
21 working on behalf of 3M.
22    So I didn't authorize him to act on behalf
23 of AMK. What he was doing is he was acting on
24 behalf of 3M and explaining to AMK how the process
25 was supposed to work per 3M guidelines.

Page 89

1  So when he spoke, I was assuming, when he
2  said, "3M wants you to do this, and 3M wants you to
3  do that," that he is speaking for 3M and that he is
4  connected with 3M, and 3M knew what he was telling
5  AMK to do.
6  Q.  But you know today that's not correct;
7  right?
8  A.  I'm sorry? Say that again?
9  Q.  You know, as you sit here today, that it's
10 not correct that Mr. Dupler was an authorized 3M
11 representative; correct?
12 A.  Well, once I received the lawsuit, the
13 summons, and they said that -- then I assumed that
14 much of what I'd been told, if not everything that I
15 was told, was not accurate, yes.
16    And I brought Tim Dupler on with Hayley
17 Schaffer and Kim Shafer, like we discussed, for that
18 very reason. I wanted to determine if they were
19 correct long before any lawsuit came in.
20    So that was the whole point of me bringing
21 them on with Ms. Hayley Schaffer -- so she could
22 help me verify that what they were saying was
23 correct.
24    To answer your question, yes. Now I know,
25 according to 3M, that they have no affiliation.

MATTHEW STARSIAK                                                    July 27, 2020

Page 146

1   Let's work with this one. There's three
2   others. Okay? We're talking about this one.
3   Somebody needs to find the other three. Okay?
4   Please?
5           MS. MURPHY: One moment.
6           MR. PRICE: Okay. Let's go to the -- is
7   this the top of the document? Okay. There we go.
8           (Exhibit No. 8 marked.)
9   Q.   (BY MR. PRICE) Do you see this,
10  Mr. Starsiak?
11  A.   I do see this document. Yes, sir.
12  Q.   And it's on your letterhead; correct?
13  A.   No. This isn't my letterhead. It looks
14  like somebody has taken pieces of my letterhead and
15  tried to create something, but I don't recognize
16  that logo or that -- whatever that is, like, two
17  dots or something above it.
18           So it looks like somebody created this but
19  not on my letterhead.
20           MR. PRICE: Could we scroll down further,
21  please?
22           MR. SCHUPP: What's that Bates number?
23  It's kind of hidden on the -- because of where the
24  video is showing up on my screen.
25           Can you tell the Bates numbers there, Joe?

Page 147

1           MS. MURPHY: Can you see Bates DEFS002152?
2           MR. SCHUPP: The -152 was blocked off.
3           Thank you.
4           MS. MURPHY: Okay. Should I keep
5   scrolling, Joe?
6           MR. PRICE: Please.
7           Hold on one second here. Back up to the
8   top.
9   Q.   (BY MR. PRICE) Are you telling me, then,
10  sir, that this is not your letterhead either?
11  A.   No, sir. This is not my letterhead, and I
12  don't recall ever seeing this document.
13  Q.   Do you recall ever sending a document to
14  Dorsey & Whitney in Minneapolis?
15  A.   I don't know who Dorsey & Whitney in
16  Minneapolis is.
17          MR. PRICE: Can we scroll down further?
18  Q.   (BY MR. PRICE) You did not sign that
19  letter, sir, as it says at the bottom?
20  A.   No, sir. I don't see a signature on it.
21  Q.   You wouldn't see a signature on it if it
22  was sent to the Dorsey firm in Minneapolis.
23          These came out of your file. Can you
24  explain how these would be in your file and if they
25  were fraudulently altered?

Page 148

1           MR. SCHUPP: He didn't say that, Joe, and
2   I think that's argumentative, but he can answer your
3   question.
4           THE WITNESS: So I just said I don't
5   recognize this document. And I'm not saying it's
6   in, you know, in the hundreds of emails I probably
7   sent up. I'm just saying I don't recognize this
8   document, and I don't recognize who it's being sent
9   to. So I didn't create this document, is what I'm
10  saying.
11  Q.   Could somebody at AMK working with you on
12  the respirator mask issues send out documents under
13  your name or over your name?
14  A.   Well, I think we've seen that Tim Dupler
15  at times did that, saying that 3M needed this; so I
16  guess it's possible that Tim Dupler did this, you
17  know, with the justification that 3M required this.
18           But, like I said, I don't ever remember
19  seeing this document. This is not familiar to me.
20  I don't even understand it. It looks like it's some
21  kind of a broker agreement sent to somebody for --
22  to purchase -- I don't understand this document. I
23  can't really see all of it. I see right now I'm on
24  the signature line. It just says Matthew Starsiak,
25  CEO, AMK Energy Services, which is not how I usually

