# EXHIBIT B

UNITED STATES OF DISTRICT COURT
DISTRICT OF MINNESOTA

Court File No: 0:20-CV-01314 (SRN/DTS)

3M COMPANY,

    Plaintiff,

vs.

MATTHEW STARSIAK,
AMK ENERGY SERVICES LLC, and
JOHN DOES 1 THROUGH 10, whose
true names are largely unknown,

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOCONFERENCE DEPOSITION VIA ZOOM OF
HALEY SCHAFFER

- - - - - - - - - - - - - - - - - - - - - - - - -

Taken: July 31, 2020        By Mary Piehl, B.S.Ed, RPR

**EXHIBIT B**

Videoconference Deposition via Zoom of Haley Schaffer - 7/31/2020
3M Company v. Matthew Starsiak, et al.

Page 10

1  A. I asked him when, I asked him about his voicemail
2     message from Matthew Starsiak, and he said what he
3     remembers is that it was a call that Mr. Starsiak
4     left a voicemail for him and that he mentioned he
5     was calling, he got his name from Ivan Fong, and
6     he was calling to talk to him about respirators.
7     So that's what I remember. Sorry -- that's what
8     he remembered and told me.
9  Q. Okay. Is there a copy of, a transcription or a
10    copy that voicemail?
11 A. No.
12 Q. Okay. So he was telling you based on his
13    recollection?
14 A. Correct.
15 Q. Did Mr. Motalebi discuss with you whether or not
16    he'd ever called Mr. Starsiak back in response to
17    that voicemail?
18 A. No, not on that phone call.
19 Q. Not on that phone call, meaning no with respect to
20    the voicemail he received from Mr. Starsiak?
21 A. No. What I mean is that during the phone call I
22    had with him in preparation for my 30(b)(6)
23    witness, we did not discuss whether or not he
24    called him back, Mr. Starsiak back.
25 Q. Okay. Did you ever discuss that issue as to

Page 11

1     whether or not whether Mr. Motalebi contacted
2     Mr. Starsiak?
3        MS. BUNDY: I just will caution the
4     witness, to the extent it was not in connection
5     with preparation for the 30(b)(6) and but rather
6     in your role as in-house counsel or related to
7     work product, I'd instruct you not to answer.
8        THE WITNESS: I cannot answer that
9     question because it's work product.
10       BY MR. VACCARO:
11 Q. Okay. Your discussions with Mr. Fong --
12       MR. VACCARO: Kerry, are you taking the
13    position all of those discussions are privileged,
14    or that I can explore factual issues in connection
15    with the 30(b)(6), perhaps?
16       MS. BUNDY: Yeah, to the extent that
17    Ms. Schaffer had discussions in preparation for
18    the 30(b)(6) with Mr. Fong about facts, she can
19    disclose those to you.
20       BY MR. VACCARO:
21 Q. Okay. Ms. Schaffer, with that, what were your
22    discussions with Mr. Fong in preparation for your
23    deposition today?
24 A. In preparation for my 30(b)(6) deposition, I asked
25    Mr. Fong if he recalled receiving the voicemail

Page 12

1     message from Mr. Starsiak that Mr. Motalebi
2     forwarded to him, and he said he recalled
3     receiving it. I also -- but did not have a copy
4     of it anymore. I asked him if he -- about his
5     conversation with Eric Schuster when Eric Schuster
6     first reached out to him by phone.
7  Q. And do you know when the call, the voicemail from
8     Mr. Starsiak was made to Mr. Motalebi?
9  A. I believe's around May 7th, give or take a couple
10    days, or maybe a week or two. I don't recall the
11    first date. It was before I talked to
12    Mr. Starsiak, I know that.
13 Q. Okay. And did you discuss anything else with
14    Mr. Fong in preparation today?
15 A. No, I did not.
16 Q. And other than Mr. Fong and Mr. Motalebi, did you
17    have any other discussions, other than your
18    counsel, about your deposition testimony today?
19 A. No, I did not.
20 Q. Okay. And you mentioned that you reviewed some
21    documents in preparing for today's proceeding.
22    Can you identify what those documents were?
23 A. Correspondence.
24       MS. BUNDY: Sorry, Ms. Schaffer. If I
25    might add, to the extent that those documents

Page 13

1     refreshed your recollection, you're free to
2     testify about that.
3        To the extent they didn't, we'd object as
4     work product.
5        THE WITNESS: They didn't refresh my
6     recollection.
7        BY MR. VACCARO:
8  Q. Okay. And just tell me what the general nature of
9     the documents, what types of documents you looked
10    at in preparation for today.
11 A. Correspondence.
12       MS. BUNDY: General --
13       THE WITNESS: Go ahead.
14       MS. BUNDY: General categories, to the
15    extent that they'd be something on a privilege log
16    or work product log, you can go ahead and answer.
17       THE WITNESS: Thank you. Correspondence
18    with Mr. Starsiak and Mr. Schuster.
19       BY MR. VACCARO:
20 Q. Okay. Anything else?
21 A. Other correspondence related to this matter that
22    would be work product, privileged.
23       MR. VACCARO: Counsel, I'm a little
24    unclear. Is the position that documents that were
25    reviewed in connection with preparation for the

Videoconference Deposition via Zoom of Haley Schaffer - 7/31/2020
3M Company v. Matthew Starsiak, et al.

