| | |
|---|---|
| 3M COMPANY, | Court File No.: 0:20-cv-01314 (SRN/DTS) |
| Plaintiff, | |
| v. | **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO 3M COMPANY'S MOTION FOR PRELIMINARY INJUNCTION** |
| MATTHEW STARSIAK, AMK ENERGY SERVICES LLC, and JOHN DOES 1 THROUGH 10, whose true names are largely unknown, | |
| Defendants. | |

## INTRODUCTION

3M Company's ("3M") recent litigation-driven public relations campaign has resulted in this case, a nine-lawyer-fueled tempest in a teapot aiming to bully, and destroy the good name of, an honorable citizen and disabled veteran through overreaching and other heavy-handed tactics. 3M's evocative, metaphor-laden motion cleverly disguises a critical principle central to this dispute: the attempted purchase or resale of genuine 3M products is *not trademark infringement* or otherwise unlawful. After the first sale, 3M cannot control through trademark law a free market in its own genuine products in the secondary market—whether under the guise of "protecting the public" or any other pretext.[1]

---

[1] Feigning disinterest in profit, 3M trumpets on no less than nine occasions its intent to donate "to charitable COVID-19 efforts" any recovery obtained in this case by its phalanx of BigLaw attorney timekeepers. (Compl. [ECF 1] at 8, 38.) 3M's approach is ironic in light of recent pandemic-related events during which, among other things, Dr.

The trademark cases upon which 3M relies involve a party's misappropriation of a trademark to sell *that party's products*. There is no claim that that happened here. It is also undisputed that, in the exceedingly short period in which Defendants attempted to operate in the PPE market, they were not successful in purchasing or selling any 3M products. To be clear, there is no evidence in this case that Defendants Matthew Starsiak ("Starsiak") or his business, AMK Energy Services LLC ("AMK"), ever (1) completed a purchase or sale of a single 3M respirator, directly or indirectly, in the State of Minnesota or elsewhere; (2) took title to any 3M respirator, in Minnesota or elsewhere; (3) set a price on any 3M respirator to be purchased or sold; (4) received any funds in connection with any potential purchases or sales; or (5) traveled to Minnesota in connection with any such activities. Jurisdiction under the circumstances is truly hard to fathom. Nevertheless, 3M continues to litigate Defendants' lack of commercial activity, hurling ad hominem attacks and hyperbole that have no relationship to its pleaded legal claims.

---

Peter Navarro, Director of the Office of Trade and Manufacturing Policy (OTMP), called 3M out as an "outlier" that was "operating like a sovereign profit-maximizing nation internationally" in selling respirators to foreign customers over American interests in the midst of the coronavirus crisis in the United States. Ana Swanson, Zolan Kanno-Youngs and Maggie Haberman, *Trump Seeks to Block 3M Mask Exports and Grab Masks From Its Overseas Customers*, N.Y. Times, Apr. 3, 2020, at https://nyti.ms/2UEKUDB. Defendants are among the collateral damage stemming from 3M's about-face. The Court should not be fooled: 3M would happily donate vast sums to "charitable COVID-19 efforts" in exchange for being able to control, through "trademark" litigation, downstream distribution channels for resale of its genuine products. Such control would be antithetical to trademark law and an anticompetitive coup for 3M against consumers and competition worldwide.

It was also *not trademark infringement*, or otherwise unlawful, for Starsiak and AMK to seek the assistance of 3M in-house counsel, to have discussions with those individuals about the process for obtaining 3M respirators, or to make a request on behalf of a third-party claiming to represent a significant charity organization—a request that 3M *denied anyway*. In its brief, 3M references various quotations as soundbites— isolated from any broader context—to create a false specter of fraud or questionable conduct on the part of Starsiak and AMK. When viewed fairly, these quotations do not bear out or advance any of 3M's defamatory claims.[2] And 3M's characterization of Defendants' two phone calls and exchange of emails with 3M—which standing alone *never* suffice to establish jurisdiction[3]—as the activities of a "hacker" or "bot" who "tunnel[s] into the forum and steal[s] information" really misses the mark. Among other things, the "names" of 3M's lawyers are not proprietary; both Ivan Fong and Haley Schaffer proudly and publicly advertise their status at 3M on LinkedIn.[4]

Beyond the sound and fury of its litigation machine, 3M's only potentially actionable claim in this case is a solitary one for false affiliation. That claim is built on a slender reed, and does not justify a preliminary injunction. "Star Brands Group"—a non-

---

[2] In context, the quotations are innocuous and, in most cases, are not even from Mr. Starsiak or any AMK representative, but from third-parties with whom Mr. Starsiak communicated over this time period who were purporting to explain to Mr. Starsiak their processes for handling 3M respirator transactions.

[3] *See, e.g., Eagle Technology v. Expander Americas, Inc.*, 783 F.3d 1131, 1137 (8th Cir. 2015); *Porter v. Berall*, 293 F.3d 1073, 1076 (8th Cir. 2002); *Burlington Indus. v. Maples Indus.*, 97 F.3d 1100, 1103 (8th Cir. 1996).

[4] https://www.linkedin.com/in/ivfong; https://www.linkedin.com/in/haleyschaffer

3M affiliated New York-based commercial PPE supplier previously unknown to 3M and possessing every incentive to make life difficult for a potential competitor—made a single report to 3M about "suspicious activity" at the end of May 2020. 3M sued Defendants a few days later. 3M solicited a Declaration from Star Brands Group's principal, Matthew Hise, to support its infringement claims. Mr. Hise's Declaration is demonstrably false in its claim that Mr. Starsiak stated AMK was "3M's number one sales team" and an "authorized 3M distributor"—key grounds upon which 3M secured its temporary restraining order against Defendants, which 3M now seeks to convert to a preliminary injunction.[5] Other than Star Brands Group and its own communications with Defendants, 3M has no evidence of activities undertaken by Starsiak or AMK that implicate 3M's interests. Moreover, there is no evidence Starsiak or AMK are presently engaged in any activities related to 3M in any regard. Thus, even if jurisdiction existed (which it does not), 3M has not demonstrated that the extraordinary relief of a preliminary injunction is warranted.

