1     UNITED STATES DISTRICT COURT
          DISTRICT OF MINNESOTA

2

3   ------------------------------------------------------------
                                    )
    3M Company,                     )    File No. 20-cv-1314
4                                   )              (SRN/DTS)
            Plaintiff,              )
5                                   )
    vs.                             )    Saint Paul, Minnesota
6                                   )    September 9, 2020
    Matthew Starsiak, et al,        )    3:00 p.m.
7                                   )
            Defendants.             )    HEARING CONDUCTED VIA
8                                   )    ZOOM FOR GOVERNMENT
    ------------------------------------------------------------

9

        BEFORE THE HONORABLE SUSAN RICHARD NELSON
10            UNITED STATES DISTRICT COURT JUDGE
                   **(MOTIONS HEARING)**

11

    APPEARANCES
12    For the Plaintiff:          FAEGRE DRINKER BIDDLE & REATH
                                  JOHN W. URSU, ESQ.
13                                KERRY L. BUNDY, ESQ.
                                  JOSEPH M. PRICE, ESQ.
14                                PETER W. BALDWIN, ESQ.
                                  90 South Seventh Street
15                                Suite 2200
                                  Minneapolis, Minnesota
16                                55402-3901

17    For the Defendants:         MEAGHER & GEER, PLLP
                                  TIMOTHY R. SCHUPP, ESQ.
18                                ROBERT WILLIAM VACCARO, ESQ.
                                  33 South Sixth Street
19                                Suite 4400
                                  Minneapolis, Minnesota 55402
20

      Court Reporter:            CARLA R. BEBAULT, RMR, CRR, FCRR
21                               316 North Robert Street
                                 Suite 146 U.S. Courthouse
22                               Saint Paul, Minnesota 55101

23

        Proceedings recorded by mechanical stenography;
24    transcript produced by computer.

25

**P R O C E E D I N G S**

**VIA ZOOM FOR GOVERNMENT**

THE COURT:  Good afternoon, counsel.  All right.
We are here today in the matter of 3M Company versus Matthew
Starsiak, et al.  This is civil file number 20-1314.  Let's
begin by having counsel note your appearances and we'll
begin with the plaintiffs, please.

MR. URSU:  Sure.  This is John Ursu of Faegre
Drinker Biddle & Reath for Plaintiff 3M Company.

THE COURT:  Good afternoon.

MR. URSU:  Good afternoon, Your Honor.

(Crosstalk)

THE COURT:  All right, Ms. Bundy, go ahead.

MR. SCHUPP:  I'm sorry.

MS. BUNDY:  Thank you.  I was just going to add
Kerry Bundy also with Mr. Ursu.

THE COURT:  Very good.

MR. PRICE:  Joe Price, Your Honor.  Good to see
you again.

THE COURT:  Nice to see you, Mr. Price.

MR. BALDWIN:  And good afternoon, Your Honor.
Peter Baldwin also with Mr. Ursu on behalf of 3M.

THE COURT:  Very good.  Anybody else on the call
for the plaintiff?  All right.

1          And then for the defense, please.

2          MR. SCHUPP:  Good afternoon, Your Honor.  Sorry

3    for jumping in early.  Tim Schupp on behalf of Mr. Starsiak

4    and AMK, and Rob Vaccaro is in the room here, although not

5    on the camera.

6          THE COURT:  All right.  Very good.

7          We are here today to consider two motions.  The

8    motion to dismiss for lack of jurisdiction and motion for a

9    preliminary injunction.  I think it makes most sense to

10   begin with the motion to dismiss.  Mr. Schupp, Mr. Vaccaro,

11   whoever wishes to be heard.

12         MR. SCHUPP:  Thank you, Your Honor.  May it please

13   the Court, counsel:

14         Excuse my kind of angle on the Zoom, Your Honor,

15   but we had a blind that's broken in here and if we do it

16   straight at the camera it kind of is too glaring, so I've

17   got the camera set up kind of sideways and I apologize for

18   that.

19         THE COURT:  I can see and hear you very clearly.

20         MR. SCHUPP:  Okay.  Thank you.

21         In late April 2020, as the Court knows,

22   Mr. Starsiak, through his company AMK, was asked whether he

23   could help locate or source 3M masks for some government

24   entities and others that were needed due to the pandemic.

25   AMK got involved as a facilitator or a broker's

representative and never sought to buy or sell any products on its own behalf.

AMK went to 3M on two occasions for information and assistance, which 3M did not provide either time. After the second occasion, 3M representative Haley Schaffer told AMK that, quote, I suggest you continue your discussions with FEMA as they would be in a position to prioritize your request, which is what AMK did and then was sued by 3M for doing so.

3M alleges in paragraph 4 of their complaint that, quote, Defendants did walk away from their discussions with 3M with something they could use: the names of 3M lawyers they communicated with.

Now, the notion that Mr. Starsiak burrowed into 3M, as they said in their brief, to obtain names is frankly ridiculous. I did a Google search this morning and I input 3M Company's general counsel, and the first page I got ten listings for Ivan Fong, and that's just on the first page, including his LinkedIn address and a Wikipedia page about him that includes his photograph. And then there's also many prominent public mentions in SEC filings and the like relating to the 3M Company that talks about Ivan Fong. So this information is readily and easily available in the public and to ascribe nefarious motives other than exactly what Mr. Starsiak said he was contacting them for really

1    doesn't have any factual or common-sense approach.

2         THE COURT:  But, Mr. Schupp, that isn't the

3    question before the Court right now.  I mean, for now I will

4    take the facts of the complaint as true, and the real

5    question is whether there's been a prima facie showing under

6    the *Calder* effects test.  So let's focus on that.