Page 149

1   have my signature line.
2           But that's all I see. And "We look
3   forward to the successful" -- let me move that
4   screen --
5                   "We look forward to the
6                   successful conclusion of
7                   this transaction. Please
8                   sign and return the
9                   following acknowledgement of
10                  this broker notice to be
11                  included as part of the
12                  closing procedures with The
13                  3M Company."
14          So I don't know what this is. I'm sorry.
15  Q.   Can you scroll down to the bottom,
16  Mr. Starsiak, and see the entire remainder of the
17  document? Hold it right there. Up a little bit
18  more. Do you recognize your name and Kim Shafer's
19  name on there?
20  A.   I do. There's my name, Kim Shafer's name,
21  and there's an Ally, who was one of the brokers for
22  Kim Shafer, that supposedly was working directly
23  with 3M. And the fact that her name is on there --
24  I don't know why her last name is not on there,
25  though. That looks kind of weird. But she was one

MATTHEW STARSIAK                                                   July 27, 2020

Page 178

1  correctly. Let's just put it like that.
2       MR. SCHUPP: You mean transcribed.
3       THE WITNESS: Transcribed. Correct.
4       Q.  (BY MR. PRICE) Is this incorrect? Is it
5  incorrect that these men were told that you were the
6  second-largest contractor for FEMA?
7       A.  Oh, I'm not saying that's incorrect. I'm
8  saying that there's certain things that were
9  incorrect.
10       But, yes, we were told we were the
11 second-largest contractor for FEMA. That's correct.
12      Q.  But at the time in May of 2020, you hadn't
13 done any work for FEMA for three years, isn't that
14 right?
15      A.  Correct. But that's why it says we were
16 the second largest. Not that we are, but we were.
17      And I think that's one of the things --
18 like, in the thing that -- "we're the second-largest
19 contractor" is actually "we were the second-largest
20 contractor for FEMA."
21      But that's usually the way it's stated.
22      Whether it's stated like that correctly
23 here or not, I can't say, but usually it's "we
24 were," not "we're."
25      Q.  Do you recall when Mr. Heist and his

Page 179

1  colleagues were asking you to verify your
2  relationship with 3M?
3       A.  That's correct. I do remember them
4  stating that.
5       Q.  And did you ever provide any verification
6  to them of your relationship with 3M?
7       A.  Well, what I did is, I explained my
8  relationship is that we were working with
9  distributors. I said we were working with six
10 different distributors.
11      Q.  Did you tell them that you have Ivan Fong
12 that you go to regularly, the lead senior counsel,
13 and he gave you to Ms. Schaffer?
14      A.  Yes.
15      Q.  Do you recall that?
16      A.  They asked me who I was working with at
17 3M, and I was very up front and honest with them
18 that I worked with -- or at least was in contact
19 with Mr. Ivan Fong and Ms. Haley Schaffer. Correct.
20      Q.  Did you ever talk to Ivan Fong in all of
21 those transactions or attempt to send a direct
22 email?
23      A.  Yes. I did send Mr. Ivan Fong a direct
24 email. I don't know how many, but I remember I did
25 send him a direct email.

Page 180

1       Q.  Did you have any other contacts with any
2  other businesses similar to the contact you had with
3  Stars when you were --
4       A.  I'm sorry. Go ahead.
5       Q.  -- when you were attempting to broker
6  masks?
7       A.  So this Star Group actually came in
8  through Mark Wright. It didn't come in through me;
9  so the --
10      Q.  Did any other groups come in?
11      I'm sorry.
12      A.  I'm sorry.
13      So I was going to say the two groups that
14 I had that came in through me were William
15 Kiriakopoulos and Antonella Commatteo. They both
16 had multiple first responders and government groups
17 that wanted to purchase, and they submitted their
18 documentation directly to the groups with Kim Shafer
19 and Tim Dupler that they said needed to receive the
20 documentation.
21      Q.  And were they ever able to obtain masks
22 with your assistance?
23      A.  I never saw a single transaction completed
24 during that entire month, month and a week, or
25 whatever that was.

Page 181

1       Q.  Did Mr. Wright have an AMK address?
2       A.  He requested an AMK email for he and Mica
3  Xavier, his employee, and I gave them one at the
4  beginning of May.
5       Q.  When was the last time you saw Mark
6  Wright?
7       A.  When was the last time I saw Mark Wright?
8       Q.  Yes.
9       A.  I've actually never seen Mark Wright.
10 I've actually never met him in person.
11      Q.  Did you ever see Mica Xavier?
12      A.  I never saw Mica Xavier either. It's only
13 by phone that I know them.
14      Q.  When was the last time you talked to Mark
15 Wright?
16      A.  Oh, I don't know. Maybe a week ago. I'd
17 have to look up on my calls, but...
18      Q.  I can't tell if that's something you're
19 doing now.
20      A.  No. I said I'd have to look it up.
21      Q.  I'm sorry. I can't tell.
22      Are you doing something, Mr. Starsiak?
23      A.  I'm just saying --
24      MR. SCHUPP: He's waiting for the next
25 question, Joe.