## Page 34

1  A.  I think a lot of this is probably work product,
2      because it was done in my -- if you're asking me
3      in my personal capacity as part of 3M litigation.
4  Q.  Well, I'm just trying --
5  A.  And privilege.
6  Q.  So the manner in which Mr. Fong reached out to
7      you --
8          MR. VACCARO:  Is there a claim of
9      privilege, Kerry?
10         MS. BUNDY:  Yeah, I mean what was
11     discussed is privileged and work product.
12         MR. VACCARO:  I'm not asking --
13         MS. BUNDY:  But the manner, the media of
14     whether it was by phone or email, that is, she can
15     disclose that.  We just need to -- Mr. Vaccaro,
16     and we're just going to need to proceed pretty
17     slowly here to make sure we abide by the
18     privilege.
19         Go ahead, Ms. Schaffer.
20         THE WITNESS:  I received both.  I had
21     received an email from Mr. Rhodes, and I believe I
22     may have also had a phone conversation with
23     Mr. Rhodes.
24     BY MR. VACCARO:
25 Q.  Okay.  And what did you discuss with Mr. Rhodes?

## Page 35

1      I should say Mr. Rhodes --
2          MS. BUNDY:  Object.
3      BY MR. VACCARO:
4  Q.  I'm sorry, did you identify Mr. Rhodes' role at
5      3M?
6  A.  Deputy General Counsel and Vice-President.
7  Q.  All right.  I missed that, I'm sorry.  And what
8      did you discuss with Mr. Rhodes?
9          MS. BUNDY:  Objection, attorney-client
10     privilege.
11         MR. VACCARO:  I'm not clear on boundaries
12     that you're drawing with respect to privilege, and
13     so it's difficult for me to respond to what 3M has
14     been asserting against my clients if we're going
15     to put, use privilege as both a sword and a shield
16     to protect selective communications, but to use
17     others against my clients.
18         So while I'm not going to -- if you're making
19     a claim of privilege, you know, we may have to
20     have that fight down the road by motion.  But I'm
21     just telling you that I don't see how information
22     such as this has not been put directly in issue my
23     client.
24         MS. BUNDY:  Yeah, so a couple things.
25     We're not using attorney-client as a sword and

## Page 36

1      shield.  There are several questions and facts you
2      can uncover from Ms. Schaffer about her
3      discussions with Mr. Starsiak and conclusions or
4      facts relating to work product.  But to the extent
5      you're talking about internal in-house
6      communications relating to legal advice or
7      anticipation of litigation, we'll not do it.
8          To the extent you want to ask her after you
9      received the message what did you do, she can
10     certainly answer that.  To the extent you want to
11     explore what was discussed, that clearly is
12     privileged.
13     BY MR. VACCARO:
14 Q.  Was Mr. Fong physically located in Minnesota at
15     all times between April and June of 2020?
16 A.  He does live in Minnesota.  I don't know if he
17     left for any reason, but he resides in Minnesota
18     and he also offices out of Minnesota at 3M
19     headquarters.
20 Q.  Okay.  And I heard you say he offices outside of
21     Minnesota as well?
22 A.  No.  He offices out of 3M headquarters in
23     Minnesota.
24 Q.  Okay.
25 A.  Yes, sorry.

## Page 37

1  Q.  That's okay.  And were you physically located in
2      the state of Minnesota at all times between April
3      and June of 2020?
4  A.  Yes.
5  Q.  Okay.  And I believe, Ms. Schaffer, you've been in
6      attendance at prior depositions in this case with
7      Mr. Starsiak and Mr. Schuster; is that true?
8  A.  Parts of them, yes.
9  Q.  Okay.  And Mr. Schuster had testified last
10     Wednesday that he reached out to Mr. Fong on April
11     23rd of 2020.  Do you recall that testimony?
12 A.  I do not.
13 Q.  Okay.  I represent to you that Mr. Schuster
14     testified he reached out to Mr. Fong on April
15     23rd, 2020.  I'm trying to understand did you play
16     any role in helping Fong or Schuster out in this
17     April 2020 time period?
18         MS. BUNDY:  Objection, form.
19         THE WITNESS:  I became involved on the
20     morning of May 11th.
21     BY MR. VACCARO:
22 Q.  Okay.  You anticipated my question, and I just
23     wanted to figure out what your first involvement
24     was with Mr. Starsiak and at AMK.
25 A.  That is I became involved on May 11th, when

Videoconference Deposition via Zoom of Haley Schaffer - 7/31/2020
3M Company v. Matthew Starsiak, et al.