---

[5] 3M has refused any discovery into 3M's discussions with Mr. Hise, or the investigation it performed, on the grounds of "privilege"—despite the obvious importance of such information, the fact that 3M has placed the information directly at issue, and that 3M is affirmatively using the information as sword and shield, as needed, against Defendants. The Court will note the wide swaths of redactions contained in Mr. Hise's "report", which is actually a 3M-generated document that was attached to Mr. Hise's Declaration and used to support 3M's motion for a TRO. (ECF 16-1.) 3M declined to even identify the redacted information in this document on its initial privilege log, doing so in a supplemental log a couple minutes before the deposition of its corporate witness. Mr. Hise's Declaration, for its part, audaciously declares that _3M's_ heavily redacted document constitutes a "true and correct copy" of Mr. Hise's report. (Hise Decl. [ECF 16] at ¶ 11.)

In sum, 3M has overzealously deployed its resources to try to put a disabled veteran with no connection to Minnesota, no 3M-related transactions under his belt, and no income related to any 3M products out of business by forcing him to defend this jurisdictionally defective and otherwise baseless trademark lawsuit. 3M's motion for preliminary injunction should be denied and this case dismissed for lack of personal jurisdiction over Defendants.

## FACTUAL BACKGROUND

3M uses truncated, incomplete quotations—often not even stemming from Defendants—to imply misconduct and otherwise cast Defendants in the darkest possible light. Most of the "facts" presented in 3M's submission, however, have no connection or materiality to personal jurisdiction over Defendants, 3M's legal claims, or its request for a preliminary injunction.[6] In lieu of responding to each incomplete, legally immaterial fact set forth by 3M, Defendants present the following background in order to aid the Court in evaluating 3M's request for a preliminary injunction.

---

[6] A representative example is 3M's repeated assertions that Mr. Starsiak must have been a "fraud" because AMK's website reflected a New York address while Mr. Starsiak resided in Utah. As Mr. Starsiak testified, AMK previously rented space for a project in New York on the same street as the address reflected on AMK's website. (Declaration of Robert W. Vaccaro in Support of Defendants' Opposition to Motion for Preliminary Injunction ("Vaccaro Opp. Decl."), Ex. A (Starsiak Dep.) at 34:21-24; 35:13-16.) Mr. Starsiak acknowledged there was an error in the number of the address. (*Id.* at 34:25-35:8.) Mr. Starsiak used a Utah-based phone number, and made no secret of his being based in Utah in his discussions with others. (Vaccaro Opp. Decl., Ex. B (Schuster Dep.) at 29:3-8.) In any event, this detail is not probative on any issue relevant to 3M's trademark claim or request for a preliminary injunction.

## I.    STARSIAK AND AMK

### A.    Matthew Starsiak

Defendant Starsiak resides in and is a citizen of Utah.  (Declaration of Matthew Starsiak ("Starsiak Decl.") [ECF 30] ¶ 2.)  Starsiak is a disabled former United States Marine.  (Starsiak Decl. ¶¶ 3-5.)  He served in the Marine Corps for nearly twenty-four years, retiring in 2015 with an honorable discharge.  (*Id.* ¶ 3, Ex. A.)  He is a decorated Marine.  (Vaccaro Opp. Decl., Ex. C (Service and Commendation Medals).)  In 2017, Starsiak founded AMK with the intent of supporting fellow disabled veterans in obtaining employment providing humanitarian services, such as HUD home reconstruction and affordable residential and commercial housing projects.  (Starsiak Decl. ¶ 6.)

### B.    AMK Energy Services LLC

Defendant AMK is a Utah limited liability company.  (Starsiak Decl. ¶ 7, Ex. D.) AMK is a Service-Disabled Veteran-Owned Small Business (SDVOSB) verified by the United States Department of Veterans Affairs.  (*Id.* ¶ 8, Ex. E.)  AMK assists in disaster relief operations, largely by hiring former veterans as independent contractors.  (*Id.* ¶ 9.) AMK has assisted in disaster relief and humanitarian projects, including performing cleanup work in Florida and supporting FEMA in Puerto Rico to rebuild homes after hurricane damage.  (*Id.*; Vaccaro Opp. Decl., Ex. A (Starsiak Dep.) at 22:15-20.)

Although AMK was formally registered in Utah in 2017 (Starsiak Decl., Ex. D), its origins stem from Starsiak's military service and his desire to found and operate a government-support, humanitarian company.  (Starsiak Dep. at 20:7-21:20.)  Profits that AMK receives in connection with its humanitarian efforts are redeployed to support other

humanitarian projects or donated to charity. (Starsiak Dep. at 187:12-190:15.) Numerous business partners and individuals affirm Mr. Starsiak and AMK's reputation for honesty and integrity in their dealings. (Vaccaro Opp. Decl., Ex. D (Recommendation Letters).)

## II. AMK'S PPE-RELATED ACTIVITIES

In April 2020, a personal acquaintance of Mr. Starsiak named Mark Wright requested the assistance of Mr. Starsiak and AMK to procure 3M respirators on behalf of his government clients. (Starsiak Dep. at 36:24-37:11; 46:6-20.)[7] Specifically, Mr. Wright requested Mr. Starsiak's assistance in locating an authorized 3M distributor for these clients. (*Id*. at 39:22-25.) At this time, Mr. Starsiak had had no prior experience in the PPE marketplace. (*Id*. at 48:4-10.) Mr. Starsiak brought on Mr. Wright as a consultant of AMK to serve as operations manager. (*Id.* at 16:5-8; 17:14-16.) Mr. Wright, in turn, brought in one of his employees, Mica Xavier, to assist on the project. (*Id.* at 18:2-4.)