7         MR. SCHUPP:  Well, okay, Your Honor.  I want to

8    first comment on exactly what it is that we have for

9    contacts with Minnesota aside from the *Calder* effects test,

10   and what we have is basically some e-mails, two telephone

11   calls on May 11th with Haley Schaffer and others, and a

12   voicemail message that was left with Mr. Motalebi when

13   Mr. Starsiak called him to try to get the names of 3M

14   distributors where he could purchase masks.

15        So turning to 3M's claim for specific personal

16   jurisdiction, it's the *Calder* case, and that's a 1984 case,

17   which was a libel case against the *National Enquirer*.  The

18   authors were in Florida and the target of the libelous

19   article lived in California.  *National Enquirer* had a

20   circulation of 600,000 in California, according to the

21   opinion.  And under those circumstances where the author

22   sourced material out of California, had the article

23   published in California and the people lived in California,

24   the Court found personal jurisdiction in that instance.  But

25   the Court should keep in mind, and I think the Court's

1   cognizant of the fact, that the *Calder* test is narrowly

2   construed and not broadly construed.

3           And I think if we turn to the *Walden versus Fiore*

4   case, which is a 2014 Supreme Court case we cited, I think

5   it's helpful in looking at the narrow effect of *Calder*.  And

6   if the Court sees at page 289, relying on *Calder*,

7   respondents emphasized that they suffered the, quote, injury

8   caused by petitioner's allegedly tortious conduct; i.e., the

9   delayed return of their gambling funds.

10          What happened was these people were travelling

11  from North Carolina to Nevada and their gambling funds were

12  retained by the authorities.  It was later returned to them,

13  and they then brought an action against the authorities who

14  had retained their money in Nevada, and the Court held that

15  there was no personal jurisdiction in Nevada under those

16  circumstances.

17          In any event, going back to the case, relying on

18  *Calder,* respondent emphasized that they suffered the injury

19  caused by petitioner's allegedly tortious conduct; i.e., the

20  delayed return of their gambling funds while they were

21  residents in the forum.  *Calder* made clear that mere injury

22  to a forum resident is not a sufficient connection to the

23  forum.  The proper question is not where the plaintiff

24  experienced a particular injury or effect, but whether the

25  defendant's conduct connects them to the forum in a

1   meaningful way.

2   And that's what's lacking in this particular case,

3   Your Honor, is the connection between their cause of action

4   and the forum state.

5   And before I discuss that connection, I just want

6   to bring to the Court's attention the *Bristol Myers Squibb*

7   case, which is a 2017 Supreme Court case, where the court

8   noted that specific jurisdiction is very different in

9   comparison to general jurisdiction.  In order for a state

10  court to exercise specific jurisdiction, the suit must arise

11  out of, or relate to, the defendant's contacts with the

12  forum.  In other words, there must be an affiliation between

13  the forum and the underlying controversy, principally an

14  activity or an occurrence that takes place in the forum

15  state and is therefore subject to the state's regulation.

16  So as we pointed out in our --

17  THE COURT:  Mr. Schupp, as you're aware -- I'm

18  sorry about this format.  It always feels like I'm

19  interrupting people, so I apologize for that.

20  MR. SCHUPP:  That's okay, Your Honor.  No worries.

21  THE COURT:  I've had occasion recently to take a

22  hard look at this whole question in the *Travel Leaders* case.

23  How do you distinguish the analysis I engaged in in that

24  case from this case?

25  MR. SCHUPP:  Since I'm not familiar with that

1    case, I can't tell you, Judge.

2              THE COURT:  All right.  That's fine.  Go ahead.

3              MR. SCHUPP:  Well, anyway, what I was going to say

4    is the colorable claim in this case that's been articulated

5    is one of false affiliation that occurred with Star Brands

6    in New York.  And the way that 3M ties that to the

7    jurisdiction is found at page 34 of their opposition where

8    they say as a matter of law in the Eighth Circuit, a party

9    whose trademark are infringed is harmed in its principal

10   place of business, and then cites the *Pangaea* and *Dakota*

11   *Industries* case, *Inc.*; and I would challenge that assertion,

12   Your Honor, as not being accurate at all, especially based

13   on the *Pangaea* and the *Dakota Industries* case.

14             The *Pangaea* case involved the Flying Burrito

15   Company in Arkansas who brought an infringement action

16   against a company in Ames, Iowa who had the identical name.

17   Representatives from that Iowa company had travelled down to

18   Arkansas one time to talk about the issue, and then they

19   were sued by *Pangaea* in District Court down in Arkansas, and

20   the Eighth Circuit upheld dismissal for lack of personal

21   jurisdiction, even though the alleged trademark infringement

22   occurred in Arkansas.  The Court found that the single

23   contact with the forum state and the fact that *Pangaea* was

24   located in Arkansas was insufficient to exercise personal

25   jurisdiction, which I would submit is exactly what we have

1    in this case.

2         We have a claim of false affiliation that occurred

3    in New York that they are trying to tie to Minnesota through

4    the conversations with the lawyers, and a couple of phone

5    calls and a number of e-mails which the courts in the cases

6    have always held is insufficient, in and of themselves, to

7    confer personal jurisdiction.

8         Then the Dakota Sportswear Company or *Dakota*

9    *Industries* case -- so *Pangaea* doesn't stand for the

10   proposition that as that matter of law the trademark is

11   infringed, they were harmed in the principal place of

12   business, because the Court declined jurisdiction.

13        In *Dakota Industries* the court said in trademark

14   infringement actions two circuits have stated that the claim

15   arises at the place of the passing off, which is where the

16   deceived customer buys the defendant's product in the belief

17   he's buying the plaintiff's.  So in this case it wouldn't be

18   passing off.  It would be false affiliation.  And the false

19   affiliation, of course, occurred in New York, not in

20   Minnesota.

21        The Court did go on to say that there was a

22   District Court in Illinois that found infringement of a

23   patent trademark or copyright takes place where the owner

24   suffers the damage, but that appears to be the minority

25   view.  And the Court said, We need not decide this issue

1    because in this case some of the sportswear garments were

2    passed off in the forum state and Dakota Industries has its

3    principal place of business in the forum state.