MATTHEW STARSIAK									July 27, 2020

Page 186

1          MR. SCHUPP: The joke is we never stopped
2     hearing, Joe.
3          MR. PRICE: All right. But you can hear
4     me okay? Perfect. All right.
5     Q.   (BY MR. PRICE) Mr. Starsiak, was Tim
6     Dupler ever a consultant of AMK?
7     A.   No. Tim Dupler was never a consultant for
8     AMK. He was never paid, never consulted. He was
9     supposed to be the 3M distributor rep, or whatever
10    you want to call him.
11    Q.   And you never paid him anything for what
12    he did for AMK?
13    A.   No. I never paid him anything, and I
14    don't believe he ever did anything for AMK. There
15    was not a single transaction that I ever saw or came
16    to fruition. AMK has never received any money
17    whatsoever, and so there was nothing to pay him for.
18         He was supposed to get a commission -- or
19    a percentage of the commission if it came in from
20    3M, but he never produced anything. He never
21    received a dime from AMK, and AMK never received a
22    dime from 3M or anybody else.
23    Q.   Would you agree with me that, if
24    Mr. Dupler had successfully helped broker these
25    deals, AMK would have benefited financially from

Page 187

1     that?
2     A.   I'm sorry? Say that one more time? That
3     last part? AMK would have?
4     Q.   Financially benefited from that if
5     Mr. Dupler had been successful in helping broker
6     these deals?
7     A.   So how it was explained to me is that 3M
8     would decide who received money, and AMK might not
9     have received money at all. And it wasn't really
10    the purpose of AMK to receive money on this. It was
11    to help the hospitals and the different groups that
12    needed masks to receive masks. Whether or not AMK
13    received any money wasn't the point. In all of
14    AMK's projects, the moneys are earmarked for
15    humanitarian projects. So even if AMK did receive
16    money, it would have gone into a charity or a
17    humanitarian project.
18    Q.   Are you saying that none of the activities
19    that AMK conducted with respect to the masks would
20    have resulted in any income to AMK?
21         MR. SCHUPP: Objection. Misstates his
22    testimony.
23         You can tell him again.
24         THE WITNESS: So what I'm saying is we
25    were told that 3M would decide who received what

Page 188

1     moneys, and if AMK received moneys, which was not up
2     to us, we might have received money or we might not
3     have. If we didn't, that wasn't a problem because
4     we weren't there for the money. We were there to
5     help these hospitals and these government agencies
6     receive the masks that they needed or the
7     respirators that they were requesting, and we were
8     just trying to help facilitate that process.
9          But if AMK would have received any moneys,
10    then AMK, what it usually does with its projects is
11    just put them into a charity or a humanitarian
12    project.
13         So AMK is a humanitarian company. It's
14    designed just to help during disaster relief
15    operations and humanitarian needs.
16    Q.   (BY MR. PRICE) Do you know what factors
17    3M would have considered as determining whether AMK
18    would have received anything from a deal had it been
19    consummated?
20    A.   No. He was very vague on that. He and
21    Kim Shafer were very vague. They just said 3M would
22    evaluate all the parties involved, and then they
23    would decide what part or what role parties played
24    and how much of the 10 percent commission they would
25    receive; so it wasn't very clear.

Page 189

1          And it wasn't very important to me at the
2     time. That really wasn't the point of the whole
3     process to me.
4     Q.   With respect to the 10 percent commission,
5     did you or AMK have any sort of agreement with
6     people like Kim Shafer and Tim Dupler as to how any
7     commission which was received would be divided?
8     A.   So that was very vague as well, and it
9     changed depending on who the group was that was
10    supplying it. So it was very vague.
11         So I can't say -- they would throw out
12    numbers, but then they would change the numbers, and
13    it was very vague.
14    Q.   Do I understand that AMK is not for
15    profit, not a for-profit business?
16    A.   So --
17         MR. SCHUPP: Objection. Misstates what he
18    said.
19         THE WITNESS: So yeah. That wasn't what I
20    said. What I said was we take the profits, and we
21    put them towards humanitarian projects, or we put
22    them towards charities.
23         A good example:
24         Before this project, I was working on the
25    Service-Disabled Veteran Treatment Center that was a

U.S. Legal Support, Inc.
(312) 236-8352