Page 42

1  A.  Yes.
2  Q.  Okay. And what did you do at that time?
3      MS. BUNDY: Again, to the extent you
4      don't -- you can talk about the facts as they
5      relate to factually what occurred, but to the
6      extent it relates to attorney-client
7      communications or work product, I'd just caution
8      the witness not to answer.
9      THE WITNESS: I had a conversation with
10     Matthew Starsiak the morning of May 11th, and then
11     another one on, maybe two hours later, at about
12     11:30 on May 11th with two of my colleagues.
13  BY MR. VACCARO:
14  Q.  Okay. And we'll get to that. Let me have you
15     look at Tab 4, if I could.
16     MR. VACCARO: And Mary, could we mark this
17     as Exhibit 4.
18     (Exhibit No. 4 was marked for
19     identification.)
20     THE WITNESS: I have Tab 4 open.
21  BY MR. VACCARO:
22  Q.  Okay. And Exhibit 4 is an email string. It
23     starts, the Bates range is ES166 through ES169,
24     and the email string runs between May 10th, 2020,
25     and May 11th, 2020.

Page 43

1      Ms. Schaffer, are you familiar with this set
2      of emails?
3  A.  I saw it after, I think I saw it after your
4      production or Eric Schuster's production. I'm not
5      sure.
6  Q.  Okay. But before, before our production of
7      documents in this litigation were you familiar
8      with any of those emails?
9  A.  I had not seen the first one.
10 Q.  When you say the first one, which specifically
11     didn't you?
12 A.  I hadn't seen the email between Eric Schuster and
13     Matthew Starsiak until it was produced in this
14     litigation, and I have to look down email by
15     email.
16 Q.  Okay.
17 A.  I do not know if I saw ES169 before today, before
18     production. I don't know if I saw ES168. I may
19     have seen ES169. I'm not sure.
20 Q.  That's the May 10th email Mr. Schuster to Mr. Fong
21     at the bottom?
22 A.  Yeah, that's correct.
23 Q.  And then there's another --
24 A.  No, I don't think I saw that one, but I'm not
25     sure. To be honest, I don't recall.

Page 44

1  Q.  So in any event, if you turn to ES168,
2      Mr. Schuster is writing to Mr. Fong on May 10th,
3      kind of in the middle of the page at, looks like
4      8:29. Actually, yeah. Do you see that email
5      there, May 10th, 2020?
6  A.  Yes, I do.
7  Q.  Okay. And Mr. Schuster says to Mr. Fong "I hope
8      you can have one of your direct reports call
9      Mr. Starsiak tomorrow morning."
10     Do you see that there?
11 A.  I do.
12 Q.  And Mr. Fong responds to that email at 9:31 p.m.,
13     and says "Yes, that is the plan. Thank you and
14     have a good evening."
15 A.  I've got to find it.
16 Q.  It's just above that prior email.
17 A.  Right above that prior email I think is another
18     one from Eric Schuster to Ivan Fong.
19 Q.  So its kind of funny the way the email is.
20 A.  Yeah, I see that 9:31.
21 Q.  Okay. So you see that there Mr. Fong responded?
22 A.  That's correct.
23 Q.  And from everything I've seen, it looks to me like
24     you are the direct report as referred to in
25     Mr. Schuster's email on ES168. Is that fair?

Page 45

1  A.  Yes.
2  Q.  Okay. And how did, how did you reach out to
3      Mr. Starsiak after this email?
4  A.  I believe I called him.
5  Q.  Okay. Do you know at what number you called him?
6  A.  I would have gotten a number from his email.
7  Q.  Okay. And about what time? That was the morning
8      of May 11th?
9  A.  That is correct.
10 Q.  And about what time?
11 A.  I'm estimating it was 8 or 9 o'clock in the
12     morning Central Time, maybe 9:00 in the morning
13     Central Time.
14 Q.  Okay. And what did you discuss at that time?
15 A.  I told him that I had received his contact
16     information from Ivan Fong, I told him that my
17     role on the COVID Team was as litigator to look at
18     cases for potential bad actors and work with law
19     enforcement, but I also can talk to him, as I've
20     done with others, to brief them on distribution
21     channels. And I also asked him some questions
22     that he said he couldn't answer. Because he was
23     just the high level CEO, he wanted me to talk to
24     his people and employees to get answers. So he
25     suggested that we have a call later on, around

Videoconference Deposition via Zoom of Haley Schaffer - 7/31/2020
3M Company v. Matthew Starsiak, et al.

## Page 46

1     11:30 that day, where he would get his employees
2     on the line and they could answer the questions
3     that I had.
4 Q. About how long did that first call last?
5 A. Maybe ten minutes at the most. He also told me
6     about his military background and his, the same,
7     the same biographical information that he told us
8     on the 11:30 call, or similar information.
9 Q. Okay. And before you ended that call, how was the
10     call left? What was, who was supposed to do what?
11 A. He was going to send us a conference, send me a
12     conference line for a follow up phone call, and
13     his employee, Mica -- Xavier, I think his last
14     name was -- subsequently sent me an invitation for
15     a conference line.
16 Q. Okay. You read my mind. Turn to Tab 5.
17     MR. VACCARO: Which we'll label 5, Mary.
18     (Exhibit No. 5 was marked for
19     identification.)
20     BY MR. VACCARO:
21 Q. And Exhibit 5 is Bates labeled 3M AMK 48, and it
22     is an email from Mica Xavier to Haley Schaffer
23     dated May 11th, 2020 at 10:26 a.m. Central Time,
24     Central Daylight Time.
25     Did you, is this the email that you just