Mr. Starsiak knew from his prior government experience the importance of obtaining genuine product for clients. He testified:

> I wanted to make sure that whoever we introduced them to that was from 3M was a real 3M distributor . . . I wanted to make sure because I knew that if anybody paid for something and they didn't receive a mask, somebody was going to go to jail. So I wanted to make sure that everything was done right, and especially when it has to do with government, I don't want –

---

[7] In addition, Mr. Starsiak's parents, who work in the healthcare field, alerted Starsiak to problematic healthcare conditions they were encountering on a medical mission in South Korea, and to the need for reliable Personal Protective Equipment ("PPE"). They asked if he could do something to help. (*Id.* at 37:3-16.)

since I've worked with the government and I have a high – how would you say it?  I feel like I have a very high responsibility to make sure that everything is done correctly.  I wanted to help, but I wanted to make sure everything was done correctly.

(Starsiak Dep. at 56:25-57:13.)

In order to try to help, Mr. Starsiak began reaching out to his contacts, one of whom was a Maryland attorney named Eric Schuster.  (*Id.* at 40:11-41:13.)  Mr. Schuster advised Mr. Starsiak that he knew Ivan Fong, a senior lawyer at 3M.  (*Id.* at 42:9-17.)[8] Mr. Schuster and Mr. Starsiak agreed that Mr. Schuster would reach out to Mr. Fong to see if he could assist Mr. Starsiak in connecting him with a 3M distributor for the purposes of facilitating 3M mask purchases.  (*Id.* at 42:18-22.)

Initially, Mr. Schuster met with some success.  Mr. Schuster traded emails with Mr. Fong and, ultimately, Mr. Fong volunteered contact information for a 3M representative named Kourosh Motalebi, who Mr. Fong invited Mr. Starsiak to contact to discuss the process for reaching an authorized 3M distributor.  (Vaccaro Decl. [ECF 48], Ex. C [ECF 48-3].)  As instructed by Mr. Fong, Mr. Starsiak telephoned Mr. Motalebi in the hopes of being able to discuss 3M's process for mask sales.  (Vaccaro Opp. Decl., Ex. A (Starsiak Dep.) at 85:15-25.)  Mr. Motalebi did not answer the phone, so Mr. Starsiak left a voicemail.  (Starsiak Dep. at 86:1-11.)  Motalebi never returned Mr. Starsiak's call. (*Id.* at 86:12-13.)

---

[8] 3M repeatedly states that Mr. Schuster wrote Mr. Starsiak that he had "a huge contact for you"—meaning 3M's Ivan Fong (3M Br. at 7, 18)—but 3M does not identify where that comment was allegedly made or provide any citation for it.  Defendants are unable to find the source of the quotation.

Around this same time, Mr. Starsiak was introduced by another one of his contacts to an individual named Tim Dupler, who Mr. Starsiak believed was an authorized 3M distributor who was able to see allocations available for 3M respirators and obtain genuine 3M products. (Starsiak Dep. at 58:20-59:9.) Mr. Dupler advised Mr. Starsiak that FEMA had confiscated 3M respirators and warehoused them in FEMA facilities across the country, filling up millions of square feet of space. (*Id.* at 50:22-51:6.) Mr. Dupler told Mr. Starsiak that this was the source of his respirator allocations. (*Id.* at 51:3-6.) Mr. Starsiak also met others, including Kim Shafer, who was partnered with John Paul Dejoria, a respected entrepreneur and billionaire who operates a philanthropic foundation known as JP's Peace, Love & Happiness Foundation.[9] Ms. Shafer also claimed to have access to 3M respirator allocations. (*Id.* at 60:20-62:16.)

Separately, on or about May 9, 2020, Mr. Starsiak was contacted by an individual named William Kiriakopoulos, who advised Mr. Starsiak that he also represented a large charity organization that was interested in purchasing a significant volume of masks in connection with its philanthropic efforts. Mr. Starsiak again turned to Mr. Schuster to see if he could be of assistance, emailing him the details of the request as relayed to him by Mr. Kiriakopoulos. (Vaccaro Decl. [ECF 48], Ex. H [ECF 48-8].) Mr. Schuster, in turn, forwarded Mr. Starsiak's email to Ivan Fong, who agreed to have one of his subordinates, 3M Assistant General Counsel Haley Schaffer, contact Mr. Starsiak to discuss whether some type of transaction could be facilitated. (*Id.*; Ex. D [ECF 48-4].) Mr. Starsiak's

---

[9] *See* https://www.peacelovehappinessfoundation.org/

communication did *not* indicate that he or AMK was directly representing the Gates Foundation, Richard Branson, or Elon Musk; it indicated his client was representing an influential charity. (ECF 48-8.)[10]

On May 11, 2020, a brief phone call took place during which Mr. Starsiak explained Mr. Kiriakopoulos's request to Ms. Schaffer to see if she could provide any assistance. Unbeknownst to Mr. Starsiak, Ms. Schaffer invited to the call two of her 3M colleagues investigating COVID-related fraud on behalf of 3M, Global Corporate Security officer and former FBI agent Joel Van Heyst, and 3M Trademark Counsel and corporate fraud investigator Michael Gannon. (Schaffer Dep. at 48:4-6; 51:24-52:10.) Schaffer did not disclose Van Heyst's or Gannon's role at 3M to Mr. Starsiak on the call; she simply stated that they were "working on our respirator issues with me." (Vaccaro Decl. [ECF 48], Ex. F [ECF 48-6] at 3 (Transcript Page 3:25-4:3).) Ms. Schaffer briefly discussed some background concerning 3M's respirator production, then advised the callers that she needed to leave the conference to get on another call. (*Id.* at 8 (Transcript Page 22:24-25).)