4         So *Dakota Industries* absolutely does not stand for

5    the proposition that as a matter of law in the Eighth

6    Circuit a party's whose trademark is infringed or harmed in

7    its principal place of business, the court simply did not

8    hold that and notes that the majority view is that the

9    infringement action takes place as the passing off, or in

10    this case the alleged false affiliation.  So I would submit

11    under their own authority that they cite and the facts as

12    they have laid them out that they haven't shown a prima

13    facie case and the jurisdiction is lacking in this case and

14    we respectfully request a dismissal, Your Honor.

15         THE COURT:  Thank you, Mr. Schupp.

16         Mr. Ursu.

17         MR. URSU:  Ms. Bundy will handle this part of the

18    argument for us.

19         THE COURT:  Okay.  Very good.  Sorry.

20         Ms. Bundy.

21         MS. BUNDY:  No problem.  Thank you, Your Honor.

22         So this is a case where defendants specifically

23    targeted 3M by reaching out under false pretenses to get

24    information about 3M's Minnesota-based lawyers and 3M's

25    Minnesota-based procurement process for N95 masks.  They

1     then used that exact information to falsely affiliate

2     themselves with 3M to potential purchasers such as Star

3     Brands.  That's a violation of the Lanham Act.

4          And these are the facts that existed at the time

5     of the TRO, and in your TRO order the Court found that

6     sufficient for establishing a prima facie case for

7     jurisdiction.  Those facts haven't changed, the standard

8     hasn't changed, and the result shouldn't change.

9          If we look -- because it's an intentional tort we

10    will be looking at, as the Court knows, the two tests.

11         THE COURT REPORTER:  I'm sorry.  I'm sorry to

12    interrupt but, Mr. Schupp, could I please have you mute?

13         THE COURT:  Mr. Schupp, you need to put yourself

14    on mute, please.

15         MR. SCHUPP:  Say again?

16         THE COURT:  Wait.  Hold on.  He's not on mute yet.

17    Maybe he is.  It's not appearing as muted.

18         Okay.  Go ahead, Ms. Bundy.  Sorry.

19         MS. BUNDY:  Sure.  So the facts under the

20    five-point test are easily met here.  Let's look first at

21    the nature and the quality of the context.  There are

22    meaningful contexts here of specific targeting.  Starsiak

23    wrote e-mails that he knew and authorized his lawyer to send

24    to 3M.  His lawyer contacts.  Those e-mails included

25    misrepresentations.

1    For instance, in docket 14 at 1, Mr. Fong's

2 exhibit, it shows the e-mail that he wrote knowing that it

3 would be entered and given to Mr. Fong.  It said that a

4 group had been getting the runaround with 3M escrow

5 attorneys.  There are no escrow attorneys, as Ms. Schaffer

6 set forth in her declaration at paragraph 11.

7    Additionally, Mr. Starsiak mentions to 3M that he

8 uses a Dentons attorney, but he needed someone better this

9 time.  But again we've learned, at Schaffer declaration

10 paragraph 13, that Dentons doesn't represent defendants.

11    And finally he mentioned that he was trying to

12 purchase 100 billion masks, but as we've seen in the record

13 there aren't 100 billion masks.

14    These communications not only were fraudulent but

15 they were direct communications that went with the forum

16 state with 3M, lawyers including at the highest level with

17 the general counsel.

18    We also heard Mr. Schupp talk about there were

19 additional context that we've learned through limited

20 discovery of talking to Mr. Motalebi.  We've heard that

21 during the same discussion or during the discussion that

22 Ms. Schaffer had with Mr. Starsiak and the defendants that

23 misrepresentations similar to those found in his e-mail that

24 was targeted to us were made.

25    Mr. Starsiak and his company were doing this for

1       two reasons.  They were inducing, attempting to induce

2       commercial activity in the forum.  He wanted to be able to

3       buy masks to sell to others and make the representation that

4       he was working with 3M.  Additionally, he wanted to get

5       contacts and information to perpetuate his scheme.

6               He, again, represented that he represented the

7       Gates Foundation or had an affiliation with them; and again,

8       the Gates Foundation has denied any affiliation.  So these

9       fraudulent contacts were not only meaningful, they were

10      persistent, looking at the second factor.

11              I think it's pretty much uncontested based on what

12      I've seen in the reply brief that there were approximately

13      30 contacts between 3M and Starsiak within a roughly

14      six-week period between April 23rd and June 4th.  Some of

15      these contacts were multiple -- by defendants were multiple

16      times a day.

17              Now, defendants argue that we can't use these

18      facts to support jurisdiction because there's just no

19      connection between this fraudulent conduct and the cause of

20      action and that's just purely wrong.  The claim here is

21      trademark infringement for false affiliation.  The contacts

22      are directly related to that cause of action.  Mr. Starsiak

23      is falsely suggesting to the public that he is affiliated

24      with 3M and in order for that claim by him to be plausible,

25      it has to sound legitimate.  He has to credibly pass himself

off as speaking for 3M or being a 3M distributor, and the
core contacts that we just discussed gave him the tools to
be able to do that.  And that's why that's so dangerous here
and why it's so harmful to 3M.

This is not a case where he's just out there
saying he represents 3M or is a 3M distributor.  He is
making specific representations about information he learned
and people he knew in order to plausibly pass himself off as
an affiliate of 3M.

We see this in Matt Hise's declaration that the
Court has previously referenced.  We see that with respect
to the five phone calls that were made.  And Mr. Hise's
declaration, by the way, an individual who was not deposed
in this case and therefore his -- and therefore his
testimony remains unrebutted, repeatedly said that he was
told that he was the number -- that defendant was the number
one sales team.  That he was an authorized distributor.