## Page 47

1     referenced from Ms. Xavier forwarding a conference
2     number to you?
3 A. Yes.
4 Q. Okay. And then it says "We're looking forward to
5     speaking with you at 12:30 Eastern today."
6     Do you see that?
7 A. I do see that.
8 Q. And do you recognize the 561 area code?
9 A. No, I don't.
10 Q. Do you know where that area code is?
11 A. Nope.
12 Q. That's not an area code in Minnesota, is it?
13 A. I don't know.
14 Q. Okay. Are you familiar with Minnesota area codes
15     that are 561?
16 A. I'm familiar with 612, 952, and 763. I don't know
17     all the Minnesota area codes.
18 Q. That's fine. And if you look at Ms. Xavier's
19     signature block, she also listed a direct number
20     for her as 7 -- two numbers, a direct number and a
21     What's App number, both of which have area code
22     770. Did you see that?
23 A. Yes.
24 Q. Do you know what part of the country that area
25     code represents?

## Page 48

1 A. No, I don't.
2 Q. Okay. Do you know if it's a Minnesota area code?
3 A. I do not.
4 Q. Did you dial into this conference bridge number on
5     May 11th at 12:30 p.m. Eastern time?
6 A. Yes, I did.
7 Q. And do you remember that phone call?
8 A. Yes, I do.
9 Q. Did 3M make any recording of the conversation -- I
10     should say did 3M make a recording of either of
11     your conversations with Mr. Starsiak or AMK on May
12     11th, 2020?
13 A. No.
14 Q. Other than the two conversations which you've
15     referenced that both occurred on May 11th, 2020,
16     did you have any other telephone contact with
17     Mr. Starsiak?
18 A. Yes.
19 Q. Okay. Can you tell me what other contact you had?
20 A. He called me on a Friday evening, maybe at about
21     5:30, and it was in June. I think it was Friday,
22     June 5th. And he left me a voicemail message. He
23     then called me back and I picked up the phone. I
24     didn't know who was calling me. And he said it
25     was Matthew Starsiak and he had some questions he

## Page 49

1     wanted to talk to me about. It was a very short
2     phone call because I was with my kids and I said,
3     "Now is not a good time. Can we talk at another
4     time," or something like that, and he said, "Sure,
5     no problem."
6 Q. Okay. And so this is June 5th, did you say, or
7     6th? I couldn't hear that.
8 A. I think it's June 5th. It was the first Friday on
9     June, it was on a early Friday evening in June, as
10     far as I remember.
11 Q. Okay. The voicemail that you reference, do you
12     know if that's been produced in this litigation?
13 A. It has. It's the same day as that voicemail. It
14     was shortly thereafter.
15 Q. Sorry. I heard what you said but I don't
16     understand.
17 A. Don't understand, sorry. The phone call, when
18     Mr. Starsiak called me, he called and left me a
19     voicemail. Then he called me shortly thereafter
20     that voicemail, and that's the conversation I was
21     just describing to you, is when we spoke.
22 Q. Okay. But the voicemail --
23 A. So that one has the accurate date. Sorry.
24 Q. Okay. I understand. So this is the date that 3M
25     filed its lawsuit against Mr. Starsiak at AMK; is

Videoconference Deposition via Zoom of Haley Schaffer - 7/31/2020
3M Company v. Matthew Starsiak, et al.

## Page 50

1 that correct?
2 A. That's right.
3 Q. And so did you talk to Mr. Starsiak or did you --
4    how long did the conversation last?
5 A. A very short amount of time.
6 Q. Okay. Any other telephone conversations or other
7    contacts with either Mr. Starsiak or any other
8    representative?
9 A. Verbal, are you asking about verbal conversations?
10 Q. Telephone contacts.
11 A. Yes. I spoke to Eric Schuster. I called him on
12    May 11th, because after the May 11th, the second
13    phone call that Starsiak had with his people, we
14    at 3M had some concerns about the information that
15    he had told us. And so I called Mr. Schuster to
16    find out if -- find out about Matthew Starsiak and
17    learn more, because Mr. Schuster recommended that
18    we talked to him and I wanted to determine whether
19    or not he was a fraudster.
20 Q. So the question I asked was whether you had any --
21    other than the two phone calls in May 11th and
22    this voicemail you referenced on June 5th, if you
23    had any other telephone contacts with either
24    Mr. Starsiak or a representative of AMK. And I
25    understand you might have spoken to Mr. Schuster,

## Page 51

1    but I was just asking about Mr. Starsiak and AMK.
2 A. Yeah, I understand.
3       MS. BUNDY: Objection, form.
4       THE WITNESS: Mr. Schuster was connected
5    to AMK, and that's why I answered it in that way.
6    BY MR. VACCARO:
7 Q. How did you believe he was connected to AMK?
8 A. He made the referral to 3M, and, and that is how I
9    understood he was connected to AMK. At that point
10    I didn't know if he represented AMK or not as a
11    lawyer.
12 Q. Well, I'll tighten the question a little bit and
13    say other than the two conversations that you had
14    with Mr. Starsiak and AMK representatives on May
15    11th, as well as the conversation referenced on
16    June 5th with Mr. Starsiak, did you have any other
17    telephone contacts with Mr. Starsiak or any AMK
18    employee or who you thought was an employee,
19    beyond those discussions?
20 A. No.
21 Q. Going back to the second phone call on May 11th,
22    the conference bridge number that you called into,
23    who was present on that conference call from 3M?
24 A. I was present, Joel Van Heyst was present and
25    Michael Gannon was present.