The following day, Mr. Starsiak emailed Ms. Schaffer, thanking her for reaching out and requesting a call directly between 3M and Mr. Kiriakopoulos's clients "so we can

_____

[10] 3M also repeatedly and falsely represents that Mr. Starsiak misinformed 3M that he was "getting the run around by 3M escrow lawyers." (3M Br. at 14; Compl. ¶ 48.) Mr. Starsiak never claimed this; his email to Mr. Schuster, which Mr. Schuster forwarded to 3M, reflects the representations that were made to him by Mr. Kiriakopoulos. (ECF 48-8.) When Haley Schaffer asked on a later telephone conference whether Mr. Starsiak or AMK had communicated with any 3M lawyers to date, Mr. Starsiak forthrightly explained that they had not. (Vaccaro Decl. [ECF 48], Ex. F [ECF 48-6] at 4 (Transcript Page 8:11-9:6).)

further discuss the possibility of getting a production contract started so they can slowly build up a supply of 1860 masks to donate to some of their charity recipients and we can further verify the correct 3M process with your guidance and counsel[.]" (Schaffer Decl. [ECF 13], Ex. 1 [ECF 13-1] at 7.) Mr. Starsiak also noted that "we want to ensure we are instructed per 3M legal counsel on the right way to do it . . ." (*Id.*) Ms. Schaffer responded by requesting documents that Mr. Starsiak referenced in the earlier call. She committed to review the documents, "circle back with the internal team", and respond to Mr. Starsiak about setting up a call to discuss next steps. (Schaffer Decl. [ECF 13], Ex. 1 [ECF 13-1] at 6.) Mr. Starsiak agreed to do so. (*Id.* at 5.)

The next day, May 13, 2020, Mr. Starsiak emailed Ms. Schaffer to update her regarding the requested documentation from Mr. Kiriakopoulos. (*Id.* at 4.) Ms. Schaffer responded almost immediately, advising Mr. Starsiak that 3M could not help him, without having even given Mr. Starsiak the opportunity to respond to her prior request for documentation. (*Id.* at 3.) Ms. Schaffer never advised Mr. Starsiak that she thought he was doing anything wrong. During her telephone conference with Mr. Starsiak, Ms. Schaffer stated that, while she was suspicious of what was going on in the PPE market, that suspicion did not extend to Mr. Starsiak, AMK, or the others on the call. (Vaccaro Decl. [ECF 48], Ex. F [ECF 48-6] at 7 (Transcript Page 21:2-4).) Furthermore, Ms. Schaffer encouraged Mr. Starsiak to "continue your discussions with FEMA as they would be in a position to prioritize your request." (Schaffer Decl. [ECF 13], Ex. 1 [ECF 13-1] at 3.)

On June 5, 2020, without any forewarning, 3M brought suit against Mr. Starsiak and AMK. (Compl. [ECF 1].)

## III.  3M'S MISLEADING FACTUAL RECITATION

Defendants addressed the lack of Minnesota contacts in this case in connection with their motion to dismiss, and will not repeat those facts here. A few aspects of 3M's factual recitation relating to jurisdiction, however, warrant a response.

3M contends that jurisdictional discovery has provided evidence of additional Minnesota-based contacts. This is not true. First, 3M's quotation from Mr. Starsiak that he "went out of [his] way to get two 3M attorneys" relates to the communications with Mr. Fong and Ms. Schaffer that have already been addressed. (3M Br. at 1.)[11] These are not "new" contacts with 3M. As noted previously, the communications amounted to a voicemail, two brief phone calls, and a few emails with Mr. Fong and Ms. Schaffer—nothing more.

Second, the "broker position" that 3M references on page 2 of its brief is completely unclear, does not show any purposeful availment of Minnesota, and is in any event irrelevant. Given the jurisdictional discovery, it is not disputed that Starsiak and AMK closed no mask transactions, in the State of Minnesota or elsewhere. (Vaccaro

---

[11] 3M conflates contacts with 3M representatives and contacts with Minnesota, contending that if Defendants "went out of [their] way to get two 3M attorneys," then they went "out of their way to Minnesota." (3M Br. at 2.) This blatantly misstates the law of personal jurisdiction, which requires sufficient contacts with the forum itself, rather than mere contact with representatives located there. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (minimum contacts analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.").

Decl. [ECF 48], Ex. B [ECF 48-2] at 10.)  Moreover, as previously addressed in Defendants' supplemental brief on jurisdiction, the underlying broker position documents were in draft form, were not created by Defendants, and no evidence exists they were ever sent to their addressee in Minnesota or elsewhere, or to 3M.  (ECF 47 at 6.)

Finally, 3M claims that "Defendants even bantered with their cohorts about how 'it's all about back in the old days when it [was] Minnesota Mining and Manufacturing'"—as if any person's mere invocation of the word "Minnesota" operates as a jurisdiction-creating talisman.  This stray comment, spoken by Tim Dupler—not Mr. Starsiak or AMK—is immaterial to any jurisdictional or preliminary injunction analysis. Moreover, Mr. Dupler was not authorized to act on behalf of AMK; he purported to represent 3M.  (Starsiak Dep. at 87:21-89:5.)[12]

## LEGAL ARGUMENT

## 3M CANNOT SHOW ENTITLEMENT TO A PRELIMINARY INJUNCTION AGAINST STARSIAK AND AMK.

### I.  Legal Standard for Preliminary Injunction

A preliminary injunction is an extraordinary remedy, and the movant bears the burden of establishing its propriety.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003); *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) ("The burden of proving that a preliminary injunction should be issued rests entirely with the movant.").