In the fraud report that Mr. Hise submitted to 3M,
at docket entry 16-1, Exhibit 1 to his declaration, you see
Mr. Hise memorializing what AMK told him about 3M's
processes.  Details about the client providing lot
information or LOI to AMK.  AMK would then be providing that
LOI to the 3M team.  AMK's lawyers would then be talking to
3M's lawyers and 3M would provide AMK a production timeline.

You see him saying in the transcribed discussion

1    that he talked to Mr. Fong and talked to Ms. Schaffer.  In

2    fact, he gives details that he wasn't talking exclusively to

3    Mr. Fong because Mr. Fong was in board meetings and

4    therefore that's why he brought in Ms. Schaffer.  This is

5    specific, intimate information that allows someone to be

6    different and stand out from the other fraud perpetrators

7    out there by showing specific facts that lead him to -- lead

8    him to deceive the public into believing that he is

9    affiliated with them.

10            With respect to these comments in the brief,

11   defendants state, Well, if there's 30 conducts [sic], some

12   of the comments made by my client cannot be considered false

13   affiliation because they have regular contacts.  As we just

14   discussed, there were a lot of other contacts and conduct

15   that Mr. Starsiak said.  However, that particular statement

16   is taken out of context.  If you look at the transcript, you

17   can see that in that transcript Star Brands is challenging

18   Mr. Starsiak's affiliation.  He's asking them tell us how

19   you are a legitimate distributor and Starsiak is bragging

20   that he's in regular contact to prove the affiliation.  What

21   he doesn't say is that the majority of those contacts are

22   him mining for information.

23            Since limited jurisdictional discovery occurred,

24   there are a few other items I want to bring to the Court's

25   attention to that support the direct relationship between

1    this fraudulent activity, on the one hand, of mining for

2    certain affiliates and contacts information in Minnesota,

3    with his false affiliation claims to the public.

4         Exhibit 28 to my declaration, Mr. Starsiak and the

5    defendants are talking about his connections with another

6    group of individuals and he's saying how he was doing a deal

7    with the Gates Foundation, which we know isn't true, and how

8    he, quote, went out of his way to get two 3M attorneys on

9    the phone.  That is not random and fortuitous.  That is

10   intentional.

11        Exhibit 25 shows Mr. Starsiak along with

12   Mr. Schuster, his lawyer friend, perpetuating the fraud in

13   mid-May of 2020 by telling a third party that Starsiak has

14   production contracts with 3 million [sic] to produce 1

15   billion a week of masks, again claiming another instance of

16   claiming a false affiliation.

17        Exhibit 26 again, Mr. Starsiak talking to a

18   different customer, not Star Brands, about the 3M process

19   for purchasing masks.

20        And finally, and this one is really critical,

21   especially given the procedural posture that we're at right

22   now, it's found in the affidavit at Exhibit 27.  These

23   documents include a Notice of Broker directly addressed to

24   Dorsey & Whitney in Minnesota.  Mr. Starsiak and AMK is

25   representing that he was a broker for the sale of 3M

1   respirators.  He's passing along a copy to someone else.

2            Now, defendants claim there's no evidence that

3   this was sent to Dorsey & Whitney, but curiously in the

4   reply brief they also don't say it was ever sent.  And given

5   the procedural posture here, if there is a factual dispute,

6   as the Court knows we must look at the facts most favorable

7   to 3M and resolve all conflicts in its favor.  And based on

8   that document alone, we're seeing a reach out to 3M -- to

9   someone other than 3M in Minnesota where he is falsely

10  affiliating himself with 3M.

11           Now, through this lens we think that the facts

12  easily establish specific jurisdiction to be consistent with

13  the notions of fair play and substantial justice.  Factors

14  four and five don't appear by defendants to be at issue, but

15  I do want to focus just on factor four for one minute

16  because I think it really is at the heart of not only my

17  motion but our motion for preliminary injunction, and that's

18  that Minnesota has an interest in protecting its residents

19  from fraudulent practices like we have here.

20           As we all know, we're in a time of pandemic and as

21  recently as this week there are news outlets, including the

22  *StarTribune*, that are reporting that N95 masks are in short

23  supply in Minnesota hospitals and across the country and

24  they are being rationed and nurses feel unsafe.  And that

25  the result of this is potentially, because of outward

1    effects of the gray market, including the market in which

2    defendants were playing, and the Court has the power here to

3    stop it.

4            So now let's turn to the effects test.  The

5    effects test merely bolsters the conclusion that the

6    defendants are subject to personal jurisdiction.  This is an

7    instance where we have conduct that is expressly and

8    uniquely aimed at the forum state.  We've talked about the

9    cluster of activities with respect to trying to procure

10   masks here, talking to 3M employees, sending a communication

11   to Dorsey & Whitney.  These and the falsity of those

12   representations, these alone meet the standard of uniquely

13   or expressly aimed at the forum state.

14           You could look at the *Oriental Trading* case that

15   we cite, as well as the *Finley* case we cite, which talk

16   about courts upholding a denial of a motion to dismiss and

17   exercising personal jurisdiction where fraudulent

18   communications are directed either at forum residents within

19   the forum.

20           Now, Mr. Schupp cites the *Walden v. Fiore* case.

21   Granted, that's a Supreme Court case, but it's also

22   completely different from the facts here.  It's true that

23   Walden narrows the *Calder* effects test, but the facts in

24   that case are very different.  The facts in that case

25   involve an out-of-state defendant who is being sued by a

Nevada resident for contacts that Nevada resident had while in Georgia.  So the only -- in that case the only contact with Nevada was the fact that the allegedly bad acts occurred in Georgia with a Nevada resident.  And that is clearly not what we have here.  Instead, as we've stalked about, we have all of the purposeful targeting into the forum state.