## Page 52

1 Q. Who is Joel Van Heyst?
2 A. He is Global Corporate Security, he sits on Global
3    Corporate Security organization and is involved
4    with COVID related fraud, and Michael Gannon is in
5    our trademark organization, and he's a lawyer and
6    he is also involved in corporate fraud.
7 Q. And did I see some reference somewhere that
8    Mr. Van Heyst was previously an FBI special agent;
9    is that true?
10 A. Yes.
11       COURT REPORTER: Can you spell his name?
12       THE WITNESS: V-A-N, space, H-E-Y-S-T.
13    BY MR. VACCARO:
14 Q. So other than Mr. Van Heyst, Gannon, and yourself,
15    was anyone else on the call from the 3M side?
16 A. No.
17 Q. Did you identify Mr. Van Heyst and Michael Gannon
18    on the call?
19 A. Yes.
20 Q. And did you identify Mr. Van Heyst and
21    Mr. Gannon's roles at 3M?
22 A. I said they were working on COVID issues with me,
23    and I had previously told Mr. Starsiak my role in
24    relationship to the COVID team, and so I explained
25    that they were part, they were also dealing with

## Page 53

1    COVID issues. I did not identify them by title.
2 Q. Okay. In your first call to Starsiak, did you
3    tell Mr. Starsiak about Mr. Van Heyst or
4    Mr. Gannon's roles who else were at 3M?
5 A. No.
6 Q. Did you explain to Mr. Starsiak or any AMK
7    representative why these gentlemen were on the
8    call with you?
9 A. They didn't ask me, so no.
10 Q. Did you tell Mr. Starsiak on the initial call with
11    him on the morning of May 11th that you were going
12    to be inviting Mr. Van Heyst and Mr. Gannon to
13    monitor the phone call?
14       MS. BUNDY: Objection, immaterial, beyond
15    the scope.
16       THE WITNESS: I did not invite them to
17    monitor the phone call, and I didn't tell him that
18    because I didn't know at that time.
19    BY MR. VACCARO:
20 Q. Okay. When did you, when did you know?
21 A. I invited them. Yeah, I don't understand. Did I
22    know what? I invited them to join the phone call
23    between my call with Mr. Starsiak and my call at
24    11:30 with Mr. Starsiak and his team.
25 Q. And why did you invite them to be involved?

Videoconference Deposition via Zoom of Haley Schaffer - 7/31/2020
3M Company v. Matthew Starsiak, et al.

## Page 74

1   They talk about needing attorney attestation,
2   and as our website indicates, we do not use
3   attorney attestation, so that was a fact.
4       We asked for a -- we asked questions that he
5   couldn't answer. He said that he had been getting
6   the runaround by a 3M attorney, and Mr. Fong and I
7   in communications, we both asked him who the 3M
8   attorney was, and then he, he couldn't identify
9   any 3M attorney. We do not use escrow attorneys,
10  3M attorneys.
11      Those are some of the facts that I can recall
12  off the top of my head. I'm sure I could go
13  through the transcript and email carefully and
14  give you others if you wanted to do that.
15  BY MR. VACCARO:
16  Q.  What is Star Brands Group?
17  A.  I don't know.
18  Q.  You don't know what Star Brands Group is?
19  A.  No.
20  Q.  Were you made aware of any reports, after your
21      communications with Mr. Starsiak, reporting
22      allegedly improper conduct on the part of
23      Mr. Starsiak or AMK?
24  A.  Yes.
25  Q.  Can you identify what you learned or what you

## Page 75

1   heard in that regard?
2       MS. BUNDY: I'll instruct the witness
3   that, you know, to the extent you want to talk
4   about the report and the facts surrounding it,
5   that's fine, but I caution you not to disclose
6   attorney-client privilege and work product.
7       THE WITNESS: I, I -- what I think I can
8   say without waiving work product and privilege is
9   that I understood a report where Mr. Starsiak was
10  misusing both mine and Mr. Fong's name and
11  claiming to have a relationship with 3M that he
12  did not have, and I understand that from reading
13  the complaint.
14  Q.  Okay. And do you know who made that report?
15  A.  I'm sorry?
16  Q.  Do you know who made, do you know who that report?
17  A.  I believe, I am guessing, but I believe it might
18      be Matthew Hise.
19  Q.  Okay. Who is Matthew Hise?
20  A.  I'm not sure. I believe he might -- again, I'm
21      guessing. This is I'm guessing that he's a CEO or
22      in charge of Star Brands.
23  Q.  Okay. So I'm a little confused because you said
24      you didn't know what Star Brands Group was.
25  A.  I don't know what they are. I've heard of them