---

[12] On a few occasions, Mr. Dupler was referenced by AMK internally—not to 3M—as a "Logistics Manager" in order to explain his role in introducing allocations of 3M respirator products to AMK.  (Starsiak Dep. at 193:8-14.)  He was not, however, directly affiliated with AMK.  (*Id.*)

The court considers four factors in determining whether a preliminary injunction should issue: (1) the likelihood of the movant's ultimate success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between the harm alleged and the harm that the relief may cause the non-moving party; and (4) the public interest. *Dataphase Sys., Inc. v. C. L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). No single factor is determinative. *Id.* at 113. Instead, the court examines the particular circumstances of each case, noting that the primary question is whether the "balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.*

Before turning to the *Dataphase* inquiry, the court must first decide whether it has jurisdiction over this matter. *Mohamed v. Sessions*, Case No. 17-5331, 2017 WL 6021293, at *1 (D. Minn. Dec. 5, 2017) ("[I]f a court determines it lacks jurisdiction over the matter, it need not analyze the *Dataphase* factors."). 3M has addressed issues relating to both jurisdiction and preliminary injunction in its motion for preliminary injunction. Defendants have previously set forth their arguments with respect to personal jurisdiction in their Memorandum of Law in Support of Motion to Dismiss [ECF 29] and Supplemental Memorandum of Law in Support of Motion to Dismiss [ECF 47]. Defendants will respond to any additional 3M arguments concerning jurisdiction in their Reply Memorandum to be filed as agreed by the parties. As such, Defendants will not repeat here the arguments set forth in their jurisdictional motion. Defendants note, however, that in responding to 3M's motion for preliminary injunction, Defendants are not waiving any arguments related to jurisdiction, and incorporate them here.

## II.    A Preliminary Injunction is Not Appropriate.

3M urges the Court to grant its motion for a preliminary injunction "for the same reasons that it granted 3M's motion for temporary restraining order."  (3M Br. at 19.) 3M gave Defendants approximately 48 hours to respond to their TRO motion, necessitating a truncated opposition at that time.  On this basis, 3M contends the "record is unchallenged" but, in "an abundance of caution", it restates its arguments for injunctive relief.  This comment betrays a view of due process on the part of 3M that could be characterized as disregard, if not disrespect—whether it pertains to Defendants' right to be fairly heard in motion practice, or their constitutional right to due process in this Court's exercise of jurisdiction over them.  This is the first occasion on which Defendants have been permitted to sufficiently respond to 3M's request for injunctive relief.

A preliminary injunction is not warranted and this case should be dismissed for lack of personal jurisdiction.

### A.    Likelihood of Success on the Merits Factor

Starsiak and AMK do not contest the general validity of 3M's trademarks.[13] However, with one narrow exception discussed below, trademark law does not fit with the facts here, since this case does not involve any competitor attempting to "pass off" its own products as 3M products or otherwise misusing any trademark to do so.  It involves

---

[13] 3M's state law claims are coextensive with its federal claims and, as such, need not be examined independently.  *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 935 n.3 (8th Cir. 2003).

an attempted—but ultimately fruitless—facilitation of the purchase and sale of genuine 3M products.

### 1. The Attempted Resale of Genuine 3M Products is Not Trademark Infringement.

A fundamental principle of trademark law—neither discussed nor referenced by 3M—is that it does not prevent the sale of genuine goods bearing a true mark, even if the sale is not authorized by the mark owner. *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S. Ct. 350, 68 L.Ed. 731 (1924); *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001); *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 590 (5th Cir. 1993); *Polymer Technology Corp. v. Mimran*, 975 F.2d 58 (2d Cir. 1992); *NEC Elec. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir.), *cert. denied*, 484 U.S. 851, 108 S. Ct. 152, 98 L.Ed.2d 108 (1987); *Minnesota Mining and Mfg. Co. v. Rauh Rubber, Inc.*, 943 F. Supp. 1117, 1128 (D. Minn. 1996). As this Court observed in *Rauh Rubber*:

> The primary wrong a trademark action remedies is public confusion as to the true source of the goods; such confusion does not exist when a genuine product bearing a valid mark is sold. *Ford Motor Co. v. Cook*, 25 U.S.P.Q.2d 1050, 1054, 1992 WL 220614 (N.D. Ill. 1992). If the goods are genuine, defendant has the right to resell them and plaintiff is not protected by the trademark laws.

Under this "first sale" doctrine, the Lanham Act's trademark protections are exhausted after the trademark owner's first authorized sale of the product. *Davidoff*, 263 F.3d at 1302-03 (citations omitted). In addition, the Lanham Act "does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the

product." *Chanel, Inc. v. RealReal, Inc.*, ___ F. Supp. 3d ___, 2020 WL 1503422, *7 (S.D.N.Y. Mar. 30, 2020).

3M has no evidence—and evidence is what it needs, since it has the burden to demonstrate entitlement to a preliminary injunction remedy—that Starsiak or AMK actually facilitated the sale of *any* relevant products in this case. And even if 3M had that evidence, it would need to demonstrate Starsiak/AMK were intermediating something other than transactions in *genuine 3M products*. Specifically, 3M would need to show a material difference between its 3M respirators and the 3M respirators Starsiak/AMK did not sell—such as those products being "'seconds' of inferior quality" or "taint[ed] . . . by mishandling." *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1350 (8th Cir. 1987). This 3M has not done, and cannot do. Having failed to show any completed transactions—let alone a completed transaction involving a material difference between a transacted good and a genuine 3M respirator—3M cannot show likelihood of success on the merits.