I think that the *Whaley* case in the Eighth Circuit that was recently decided, as well as the *Travel Leaders* case that the Court has recently did, talk about and are very analogous to the intentional and unique nature of the contacts and are good support for finding jurisdiction here under the *Calder* test.

The last part I'd say is I would just talk briefly about the harm.  Defendants want you to believe that there is no harm here because there's no consummated sale.  But the statute and the Lanham Act is clear that a violation can occur when an offer for sale or distribution is made.  And that's at 15 U.S.C. 1114, subdivision 1.

They cite to the *Cortec* case.  But again, the *Cortec* case is a different case than this case.  The *Cortec* case is your garden-variety product counterfeit case where there was no showing made of any nature, quality, or quantity activities occurring in the forum state.  Rather, they were merely selling infringing product and none of that

1    occurred in the forum state.  Again, not our case.  Here

2    it's a false affiliation that was made and was credible

3    based specifically on the false contacts and

4    misrepresentations that occurred in Minnesota.

5         Additionally, the harm in a trademark case is not

6    limited to diverted sales.  As I'm sure the Court knows,

7    cases in trademark infringement looking at preliminary

8    injunction context always talk about harm and harm is not

9    just to the consumer, it's to the trademark owner.  And we

10   cited the *Buffalo Wild Wings* case versus *Grand Cayman Equity*

11   from the District of Minnesota (2011) on that point.

12         The harm relating to false affiliation relates to

13   the harm to 3M goodwill and favorable reputation, and that

14   is harm that is affiliated with conduct and activities that

15   are not up to 3M standards like we see here.

16         There is proof again in the record that Starsiak

17   knew that the harm would occur here.  He had numerous

18   documents in his possession that he produced during limited

19   discovery that show him addressing purchase orders to 3M and

20   3M general counsel using Minnesota's address.  That's

21   Exhibit 15 of my declaration, as well as Exhibit 29.

22         Additionally, there is proof in the record, based

23   on the multiple e-mails, that he knew Ms. Schaffer who he

24   was talking to was located in Minnesota based on her

25   signature block.

1       Now, Mr. Schupp wants to talk to us about the

2  *Dakota Industries* case and the fact that perhaps we were a

3  little, I think he said, charitable with the way in which we

4  characterized this, and here is what I would say.  The

5  Eighth Circuit in the Dakota Industries case said there are

6  two ways that you can look at where harm is felt.  One might

7  be where the alleged infringing activity occurred and the

8  passing off occurred, but that's not what we have here.  The

9  other is where the economic injury occurred.  And what we're

10 saying is that looking at the *Dakota Industries* case, the

11 Eighth Circuit says that the economic injury is felt at the

12 principal place of business, which is here in Minnesota.

13      But again, this is not a case merely about where

14 harm is felt.  It is about targeting 3M within the State of

15 Minnesota, making false statements to obtain information and

16 identities, and then using that information to 3M's

17 detriment.  We believe that exercising jurisdiction under

18 these facts is consistent with the notions of fair play and

19 substantial justice.  Thank you.

20      THE COURT:  Mr. Schupp.

21      MR. SCHUPP:  Thank you, Your Honor.

22      I understand the Court has to accept the facts as

23 alleged as true, but if what they allege is not supported, I

24 don't think the Court has to do that.  So, for example, we

25 have a situation with respect to these procedures that

Ms. Bundy talked about that we talked about the letter of
interest, the proof of funds and the contact with the
lawyer.  If you look at the recording of the conversation
with Haley Schaffer, none of that information was provided
by 3M.  What happened was after Mr. Starsiak was provided
with Mr. Motalebi's name to contact to obtain the name of a
3M distributor, Mr. Motalebi never called him back.  So it's
not a conversation that he had with Mr. Motalebi.  He just
left a voicemail.

So AMK on its own got in contact with individuals
and groups who told AMK that they were affiliated with or
had connections with 3M distributors.  That included
individuals who have been identified as Tim Dupler, Kim
Shafer, Bionica, Chris Leestow and Redstone, and those are
the individuals that provided the information to AMK and
Mr. Starsiak about what 3M's procedures were.  And you can
see that in the e-mails between them that the source of the
information is not from 3M but it's from these other people
that represented to Mr. Starsiak that they had connections
with 3M distributors.  And Mr. Starsiak thought they did.
He was told these people had access to lots, not in a large
number, but lots of masks from FEMA.

Well, AMK never ultimately closed a transaction.
All that information came from these other individuals who
said that they have relationships with distributors and not

1    from 3M. So they can't use that, the familiarity with 3M

2    procedures and what he's talking about, as information that

3    he obtained from them.

4         And then I want to talk about this Exhibit 27

5    which is this thing that has a Dorsey broker position

6    information on it. We commented to this in our brief, but

7    you can see from the e-mail attached from Mr. Starsiak dated

8    May 14th that the notice of broker position was actually

9    sent to a Mr. Holden at the Gordon Rees law firm in

10   California. It wasn't sent to Dorsey & Whitney. And they

11   say, Well, maybe they haven't said it wasn't.

12        Well, what we have here is a draft, and you can

13   see it's a draft, it's not finished, and we have an e-mail

14   showing where it was sent and it was sent to Gordon Rees.

15   And then it was also sent to Robin Hariri (phonetic) by

16   Mr. Starsiak, who 3M says they had no connection with, but

17   he did.

18        So when they make all these allegations and say

19   all these things and say that the Court has to accept them

20   as true, the fact of the matter is they are contradicted by

21   the documents that they use to rely on in their claim.

22        The significance of the 30 contacts was for

23   jurisdictional purposes. They say, Look at all these

24   contacts for Minnesota. But for false affiliation they say

25   no, when he said he had regular contact with 3M, that's

1   false and misleading.  And our proposition is this:  That

2   you can't have it both ways.  You can't say for one purpose

3   that they had numerous contacts and for another purpose when

4   you said you had numerous contacts, you're lying about it.