## Page 76

1   but I don't know what -- yeah. You asked me what
2   they are. I have no idea. Have I heard of them?
3   Yes, I have, I've read the complaint.
4   Q.  Fine. Do you know where Star Brands Group is
5       located?
6   A.  No.
7   Q.  Is Star Brands Group an authorized 3M dealer or
8       distributor?
9   A.  Again, I said I don't -- I've heard that name, I
10      don't know anything about them, other than I've
11      heard Matthew Hise, I've heard Star Brands, and
12      I've heard them in connection with the case.
13  Q.  Other than that, you don't know anything what Star
14      Brands Group was, a business or what it was doing,
15      you know nothing.
16  A.  I know the same information you know from the
17      complaint, and the affidavit that I think I might
18      have read, but I'm not sure.
19  Q.  Okay. Has 3M had dealings directly with Star
20      Brands?
21          MS. BUNDY: Objection, form.
22          THE WITNESS: I'm not the right person to
23  answer that. I don't know.
24  BY MR. VACCARO:
25  Q.  Okay.

## Page 77

1   A.  I don't know what you mean by direct dealings.
2       Do you mean are they a customer or are they a
3       distributor? I don't know. I don't know how to
4       answer that question.
5   Q.  You don't know whether they had any connection
6       with 3M other than this report that apparently
7       they made to 3M?
8   A.  That's correct. I heard the name Star Brands, as
9       I told you, but I'm not familiar with much about
10      Star Brands.
11  Q.  Is it fair to say that your familiarity with Star
12      Brands is solely a result of 3M having received
13      the report from Star Brands in May of 2020?
14  A.  Yes.
15  Q.  You don't know of any communications with Star
16      Brands Group before May of 2020.
17  A.  That's correct.
18          MR. VACCARO: If we could turn to Exhibit
19  8, Tab 8, which will become Exhibit 8.
20          THE WITNESS: This will take me a second.
21  My computer is closed.
22          (Exhibit No. 8 was marked for
23  identification.)
24          THE WITNESS: Okay. I have Exhibit 8
25  open.

Videoconference Deposition via Zoom of Haley Schaffer - 7/31/2020
3M Company v. Matthew Starsiak, et al.

### Page 86

1  times they do.
2  Q. Okay. And do you know what --
3  A. And they --
4  Q. Sorry.
5  A. Yeah. You know, the EP website is not only
6     related to COVID fraud. It's related to many,
7     many, many, many topics, so I can't tell you when
8     they do or don't reach out by phone.
9  Q. You don't know what the factors are that might
10    determine when a 3M representative would reach out
11    at opposed to not reaching out?
12       MS. BUNDY: We're really beyond --
13       THE WITNESS: (Talking at the same time.)
14       MS. BUNDY: Ms. Schaffer, we're really
15    beyond the scope of jurisdictional discovery here.
16    If you want to ask her about this report, that's
17    one thing; now you're asking about broad
18    processes.
19       THE WITNESS: This is managed by
20    Compliance Team. I'm not in the Compliance Team,
21    so I do not manage those processes.
22    BY MR. VACCARO:
23  Q. Well, that's fair enough. If you don't know, you
24    don't know. That's fine.
25       Do you know if 3M ever contacted Mr. Starsiak

### Page 87

1  to discuss or inquire, inquire as to his version
2  of events related to this report to the EP
3  website?
4       MS. BUNDY: That's yes or no question,
5    Ms. Schaffer. Do you know if that happened?
6       THE WITNESS: I don't believe they did,
7    but I don't know for sure.
8    BY MR. VACCARO:
9  Q. I was going to ask, did 3M contact Mr. Starsiak in
10   relation to this report?
11       MS. BUNDY: Yeah, and just to the extent
12    that it is something you know outside of
13    attorney-client privilege, you can answer.
14       THE WITNESS: I can't answer that.
15    BY MR. VACCARO:
16  Q. Okay. But you personally don't know whether or
17    not you have contacted Mr. Starsiak or anyone at
18    AMK with respect to the information in this
19    report; true?
20       MS. BUNDY: Again --
21       THE WITNESS: Again, I --
22       MS. BUNDY: Sorry.
23       THE WITNESS: I believe this is --
24       MS. BUNDY: Objection to attorney-client
25    privilege and work product.

### Page 88

1       THE WITNESS: As I think you know, I'm a
2    litigator at 3M, you know that, working on the
3    investigation of this case, so I really can't --
4    and the litigation of this case. So a lot of the
5    work around this is work product and privileged.
6       I'm certainly prepared to talk about the
7    facts, our communications and contacts in the
8    notice, as you gave us, with Mr. Starsiak and in
9    relationship to Minnesota. But I cannot talk
10    about work product and privileged investigation
11    and litigation strategies.
12    BY MR. VACCARO:
13  Q. The issue that I'm having is that this is a
14    document that has been introduced in the lawsuit
15    and it's a document that's been filed in Federal
16    Court, and so I think I'm entitled to inquire
17    reasonably about the circumstances of the document
18    and what actions were taken with respect to, with
19    respect to it. And so I'm not understanding why I
20    can't inquire as to the facts of what 3M knows and
21    what you know personally as to whether
22    Mr. Starsiak or AMK was contacted, not necessarily
23    any legal strategy or privileged information, but
24    simply whether or not he was contacted in
25    connection with the report. And I don't think