### 2.     3M Cannot Show Likelihood of Success With Respect to the Star Brands Group Allegation.

Given the lack of any closed transactions, 3M's allegation concerning Star Brands Group is 3M's *only* material allegation related to alleged trademark infringement. 3M's claim is that "Defendants falsely represented themselves as affiliated, connected, and/or associated with 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators." (Compl. ¶ 92 (Second Claim for Relief).) This claim is legally and factually infirm, and cannot support issuance of a preliminary injunction.

First, as noted above, use of trademarks related to genuine goods does not constitute trademark infringement. *Henry*, 809 F.2d at 1350 (a "manufacturer cannot rescind its genuine trademark on its genuine goods, absent, for example, tainting of the product by mishandling.") There is no "false affiliation" under the first sale doctrine where genuine products are being offered for sale. Such products are necessarily sponsored by, affiliated with, or endorsed by their manufacturers.

Genuine goods may be involved in a trademark infringement case "if a likelihood exists of confusing *the public* with respect to either sponsorship and affiliation or responsibility for quality." *Graham Webb Int'l Ltd. P'ship v. Emporium Drug Mart, Inc.*, 916 F. Supp. 909, 915 (E.D. Ark. 1995) (citing additional authorities) (emphasis added). Generally speaking, the determination of a trademark infringement claim devolves into an inquiry into whether there was a "likelihood of confusion" on the part of *consumers*. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir. 1986) (emphasis added) (Lanham Act seeks to "protect two groups: consumers and registered trademark owners", and it protects consumer expectations by "making consumers confident that they can purchase brands without being confused or misled.") Satisfaction of the likelihood-of-confusion standard requires a probability of confusion, not a mere possibility. *Chanel, Inc.*, 2020 WL 1503422 at *7.

### a. Star Brands Group is not a consumer.

3M makes no claim, nor can it, that Star Brands Group was a consumer. To the contrary, Star Brands Group was a sophisticated *commercial supplier* of PPE to sophisticated commercial purchasers and end users. (Hise Decl. [ECF 16] at ¶ 2) ("Star

Brands is a supplier of PPE to companies, hospitals, and government entities.")  As such, 3M cannot show that Star Brands Group was even in the orbit of intended protection of trademark law so as to support a likelihood of success on the merits.  This circumstance distinguishes this matter from the cases upon which 3M relies.  *Cf.*, *e.g.*, *Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836 (D. Minn. 2010) (trademark infringement action between French sparkling wine manufacturer and Spanish sparkling wine manufacturer over champagne sold to general public); *Eniva Corp. v. Global Water Solutions, Inc.*, 440 F. Supp. 2d 1042 (D. Minn. 2006) (trademark infringement action brought by distributor and seller of VIBE liquid dietary supplement and bottled water against manufacturer and seller of AQUAVIBE bottled water sold to general public).

### b.    Star Brands Group is sophisticated.

Star Brands Group's unquestionable sophistication in the PPE arena as a supplier to other sophisticated purchasers militates against any finding of potential or actual confusion here.  *Sensient Tech. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 769 (8th Cir. 2010) (purchasers of flavor delivery product were sophisticated customers, which diminished likelihood of confusion); *Everest Capital Ltd. v. Everest Funds Mgmt.*, 393 F.3d 755, 761 (8th Cir. 2005) (affirming district court finding of no likelihood of confusion where prospective hedge fund investors were "financially sophisticated" and "unlikely to invest in Everest Capital's hedge funds without exercising substantial care."); *Cardiac Pacemakers, Inc. v. Coratomic, Inc.*, 535 F. Supp. 280, 286 (D. Minn. 1982) (it was "unlikely" that sophisticated purchasers of pacemakers would be deceived or confused, negating infringement or unfair competition claim).

Given Star Brands Group's sophistication, it is unlikely that it would have embarked on a large commercial transaction in 3M respirators without exercising substantial care. Indeed, its entire approach under the circumstances—researching AMK's background, probing into AMK's affiliation with 3M, and contacting 3M to report "suspicions"—reflects sophisticated purchaser conduct negating any likelihood of potential or actual confusion. The boilerplate legalese in Mr. Hise's Declaration that Mr. Hise was "actually confused" (Hise Decl. [ECF 16] at ¶ 7) is entitled to no weight under the circumstances. Indeed, despite this bare assertion, Mr. Hise immediately reported the alleged representations to 3M after they occurred, undermining any confusion claim. If there was any confusion, which is denied, it did not last long, since Mr. Hise felt compelled to record his phone conversation with AMK and quickly submit a report to 3M about it. (*See* Hise Decl., Ex. 1 [ECF 16-1] (reporting incident of "May 2020" on May 20, 2020).) Ultimately, since no transactions ever closed involving Mr. Hise or Star Brands Group (or anyone else), any alleged confusion did not result in any harm to either Star Brands Group or 3M.

### c.  Evidence of false affiliation is lacking.

In addition, the Star Brands Group false affiliation allegations are factually deficient, in that Mr. Hise's Declaration falsely asserts Mr. Starsiak claimed AMK to be a "an authorized 3M dealer". (*See* Hise Decl. [ECF 16] at ¶ 7 ("Mr. Starsiak claimed[ ] that AMK was an authorized 3M dealer.") This did not occur. The recorded and transcribed phone call involving Mr. Starsiak reflects Mr. Starsiak introducing himself to Mr. Hise for the first time on the call. (*See* Hise Decl., Ex. 2 [ECF 16-2] at 7-9

(Transcript Page 2:25-4:3).)  It was the first and last call Mr. Hise had with Mr. Starsiak. (Hise Decl. ¶ 12.)  Mr. Starsiak does *not* state during the call that AMK was a "3M authorized distributor" or "3M's number one sales team".  Instead, when Mr. Hise inquired about AMK's 3M affiliation, Mr. Starsiak asserted that AMK had "various distributors that we work with"—*not* that it was itself such a distributor.  (Hise Decl., Ex. 2 at 14 (Transcript Page 9:2-7).)[14]  This was true.  In addition, Mr. Starsiak disclosed during the Star Brands Group conference call that he had been in regular contact with 3M's Ivan Fong and Haley Schaffer—which was also true.  (*Id.* at 13 (Transcript Page 8:3-16).)[15]  Starsiak and AMK were doing what Haley Schaffer invited them to do— continuing their discussions with FEMA to attempt to source genuine 3M products. (Schaffer Decl. [ECF 13], Ex. 1 [ECF 13-1] at 3.)  Yet 3M is now suing Defendants for undertaking those very efforts.