5   They can't have it both ways.  That's the simple point of

6   that.

7          So really what we have is the phone calls, the

8   e-mails, and the voicemail message, and that's it.  And the

9   allegation of damage here, which in the *Dakota Industries*

10  case, the Eighth Circuit did not hold that the place that

11  the trademark infringement occurs is where the trademark

12  holder resides.  That's not a holding as represented.

13         And that's all I have, Your Honor.  Thank you.

14         THE COURT:  Thank you, Mr. Schupp.

15         The Court will take that motion under advisement

16  and we'll move ahead now to the motion for a preliminary

17  injunction; but before we do, Mr. Schupp, I have a question

18  for you.

19         First, you can assume that I will study this

20  carefully, but let's assume for a moment I ruled in 3M's

21  favor on the motion to dismiss and found that they had pled

22  a prima facie case of personal jurisdiction.  Is it true

23  that your client would contest the requested order from 3M

24  on a preliminary injunction?  It seems to me that the order

25  really -- the heart of the order is enclosed paragraphs (a)

and (b) under the order portion on page 4, and 3M is asking

for two things.  That the Court enjoin Mr. Starsiak during

the pendency of this action from using 3M marks and any

other word that's -- or symbol that's confusingly similar;

and secondly, that he not engage in false, misleading, or

deceptive conduct in connection with 3M.

So again, if there is personal jurisdiction here,

is Mr. Starsiak fighting that, or would he agree to the

entry of that preliminary injunction?

MR. SCHUPP:  I would have to discuss that with

him, Your Honor.  When I talked with 3M after the TRO and

asked about whether we could resolve this, 3M said they had

to do the discovery and move forward with this motion.  So

-- and I was a little surprised in their response that they

suggested that Mr. Starsiak shouldn't have fought this, but

when I raised that issue with them they insisted, so I'm a

little put off by the assertion by 3M in that regard.

I can't tell the Court one way or the other

without talking with Mr. Starsiak.  I know for a fact that

he would consider that to be an indictment that he had

engaged in such conduct, which he vehemently denies.  That's

all I know about that.

THE COURT:  Okay.  Well, just to be clear, this is

a preliminary injunction so the case would proceed --

MR. SCHUPP:  I understand, Your Honor.

1          THE COURT:  -- in the interim period if he would

2     be agreeable to these restrictions.  And it sounded during

3     the TRO hearing like he has no intention of doing any of

4     this.

5          MR. SCHUPP:  He's not and he has not.

6          THE COURT:  And he can continue to defend the case

7     going forward.  The question is whether he would just simply

8     agree to this preliminary injunction.  Well, I'll ask you,

9     Mr. Schupp, to have that conversation with him and get back

10    to the Court if you would.

11         MR. SCHUPP:  Certainly, Your Honor.

12         THE COURT:  All right.  In the meantime we'll

13    entertain the motion.  Mr. Ursu.

14         MR. URSU:  Certainly, and I can speak to that as

15    well.  I had the conversation with Mr. Schupp, and 3M would

16    readily agree to him stipulating to a preliminary

17    injunction.  I don't think that's at issue.

18         MR. SCHUPP:  That's not what you said before,

19    John.

20         MR. URSU:  So you and I have different memories of

21    that conversation, Tim.  But we did take the discovery and I

22    think it's been very helpful in helping to establish exactly

23    why it's important.

24         You know, ultimately the Court has already found

25    that a TRO under Rule 65 is appropriate and it's the same

1       standard now.  You know, in the end this is at the heart of

2       what the Lanham Act protects against and there is not a

3       serious contest that he did these things that we said that

4       he did.  And so what Rule 65 says in these circumstances is

5       where there's harm, potential harm to the public, where the

6       balance of harms weighs in favor of the movant, where

7       there's a threat of irreparable harm, and where the law

8       protects against it, and it looks like they did what they

9       did, a preliminary injunction should issue.  It's the same

10      standard that we dealt with before.

11           And it's, if anything, the passage of time and

12      this discovery has shown why it's so important.  N95

13      respirators are different than the surgical masks and the

14      different kinds of masks that we wear every day.  They are

15      basically a filter, a tight-fitting filter that you put on

16      our face; and as we all know, COVID moves through particles

17      so the virus attaches to particles, and those particles are

18      attached to, about 95 percent of them, to electrostatic

19      technology which is the same kind of technology that you

20      would find in high-end furnace filters.

21           3M can make about a billion of these a year.  It's

22      trying to up that number by one billion.  It's trying to

23      move further, and virtually all move through six

24      distribution channels, and 3M does not permit those

25      authorized distributors to work with brokers.

1          As you know, healthcare workers are on the front

2     lines of this.  The *StarTribune* just had a good article the

3     other day on how about 50 percent of them feel fear and they

4     should, because they are being forced to reuse these.  It's

5     very hard to get fresh N95 respirators, and at least

6     according to the most recent surveys about a thousand

7     healthcare workers have died, and certainly an important

8     cause of that is the lack of good PPE availability.

9          The pricing of these, 3M has agreed that it's not

10    going to change the pricing.  It's about a buck 27 to buy a

11    1860 N95 respirator.  And because of that, thousands upon

12    thousands of gray market people entered into the market

13    thinking that if they could get their hands on respirators,

14    they could sell them at what price the market would bear.

15    And as we've seen, that's sometimes three, four, five times

16    of what 3M is actually willing to sell them for, and then

17    pocket the difference.