### Page 89

1  I'm, I'm not seeking anything privileged in that.
2  That's factual, and I think that the witness
3  should be allowed to respond to that question.
4       MS. BUNDY: So here, let me just interpose
5    a few objections here. One is, as you know, under
6    Topic 4, which I think there is where you are
7    suggesting this lies, you know, we had set forth
8    objections on this to which you did not respond.
9       Secondly, part of those objections is that
10    it's clearly outside of jurisdictional discovery.
11       Third, if 3M and Ms. Schaffer only know
12    whether that individual was contacted from
13    attorney-client communications, she cannot
14    respond. So to the extent Ms. Schaffer can say
15    that someone at 3M contacted, that's a different
16    question than if it's any representative of 3M and
17    she only knows that through attorney-client
18    communications.
19       MR. VACCARO: So is she going to answer
20    the question or not? That's where we sort of end
21    up.
22       MS. BUNDY: Well, I just told you if there
23    are facts that you want to explore outside of what
24    she knows of because of attorney-client
25    communications, she can respond. I think what she

Videoconference Deposition via Zoom of Haley Schaffer - 7/31/2020
3M Company v. Matthew Starsiak, et al.

Page 126

1  I'm trying to answer your question, so forgive me
2  if I'm not answering your question. But AMK and
3  Matthew Starsiak targeted 3M in making false
4  statements by reaching out to both myself and Ivan
5  Fong. They also additionally targeted 3M by going
6  through Eric Schuster to reach out to us.
7      They then claimed, as we've just talked about
8  Matthew Hise, to be acting on behalf of 3M.
9      In the transcript they claimed to suggest
10 that they are doing government bidding for 3M.
11     They, you know, highjacked my name and Mr.
12 Fong's name.
13     They targeted 3M and caused harm to 3M and
14 our trademarks by misusing them.
15     And you know, there are a number of ways, and
16 I could spend some time discussing each one of
17 them, in which their whole business model was
18 prefaced on their misuse of 3M's respirators, 3M's
19 marks, and alleged access which they claimed to
20 offer to potential customers to 3M, which they
21 never actually had. And so that was how they were
22 transacting business, because their business model
23 was, you know, based upon a false premise of a
24 relationship with Minnesota, with Hise Minnesota.
25 BY MR. VACCARO:

Page 127

1  Q. And you've given me a long explanation, but I
2     don't think I got an answer to my question, which
3     was how have defendants transacted business in
4     Minnesota, transacted business in Minnesota.
5  A. Well, they --
6     MS. BUNDY: Objection, asked and answered.
7     I'm sorry.
8     THE WITNESS: Yes, I said they reached out
9  to 3M in Minnesota. They reached out to me, I was
10 in Minnesota. They talked to Joel Van Heyst in
11 Minnesota. They talked to Mike Gannon in
12 Minnesota. They reached out to Ivan Fong in
13 Minnesota. They reached out to Dorsey and
14 Whitney. They attempted to do a transaction with
15 U.S. Bank located in Minnesota. Dorsey and
16 Whitney is located in Minnesota. They provided
17 and offered access to 3M, we're located in
18 Minnesota. They misused our trademarks. They
19 misrepresented their relationship with us, we are
20 based in Minnesota. All of this was part of their
21 business model, so that's how they transacted
22 business in Minnesota.
23 BY MR. VACCARO:
24 Q. Is 3M aware of a single transaction that was
25    consummated between Mr. Starsiak and AMK on one

Page 128

1     hand and any customer on the other, involving 3M
2     masks or respirators?
3  A. I'm sorry, can you repeat that one more time? I
4     just didn't hear fully.
5     MR. VACCARO: Mary, can you repeat that
6  one?
7     (The requested portion of testimony was
8  read back by the court reporter.)
9  BY MR. VACCARO:
10 Q. Mary, I'll actually re-ask the question. Is 3M
11    aware of a single transaction that was consummated
12    between Mr. Starsiak and AMK on the one hand and
13    any customer on the other involving 3M masks or
14    respirators?
15 A. 3M is not aware of any transactions that closed
16    between AMK and Mr. Starsiak on one hand and a
17    customer on the other hand that relates to 3M
18    respirators.
19 Q. Okay. Is 3M aware of any instance in which any
20    funds were placed into escrow at the request of
21    Mr. Starsiak or AMK in order to purchase 3M masks
22    or respirators?
23 A. I'm not aware of that. I'm not aware one way or
24    the other. Obviously, Mr. Starsiak would know
25    that. Mr. Vaccaro, I think you're frozen. I

Page 129

1     can't hear you talking.
2  Q. No, I'm just thinking.
3  A. Sorry.
4  Q. I can pretend to be frozen, too.
5  A. Thank you.
6  Q. Does 3M have any facts indicating that
7     Mr. Starsiak or AMK lured unwitting buyers into
8     placing large amounts of money in escrow to
9     purchase fictitious 3M masks or respirators?
10    MS. BUNDY: Objection, beyond the scope of
11 the jurisdictional discovery. You can answer if
12 you know.
13    THE WITNESS: I don't know the answer to
14 that question one way or the other.
15 BY MR. VACCARO:
16 Q. You're not personally aware of that one way or the
17    other?
18 A. I could go back into the documents and look
19    through that to answer the question, but sitting
20    here today, I can't recall one way or the other.
21 Q. Does 3M have any facts that Mr. Starsiak or AMK
22    engaged in any price gouging related to any 3M
23    products?
24 A. Yeah, I think I'd have to go back and look at the
25    document, because I believe there might be an

Videoconference Deposition via Zoom of Haley Schaffer - 7/31/2020
3M Company v. Matthew Starsiak, et al.