3M has not succeeded in showing that AMK's sole contact with Star Brands Group indicates a likelihood of success on the merits of its trademark infringement claim. 3M cannot control an attempted resale of genuine 3M products.  Star Brands Group was

---

[14] 3M wrongly suggests fraudulent conduct on the grounds that, during the Star Brands Group call, Mr. Starsiak and AMK "hung up the phone" on Mr. Hise.  (Compl. ¶ 64; 3M Br. at 12.)  The facts do not fit 3M's narrative.  The transcript reflects that the conference call connection was lost, but that AMK was trying to reestablish it.  (Hise Decl., Ex. 2 at 19 (Transcript Page 14:1 ("They lost us.  ***He's trying to call me back.***")).)

[15] 3M makes much of Mr. Starsiak's spoken use of the word "regularly" in connection with his 3M contacts.  The fact is that, at the time of the Star Brands Group call, Mr. Starsiak *was* in regular contact with Mr. Fong and Ms. Schaffer.  A true statement does not support an allegation of false affiliation.

not a consumer, but a sophisticated commercial purchaser of PPE that quickly made a report to 3M about its allegations regarding AMK. Mr. Hise's Declaration is factually incorrect in its claim that Mr. Starsiak told him AMK was an "authorized 3M dealer", and is otherwise conclusory and unsupported by evidence. The Star Brands Group issue is 3M's only basis for alleged trademark infringement by false affiliation, and Mr. Hise's Declaration provides no foundation upon which to base a preliminary injunction with respect to this issue. 3M's motion for preliminary injunction should be denied.

**B.     Threat of Irreparable Harm Factor**

Contrary to 3M's claim (3M Br. at 37), this case hardly resembles a "textbook" irreparable harm case. As a matter of fact, there has been no harm to 3M at all. Without a finding of irreparable injury, a preliminary injunction should not be issued. *Randolph v. Rodgers*, 170 F.3d 850, 856 (8th Cir. 1999); *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987) (moving party's failure to show irreparable harm absent an injunction is sufficient to warrant denial of a request for preliminary injunctive relief). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Speculative injury is insufficient to justify a preliminary injunction. *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894-95 (8th Cir. 2013).

With respect to 3M's contention that a presumption of irreparable harm exists in trademark cases where a likelihood of success on the merits is demonstrated, the most recent Eighth Circuit authority indicates that "[i]t is unclear whether the traditional

presumption of irreparable harm in trademark cases has survived more recent Supreme Court opinions emphasizing the movant's burden to show that 'irreparable injury is *likely* in the absence of an injunction.'" *Phyllis Schlafly Revocable Trust v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (emphasis in original). Regardless of whether a presumption of irreparable harm exists in the trademark context, however, 3M cannot show irreparable harm.

As noted previously, 3M cannot demonstrate a likelihood of success on the merits of its trademark claims, since resale of genuine products—whether successful or unsuccessful—does not constitute trademark infringement. 3M argues that "Defendants' actions have been calculated to deceive consumers into believing that they and their scheme are affiliated with 3M and its goodwill." (3M Br. at 36.) As explained above, 3M's sole trademark infringement claim—Star Brands Group—is fundamentally flawed. The evidence behind Mr. Hise's Declaration contradicts his own averments regarding alleged false affiliation. Moreover, no consumers are involved. Star Brands Group, the only entity identified in connection with "Defendants' actions", is a commercial supplier (*i.e.*, reseller) of PPE. (3M Br. at 36.) 3M's irreparable harm cases are distinguishable for this key reason. *Cf. Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836 (D. Minn. 2011) (Buffalo Wild Wings franchisee continued to use trademarks after termination of franchise agreement and to hold itself out to and serve the *public* as a Buffalo Wild Wings restaurant); *Gold's Gym Licensing, LLC v. K-Pro Marketing Group, Inc.*, Case No. 09-CV-1211, 2009 WL 2253247 (D. Minn. Jul. 28, 2009) (Defendant using identical and nearly identical marks owned by Gold's Gym to

sell to the *public*, via its website, t-shirts, stickers, and decals bearing Gold's marks); *Advantus Capital Mgmt., Inc. v. Aetna, Inc.*, Case No. 06-CV-2855, 2006 WL 2916840 (D. Minn. Oct. 11, 2006) (plaintiff financial services provider selling financial products to employers and individuals entitled to preliminary injunction against health care services provider); *Bel Canto Design, Ltd. v. MSS HIFI*, Case No. 11-2126, 2011 WL 3798586 (D. Minn. Aug. 25, 2011) (TRO granted against former authorized dealer of audio equipment who sold plaintiff's products with counterfeit serial numbers).[16]

3M's brief also references "rigorous quality-control standards" to ensure quality, but presents no evidence that Starsiak or AMK ever sold, or contemplated selling, 3M respirators that were deficient in any regard, let alone "materially different" as required to except its claim from operation of the first sale doctrine. *Henry*, 809 F.2d at 1350. The two cases that 3M cites on the quality-control issue—*Sweetarts v. Sunline, Inc.*, 380 F.2d 923 (8th Cir. 1967) and *Munster Real Estate, LLC v. Webb Bus. Promotions, Inc.*, Case No. 18-2120, 2018 WL 5314951 (D. Minn. Oct. 26, 2018)—are inapposite, since they involve typical trademark infringement claims stemming from competing products, rather than any actual or potential resale of genuine products.