18         And those are the allegations in this complaint

19    that that's what Mr. Starsiak did.  That he had in his hand

20    a letter of intent for a billion of these respirators.  It

21    would have netted him more than 2 billion dollars if he

22    would have been able to actually fulfill the order.  If he

23    talked his way into 3M to try to see if he could get to the

24    head of the line and then when that failed, he went out and

25    told people that he -- that 3M had hired him to vet buyers;

1    that he was 3M's -- he was a 3M-authorized distributor and

2    that he was part of 3M's number one sales team.

3         And I think the most telling part of these motion

4    papers are that because there was no discovery on the merits

5    and Matthew Hise, for instance, was not deposed, there's not

6    a serious contest as to that.  The Hise declaration states

7    that there were four or five different discussions with

8    between Star Brands Group and AMK.  The transcript supports

9    that, and his own contemporaneous fraud report to 3M

10   supports it as well.  And so he said there were multiple

11   conversations and that they were posing as 3M distributors.

12   That is what the Lanham Act protects against.  The Lanham

13   Act is designed to protect trademark holders from people

14   running around and saying that they are associated with --

15   with the trademark holder when they are not.

16        And in this particular case, we have the

17   additional overlay that 3M is the major provider of N95

18   respirators in the world; and because 3M provides the best

19   ones, most of them, and otherwise, that to be able to say

20   that you're affiliated with 3M is to be able to say that you

21   can do what the other distributors and other brokers can't,

22   which is that you can actually fulfill orders because

23   there's no question that there's enormous demand in the

24   marketplace.  The question is who has access to these

25   respirators, and virtually nobody does.

1          And so as procurement officials are besieged by

2     this type of fraudulent activity, what 3M has found is the

3     most important thing to protect against are people running

4     around and saying that they are affiliated with 3M.  To be

5     sure, it hurts our brand and it hurts our reputation, but

6     it's also a serious health risk out there in the world as

7     people try to get respirators.

8          I think that the Court's analysis for the

9     temporary retraining order was sound and it still holds

10    here.  It's the same standard and it's much of the same

11    evidence.  I will say that the evidence has only improved.

12    We now have more information about the number of different

13    commercial activities that Mr. Starsiak was engaged in.  We

14    now have more information about how he went out of his way

15    to get the 3M attorneys and get them through the loop.  We

16    now have more information that he himself knew that using

17    the Gates Foundation and other things to get into 3M was

18    fraudulent.  So we have more information about that,

19    including a whole slew of commercial transactions, but

20    really in the end the best to show, I think, that all of the

21    *SquirtCo* factors that the Court looked at before are equally

22    found here.

23          I do want to address just in the reply brief, I

24    think there was a run at Star Brands Group as being the

25    appropriate victim of a trademark case, or at least an

1   appropriate sort of target in terms of the confusion.

2   That's not supported by the law and if that were adopted by

3   the Court, it would run a giant hole in trademark law.

4       The idea was that you would just lie and falsely

5   affiliate with others, two intermediaries, and that was just

6   fine and there's no cases that say that.  And in fact the

7   Hise transcript, that would be Exhibit 2 to the Hise

8   declaration, is absolutely clear.  Eldene Her (phonetic),

9   she's on that call, she's working with Star Brands Group

10  says, Look, we have the buyers double-stacked.  But the

11  buyers are asking us, Can you tell us or can you prove to us

12  that what you have been telling us is true?  You're

13  affiliated with 3M.  Can you give us some piece of evidence

14  that substantiates this affiliation with 3M?  And of course

15  that's where they throw out Ivan Fong, that's where they

16  throw out Haley Schaffer, and that's, I think, where this

17  case gets appropriately brought in this particular venue.

18      So I don't think there's a serious contest on the

19  *SquirtCo* factors.  I don't think there's a serious contest

20  on things like irreparable harm.  And certainly the balance

21  of the harms, given the fact that Mr. Starsiak says he's

22  willing to stop doing this behavior, we're not familiar with

23  what that harm could be to Mr. Starsiak.

24      I see their briefing as reflecting exactly what

25  Mr. Schupp says, which is that Mr. Starsiak doesn't think he

1    did anything wrong.  And you'll note there was -- in the

2    Vaccaro declaration there was a bundle of letters of

3    reference of people who were saying basically Mr. Starsiak

4    was a good guy.  Those include at least one of the people

5    with whom he was engaging in what we think of as pretty

6    fraudulent activity during this period of time.  It's recent

7    and otherwise.  I think that the public interest is plainly

8    served by making sure that this type of activity stops.

9         I guess my final comment will be this was referred

10   to as a press, you know, release-based strategy or whatever.

11   Deterrence is an important part of, of course, these

12   lawsuits.  There are thousands upon thousands of complaints

13   that 3M has received and they have filed 18 lawsuits around

14   the country trying to make sure that this stops.

15        It is, I think, unquestionably, in the views of

16   law enforcement and others, a plague that is happening in a

17   terrible time and that at least for procurements officials,

18   interference with their ability to get important life-saving

19   equipment.  You know, I am a fan of vigorous advocacy and I

20   believe that Mr. Schupp and Mr. Vaccaro have done an A-plus

21   job with a pretty bad case.  The last thing in the world,

22   though, that anybody needs is a belief that somehow or

23   another that what 3M is doing is interfering with the kind

24   of buccaneering capitalism out there in the world as their

25   papers suggest.  This is about protecting access to

1    life-saving technology.  It's about protecting 3M Brand from

2    irreparable harm, and I don't see harm to Mr. Starsiak if

3    this were entered.

4            Those are my comments unless the Court has

5    questions.

6            THE COURT:  Thank you, Mr. Ursu.

7            Mr. Schupp, you may respond.

8            MR. SCHUPP:  Thank you, Your Honor.  I'd like to

9    talk about two issues, but first I just want to briefly

10   mention Star Brands.

11           First, Star Brands, I don't think Mr. Ursu meant

12   to characterize them as a victim in the sense that they

13   entered into any transaction that didn't turn out for them.