## Page 134

1  get my people on this phone and maybe they can
2  answer your question."
3      Does that answer your question?
4  Q. Isn't it true that --
5  A. I'm sorry.
6  Q. Are you done? I'm sorry. I didn't mean to
7  interrupt.
8  A. Yeah, no. So I apologize. I said sorry because I
9  clearly see that I was talking too fast for the
10 court reporter. She raised her hand for me to
11 slow down, so I apologize that I was talking too
12 fast.
13 Q. Smoke coming out of the ears.
14 A. Or fingers.
15 Q. Isn't it true, Ms. Schaffer, that Mr. Starsiak
16 acknowledged to you at the time of your call with
17 him on May 11th, that he had not spoken to a 3M
18 attorney and in fact, that was the purpose for the
19 call?
20 A. I believe that's true, yes, from what I can
21 recall, that he personally had not spoken to a 3M
22 attorney. That's the way I understood.
23 Q. I'd like to jump down to the Claim For Relief
24 section of the complaint. I think it's page 36.
25 You know what, I think I went too far. Sorry, I

## Page 135

1  went too far.
2      If you could go to Paragraph 84 of the
3  complaint, which is on page 26. And this
4  paragraph says "Upon information and belief,
5  defendants have made and will continue to make
6  substantial profits and gain from their
7  unauthorized use of the 3M marks, to which
8  defendants are not entitled at law or in equity."
9      Do you see that paragraph there?
10 A. That's, I see that, yes.
11 Q. What facts does 3M have that Mr. Starsiak or AMK
12 made substantial profits and gain from that
13 unauthorized use of 3M's marks?
14     MS. BUNDY: Object to the extent it's
15 beyond the scope of the discovery and the notice,
16 but you can answer in your individual capacity.
17     THE WITNESS: Yeah. On behalf of 3M, I
18 can't answer that question as a 30(b)(6) witness.
19 BY MR. VACCARO:
20 Q. Is there anyone who can answer that question?
21 A. I would have to investigate that. What I can tell
22 you is that if he was selling respirators, 900
23 million -- billion -- let me start over.
24     If he was selling 900 billion respirators, he
25 would be profiting off of 3M marks and profiting

## Page 136

1  off 3M marks, certainly by offering false access
2  to 3M, as he was attempting doing, in addition
3  making a substantial profit in a market where the
4  respirators really needed to go to first
5  responders and healthcare workers. To divert them
6  to those who are not authorized 3M distributors
7  for sale at potentially price gouging prices would
8  lead to a lot of profit for him.
9  Q. But 3M doesn't have any evidence that Mr. Starsiak
10 sold 900 billion respirators or one respirator
11 manufactured by 3M; true?
12 A. That is true.
13     MS. BUNDY: Again, beyond the scope.
14 Objecting.
15     MR. VACCARO: Okay. If we can turn to Tab
16 11, which would be Exhibit 11, Mary.
17     (Exhibit No. 11 was marked for
18 identification.)
19 BY MR. VACCARO:
20 Q. Do you have it, Ms. Schaffer?
21 A. I do. It's still loading, though, so I do not see
22 it.
23 Q. That's fine.
24     MS. BUNDY: I'm sorry, did you say Tab 11?
25     MR. VACCARO: Tab 11.

## Page 137

1      THE WITNESS: Yes, I have Tab 11 open.
2  BY MR. VACCARO:
3  Q. And for the record, Tab 11 is a series of
4  documents that starts with Bates 3M AMK 435 and
5  then runs through 3M AMK 448 in sequence, and then
6  there's a break in the sequence by one page. And
7  then it's 383, and AMK 450, and there was a break
8  in the production because these documents were all
9  related documents, and so I put them together to
10 create one exhibit rather than break up the
11 exhibit.
12     Ms. Schaffer, having looked at Exhibit 11, do
13 you know what these documents are?
14 A. I haven't looked at the whole exhibit. Would you
15 like me to?
16 Q. Yes, please. Take your time.
17 A. So the documents appear to be -- I'm looking
18 through my computer slowly. But they appear to
19 list those who were, some people who were involved
20 in the Personal Safety Division, our Safety and
21 Industrial Business GROUP, their lawyers, the
22 Marketing, Finance, others who all are located in
23 Minnesota and would be harmed by Mr. Starsiak's
24 false claim to use of 3M's trademarks and false
25 offering the assets and use of 3M's names and etc.