---

[16] The Court in *Bel Canto* based specific personal jurisdiction on defendant's former status as an authorized dealer for plaintiff Bel Canto, during which defendant purchased $50,000 in products from Bel Canto in Minnesota. The Court found this contact to be close enough in time to the sale of the counterfeit merchandise to justify the Court's exercise of personal jurisdiction over defendant. 2011 WL 3798586 at *4. There is no similar underlying contact between Defendants and Minnesota in this case, which additionally supports dismissal of this case for lack of personal jurisdiction. Defendants did not purchase any product from 3M in Minnesota or elsewhere.

Finally, 3M cannot demonstrate the loss of any goodwill, since the sole instance of challenged conduct involves Star Brands Group. Neither Starsiak nor AMK said they were affiliated with 3M. (Hise Decl., Ex. 2 at 14 (Transcript Page 9:2-7).) Star Brands Group knew AMK was not affiliated with 3M, was concerned about its bona fides, and made an immediate report to 3M about it. (Hise Decl., Ex. 1.) Defendants have affirmed that they are not presently engaged in any business related to 3M (Starsiak Decl. [ECF 30] at ¶ 15), and 3M has no evidence contradicting that assertion. This provides yet another reason to deny a preliminary injunction.

### C. Balance Between Harm Alleged and Harm Relief May Cause Non-Moving Party Factor

Balancing harm involves "assessing the harm the movant would suffer absent an injunction, as well as the harm other interested parties would experience if the injunction issued." *Pavek v. Simon*, ___ F. Supp. 3d ___, 2020 WL 3183249, *27 (D. Minn. Jun. 15, 2020). This requires the Court to "flexibly weigh the case's particular circumstances to determine whether . . . justice requires the court to intervene to preserve the status quo." *Id.* (citations and quotations omitted).

3M makes a conclusory assertion of "substantial hardship" but, as noted above, the only instance of alleged false affiliation 3M raises involves Star Brands Group. 3M has presented no other examples of potentially actionable claimed misconduct. As explained herein, Star Brands Group does not present a compelling case for a preliminary injunction. Moreover, Starsiak has informed the Court under oath that he is not

continuing in any efforts to transact in any 3M products—and 3M has no proof indicating otherwise. As such, a preliminary injunction is unnecessary.

With respect to the potential harm to Defendants, if this Court grants preliminary relief, it necessarily means that it rejected Defendants' motion to dismiss, which will effectively sound the death knell of Starsiak's business, because it cannot continue to fund litigation against 3M's nine-lawyer litigation team indefinitely. 3M, for its part, shows every inclination to aggressively litigate this matter to judgment if the Court allows it to do so. The balance of harms favors Defendants under the circumstances.

### D. Public Interest Factor

The public interest factor requires the Court to "consider the interest of the public when deciding whether a preliminary injunction should issue." *Pavek*, 2020 WL 3183249 at *27. The "public" has little interest in this matter, since there is no contention that Starsiak or AMK were marketing any products to the general public. The one and only instance of alleged infringement involved a business that was itself a sophisticated intermediary supplying PPE to customers who were, in turn, also sophisticated enterprises. 3M vaguely references a "new normal" and contends the public interest is promoted by "preventing customer confusion and infringement of trademarks." (3M Br. at 39-40.) But 3M cannot use the amorphous concept of a "new normal" to exempt itself from the requirements of trademark law. 3M has not demonstrated, and cannot demonstrate, the probability of consumer confusion—on the part of Star Brands Group or anyone else. Moreover, the first sale doctrine prevents any infringement claim barring evidence of a material difference between 3M goods and the transacted goods. No such

evidence exists. As noted, there were no transacted goods in the first instance, as Starsiak and AMK were unsuccessful in their venture. The "public interest" is better served by permitting potential and actual competition in the secondary marketplace for genuine products than by allowing trademark holders to control and extinguish that competition through litigation.

## CONCLUSION

This case presents a classic overreach and the telltale features of corporate bullying. As set forth in Defendants' motion to dismiss and above, there is no colorable case for jurisdiction in this forum—the state of 3M's headquarters. Moreover, as explained above, the case for a preliminary injunction as to false affiliation is weak at best. This case does not involve any probable or actual confusion, never mind *consumer* confusion. And ultimately, that is what a trademark infringement case is all about.

As part of its public-relations-by-litigation strategy, 3M self-righteously declares Defendants were trying to use 3M. The opposite is true. 3M's expenditure of vast sums to target a disabled veteran and his small business with respect to non-issues in an inappropriate forum suggests a corporate power play to try to use trademark law not as a shield, but as a sword to destroy free competition and chill action on the part of those considering it. Unfortunately, Defendants have become the vehicle for 3M to pursue this misguided anticompetitive effort.

Defendants respectfully request that the Court deny Plaintiff's motion and dismiss this case against Defendants for lack of personal jurisdiction.

Respectfully submitted,

**MEAGHER & GEER, P.L.L.P.**

Dated:  August 26, 2020                    By:  s/Robert W. Vaccaro
                                                Timothy R. Schupp (#130837)
                                                Robert W. Vaccaro (#0313750)
                                                33 South Sixth Street, Suite 4400
                                                Minneapolis, MN  55402
                                                Telephone:    (612) 338-0661
                                                Facsimile:    (612) 338-8384
                                                Email: tschupp@meagher.com
                                                        rvaccaro@meagher.com

                                                *Attorneys for Defendants Matthew*
                                                *Starsiak and AMK Energy Services*
                                                *LLC*