14   They immediately reported this to 3M, as they said, and made

15   a fraud report.  The problem is the report that 3M produced

16   in this case is heavily redacted, ostensibly on a claim of

17   privilege.  And since this is short discovery on

18   jurisdiction, we didn't have the opportunity to meet,

19   confer, bring a motion to compel, and test the privilege

20   claim they made.  But I would just note that large sections

21   of this fraud report we don't have available to us because

22   they have been covered up by 3M.

23           Then with respect to this transcript with

24   Mr. Starsiak, the transcript speaks for itself and I would

25   ask the Court review it carefully because all of these

1    things that they represent as said in that conversation

2    isn't in there.  So Mr. Starsiak never said he was

3    affiliated with 3M.  When they asked him what his

4    association is with 3M, whether he was a distributor, he

5    said -- I'm not going to quote this quite right -- but he

6    said, No, but we're in contact with distributors.  He didn't

7    represent that he was a distributor, and he just said that

8    he was in contact with distributors.  And he thought that

9    they were.  That Dupler and Redstone and Bionica and Kim

10   Shafer had all told him that they were 3M distributors or in

11   connection with distributors, and that's what he thought he

12   was dealing with after his efforts to get distributor names

13   from 3M from Mr. Motalebi failed.

14          So with respect to Star Brands, that's their only

15   claim and they have to show that they have a likelihood of

16   success on the merits as to Star Brands.  And for the

17   reasons we said in our brief, I don't think that they are

18   going to succeed on the merits.  They were not a consumer;

19   they are sophisticated; the evidence of false affiliation is

20   lacking; and there's no irreparable harm to 3M in this case.

21          I don't have anything to add other than what we

22   said in our brief and I just don't think this is a case that

23   warrants a preliminary injunction and I don't think this is

24   a case that should stay in this Court.  I think it should be

25   dismissed for lack of personal jurisdiction and that should

1  be the end of it.

2  Thank you, Your Honor.

3  THE COURT:  Thank you, Mr. Schupp.

4  Mr. Ursu, you may respond.

5  MR. URSU:  I'll just note that the work product

6  that was redacted from Mr. Hise's fraud report is internal

7  3M chatter around the report.  It's not Mr. Hise's report.

8  They have his report in the form that he gave it.

9  Mr. Hise is clear, again, there are multiple phone

10  calls, of which he recorded the last one because he was

11  afraid, and that in several of these phone calls that

12  Mr. Starsiak referred to himself as a 3M distributor and

13  that they were part of the 3M number one sales team.  That's

14  not recorded in that call.  I want to be clear about that.

15  But that is what he said and it's also in the fraud report

16  saying that they were posing as 3M distributors.  So

17  that's -- I have not heard any contest that that's squarely

18  in the bull's-eye that that is what the Lanham Act is trying

19  to protect.

20  Mr. Schupp said that evidence of false affiliation

21  is lacking.  I would note that given that Mr. Hise was never

22  deposed and that his declaration and his fraud report and

23  that transcript are effectively uncontested, I would say

24  that evidence of false affiliation is uncontested.  There is

25  no -- it's before the Court and there's plenty of good

1   reason, given the cluster of false affiliation that sort of

2   follows Mr. Starsiak around, we believe he is falsely

3   affiliating himself with 3M.  He falsely affiliated himself

4   with the Gates Foundation.  He falsely affiliated himself

5   with 5th Avenue.  He falsely affiliated himself with the

6   Dentens law firm, and at least in this environment, it's

7   certainly not surprising that he falsely affiliated himself

8   with 3M.

9         So we do think that what he did is wrong and we

10  think that a court order is the way to make sure that it

11  stops.  Thank you.  That's my response.

12        THE COURT:  All right.  I will take both motions

13  under advisement.

14        Mr. Schupp, I would ask you, though, to talk to

15  Mr. Starsiak to see whether it's necessary for me to rule on

16  the preliminary injunction motion if I do determine that I

17  have personal jurisdiction, but rather to get to discovery

18  and he can defend his actions in the lawsuit.  So if you

19  could get back to me in the next ten days, I would

20  appreciate it.

21        MR. SCHUPP:  How would you like me to do that,

22  Your Honor?

23        THE COURT:  I think you could simply do it by

24  sending the Court a letter.

25        MR. SCHUPP:  Okay.

```
1              THE COURT:  Okay?

2              MR. SCHUPP:  Do you want me to copy the other side

3     in on it or should I just send it to you?

4              THE COURT:  Oh yes, of course.  Copy the other

5     side, yes, please.

6              Yes, Mr. Ursu.

7              MR. URSU:  May I raise just a housekeeping matter?

8              THE COURT:  Of course.

9              MR. URSU:  I believe that the temporary

10    restraining order that the Court entered expires on its

11    terms today at this hearing.  My sense is that while the

12    Court has this matter under advisement, it would be

13    appropriate to continue the status quo, so that would be our

14    request.

15             THE COURT:  Yes.  I will continue the -- in fact,

16    I'll make sure that an order goes out today continuing the

17    temporary restraining order until the Court has an

18    opportunity to rule.

19             MR. URSU:  Thank you, Your Honor.

20             THE COURT:  Very good.  All right.  Anything

21    further, gentlemen?  And Ms. Bundy, sorry.

22             MR. SCHUPP:  No, Your Honor.

23             THE COURT:  Court is adjourned.

24             MR. URSU:  Thank you, Your Honor.

25             MR. SCHUPP:  Thank you, Your Honor.
```

1          (Court adjourned at 3:57 p.m.)

2                    *      *      *

3

4          I, Carla R. Bebault, certify that the foregoing is

5     a correct transcript from the record of proceedings in the

6     above-entitled matter.

7

8

9          Certified by:   s/Carla R. Bebault
                            Carla Bebault, RMR, CRR, FCRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25